```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3   ODIS JONES,                        ) AU:20-CV-01210-ML
                                        )
 4       Plaintiff,                     )
                                        )
 5   v.                                 ) AUSTIN, TEXAS
                                        )
 6   CITY OF HUTTO,                     )
                                        )
 7       Defendant.                     ) FEBRUARY 23, 2023

 8            *********************************************
                TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
 9              BEFORE THE HONORABLE MARK LANE
              *********************************************
10

11   APPEARANCES:

12   FOR THE PLAINTIFF:    HOLT MAJOR LACKEY
                           MADISON CHILTON
13                         ELLWANGER LAW LLP
                           8310-1 NORTH CAPITAL OF TEXAS HIGHWAY,
14                         SUITE 190
                           AUSTIN, TEXAS 78731
15
     FOR THE DEFENDANT:    GEORGE EDWARD HYDE
16                         HYDE KELLEY LLP
                           2806 FLINTROCK TRACE, SUITE A104
17                         AUSTIN, TEXAS 78738

18   TRANSCRIBER:          ARLINDA RODRIGUEZ, CSR
                           501 WEST 5TH STREET, SUITE 4152
19                         AUSTIN, TEXAS 78701
                           (512) 391-8791
20

21

22

23

24   Proceedings recorded by electronic sound recording, transcript

25   produced by computer.
```

1        (Proceedings began at 2:20 p.m.)

2            THE CLERK:  The Court calls the following for a final

3    pretrial conference: 1:20-CV-1210, *Odis Jones v. City of Hutto*.

4            THE COURT:  Good afternoon, you-all.  Let's start

5    with announcements.  Tell me who you are and who you represent.

6    Even though I know the answer, I just want it on the record.

7            MR. LACKEY:  Holt Lackey, representing Plaintiff Odis

8    Jones.  Also present is my associate Madison Chilton and our

9    paralegal Geoffrey Guerrero.

10           THE COURT:  All right.  Well, welcome everyone.

11           MR. HYDE:  Good afternoon, Your Honor.  George Hyde

12   with Hyde Kelly for City of Hutto, together with my paralegal,

13   Lauren Fogerty.

14           THE COURT:  In other words, the person that does all

15   the work?

16           MR. HYDE:  Yes.  The one that makes me look good.

17   Yes, sir.

18           THE COURT:  Yes.  Yes.  I'm very familiar with that.

19   Well, welcome to you as well.

20           Okay.  As you-all may recall, last week we got

21   together.  I did it for really maybe three reasons.  Number

22   one -- well, before I get into that, give me a second just to

23   get my ducks in a row here.

24           Okay.  I did it for -- I had our -- our get-together

25   last week for really three reasons.  The first was I -- as I

1  wrestled with the summary judgment motions, there were -- and I

2  think I shared this with you last week -- it was a challenge

3  for me to see which ones were matters of law, which ones were

4  matter of fact, which ones were mixed, which ones did the

5  parties agree on.  And you-all were kind enough to do that and

6  give me a nice chart that I still have and utilize for that

7  purpose.  I have it right here.

8       But that allowed me then to really share with you

9  something I wanted to do in advance of the trial rather than

10  just dump it on you right before the trial, and that is that I

11  believe the contract is not void, not voidable.  I respect the

12  City of Hutto's position to the contrary, and I'm sure my paper

13  will be graded at a subsequent date one way or the other.  And

14  that's okay.  So -- and that was really the second reason, was

15  to share that part of this analysis with you.

16       The third, quite frankly, was more subjective.  I

17  tried to scare you guys a little bit, because I have -- you

18  know, as a magistrate judge, we don't get to try as many cases

19  as we would like.  But this trial next week is really one -- is

20  the first time I've tried one where I'm really having in my own

21  mind sharp contest on why we're doing it.  And, frankly, I -- I

22  think -- I honestly believe this, that there are reasons that

23  both sides should have talked and -- but having made that

24  effort and, as I understand it, the City of Hutto is pretty

25  strong in not wanting to settle pretrial or pre-jury verdict, I

1  respect that principle as well.  I -- there's something to be

2  said for that.

3            So I'm okay with that.  I'm okay with this trial next

4  week, so I'm not really here to try to scare you anymore.

5  We're going to have our trial, and I'm going to try to the best

6  I can, as I know you-all will.  But be careful what you ask

7  for.

8            MR. HYDE:  Your Honor, if I may?

9            THE COURT:  Yeah.

10           MR. HYDE:  Probably within the last two hours, I

11 filed a motion with regard to the pretrial.  I have a copy and

12 some materials I can send to the Court.

13           THE COURT:  Was that what you gave me, Adam?

14           THE CLERK:  Yes, sir.

15           THE COURT:  All right.  Yeah.  I haven't read it.

16           MR. HYDE:  And there are two items in that that I

17 think, if we address them up front, would likely be beneficial

18 in that they may be dispositive, Your Honor.

19           THE COURT:  Okay.  Well, let's -- let's plow the

20 ground I was prepared to plow, and then we'll talk about this.

21           MR. HYDE:  Yes, Your Honor.

22           THE COURT:  So I've got a panel coming in that will

23 be here on Monday, and I want to go through with you a little

24 bit about voir dire.  But before I do that, Mr. -- Mr. Lackey,

25 which lawyers -- because the -- the docket has got a lot of

1  lawyers listed.  Which lawyers can I expect to be trying the

2  case?

3            MR. LACKEY:  Ms. Chilton and myself.

4            THE COURT:  Okay.  And then same for you, Mr. Hyde?

5            MR. HYDE:  Yes, Your Honor.  It will be myself.

6            THE COURT:  Okay.  Thank you, gentlemen.

7            MR. HYDE:  They're ganging up on me.

8            THE COURT:  All right.  No.  They are.  I used to

9  like it when they did that, though, and say it's just little

10 old me.

11           Okay.  We're going to -- our start time is going to

12 be 8:30 every day.  On Monday between 8:30 and nine o'clock I

13 want to talk about final matters with the lawyers.  The panel

14 will be assembled in here at nine o'clock.  Voir dire will

15 begin at nine o'clock.  I want to give each of you 20 minutes

16 for voir dire.

17           The reason I'm going to do that is partially selfish.

18 I'm going to ask what I call are the judge questions, which are

19 the boring questions, frankly, that really don't help too much

20 with exercising peremptory strikes.  And I'm going to try --

21 I'm going to go through the questions that you-all had

22 submitted, and I'll try to ask the ones that I think are

23 salient.  But some questions are better asked by you-all.

24           So I don't have any problems with the questions

25 you've posed.  But if I don't ask the question that you wanted,

1  that's your responsibility during the 20 minutes that I'm going

2  to give to you.

3          There will be three strikes per side, obviously.  And

4  I'm -- other things to talk about.  I want to finish voir dire,

5  swearing in the jury, and preliminary instructions before

6  lunch.  We'll have opening statements after lunch.  I was

7  thinking 20 minutes for opening statements.  Is that

8  acceptable, you-all?

9          MR. LACKEY:  Yes, Judge.

10          MR. HYDE:  Yes, Your Honor.

11          THE COURT:  Okay.  And then the workday's basically

12  going to be 8:30 to 4:30 to 5:00.  We've got a child care

13  issue.  I don't, but somebody does that may necessitate

14  breaking at 4:30 on days.  But you guys have been through this.

15  If a witness is going to take another 10 minutes, we're going

16  to go another 10 minutes.  So a little fluid.  I just wanted to

17  share those are the generalities with you.  I'll try to give

18  you time for lunch.

19          We're going to seat eight jurors.  Eight jurors.  And

20  my preference for voir dire, what we'll have is one will be

21  over there in the pews to 10.  Then 11, 20, and then whatever

22  else we've got in the back.  And my preference is we start with

23  a strike zone of 14: your three, your three, and eight for 14.

24          If a challenge for cause is made before you guys are

25  exercising your peremptory strikes, that will bump the strike

 1  zone up one.  So let's say Juror Number 8 is struck for cause,

 2  well, now your strike zone is 15.  I'm telling you that because

 3  during your 20 minutes -- and I may even mention this to the

 4  panel -- if I was in your shoes, my emphasis would be on the

 5  first 14 or maybe 16 or 17, just in an abundance of caution

 6  depending on whether or not challenges for cause are granted.

 7           So I wanted to share that with you.

 8           Let's see.  What else?  My understanding is you guys

 9  are smartly going to work with some of the tech issues after

10  our hearing today.  I've got nods.  Okay, good.  I think that's

11  brilliant.

12           You know, you-all have both told me that the trial

13  will take two and a half days, and I take you at your word.  I

14  think there's some -- we have some meddlesome things to talk

15  about today, though, that may make it go a little longer than

16  that.  So what I'm going to tell the panel is be prepared for

17  four days, just depending on how things go.

18           And I'm telling you that -- do I need to put you guys

19  on a clock or come up with time limits?  Or, I mean, if ...

20           MR. LACKEY:  Your Honor, I think in our pretrial

21  filings, we estimate our case in chief would take two days.  I

22  think that it's going to come to about 12 hours, but I think

23  that we can manage coming in at or under that.

24           THE COURT:  Twelve hours --

25           MR. LACKEY:  Well --

```
1              THE COURT:  -- testimony.

2              MR. LACKEY:  -- I mean in total.

3              THE COURT:  I think that's 12 total.

4              MR. LACKEY:  Okay.

5              THE COURT:  Because you've got to remember we're

6    looking at two and a half hours in the morning, two and a half,

7    that's five.

8              MR. LACKEY:  Okay.

9              THE CLERK:  Anyways --

10             MR. LACKEY:  I think I wasn't calculating the 4:30.

11             THE COURT:  What do you think, Mr. Hyde?

12             MR. HYDE:  Your Honor, I thought that they would

13   likely take two days, and we would maybe take a day and a half

14   if necessary.

15             THE COURT:  Yeah.  We're to Thursday before I even

16   turn around.  So -- okay.  Here's what I'm going to do, and

17   don't make me regret this.  I'm not putting you on a clock.  I

18   hate doing it.  I didn't like it -- I didn't have to do it that

19   much when I was a prosecutor, but I didn't like it.  So I'm not

20   going to do it to you, but please don't waste my time.  And,

21   frankly, don't worry about me too much.  Don't waste -- as

22   you'll, find I'm a big defender of jury time.

23             You know, so, for instance, if we're in the course of

24   something and you're, like, Judge, may we approach the bench?

25   I'm going to be, like, Do we really have to?  And then we do,
```

1   and it's, like, Judge, we have to do all this and send the jury

2   out.  I do not want to send the jury out.  So I'm going to --

3   to the extent we get some thorny issues, I'd rather work

4   through lunch or work after the jury is released at the end of

5   the day to resolve those issues so we're not wasting their

6   time.  So, just to sum up, I'm not going to put you on a clock,

7   but please don't make me regret that.

8            Okay.  Couple of things I want to talk about, and

9   then I'll talk about what you-all want to talk about.  The

10  statement of claims I think needs some adjustment.  Let me

11  start with -- I'm going to start with the Plaintiff's statement

12  of claims, which is Exhibit 2 to their Document 86.  The very

13  last sentence, you know, I granted the defense summary judgment

14  request as it related to the conspiracy, but that doesn't mean

15  that those -- that evidence isn't coming in as evidence of

16  breach.  I anticipate that's what's going to happen.  I'm just

17  not sure.  Either that sentence has to be rephrased, or I'm

18  going to strike it.

19           MR. LACKEY:  I agree with Your Honor's summation of

20  the issue.  The -- I think that's no longer a statement of our

21  claims.  That may be evidence that still comes in.

22           THE COURT:  Right.

23           MR. LACKEY:  But we should strike that last sentence.

24           THE COURT:  All right.  So, just to be clear, when

25  you stand up in front of the jury and read this, you're going

1   to read everything except that last sentence.

2          MR. LACKEY:  Yes, Your Honor.

3          THE COURT:  Okay.  Similarly, turning to Defense'

4   statement of defenses, which is Exhibit B to document 87,

5   Mr. Hyde, again, I know it will be over your objection, but I

6   propose that that very first sentence, that a period be placed

7   after the word "money."  It's on the third line.  And that

8   everything thereafter, beginning with the word "because,"

9   "because the agreement" to the word "void" be struck.  As well

10  as the next sentence that says, "These contracts were not

11  entered into in accordance with the applicable law," because

12  I've made the legal ruling on that.  You've preserved your

13  error there.  I think you're good.

14          So, with your permission, sir, I propose those

15  redactions.

16          MR. HYDE:  Yeah.  To the word "void?"

17          THE COURT:  Yes.  So, in other words, it will start

18  with the word "Defendants will show," and then it will conclude

19  with, "to try to recover the money," period.  And then strike

20  "Because the agreement along with numerous others were void,

21  those contracts were not entered into in accordance with the

22  applicable law, so the city council declared them void," all of

23  that be struck.

24          MR. HYDE:  Yes, Your Honor.

25          THE COURT:  Okay.  And then my question for you,

 1  Mr. Hyde, as it relates to the remaining statement is that last

 2  sentence.  I know what you're -- you're doing there.  I just --

 3  I'm okay with you maybe coming up with another sentence, but

 4  it's got some of the same problems, "because the contracts were

 5  illegal," just -- it either needs to be struck, frankly, or

 6  reworked.

 7           MR. HYDE:  I understand, Your Honor.

 8           THE COURT:  Okay.

 9           MR. HYDE:  We'll do that.

10           THE COURT:  Okay.  Okay.  Ms. Deichert, my courtroom

11  deputy, has asked me to remind you to have all electronic

12  exhibits submitted by noon tomorrow.  Noon tomorrow.

13           I propose reading your joint stipulation immediately

14  after your opening statements, if that's acceptable to you-all.

15  Okay.  And I want to thank you for -- I know this has been

16  contentious, but I appreciate the fact that you-all were at

17  least able to get together and give me that, as well as your

18  jury instructions.  And whoever's got the Word version of that,

19  if you could send it to Mr. Goodrum, my law clerk, he'll begin

20  to tinker with that, if it needs a lot of tinkering.

21           Which brings us to my least favorite part of our

22  gathering, which is the motions in limine.  So let me get that

23  together here.  Bear with me.

24           Okay.  I'm taking up first Plaintiff Odis Jones'

25  motions in limine, and the defendant's objections thereto.

1  I've read them.  I have some ideas.  But, Mr. Hyde, I'll let

2  you speak to the objections.  Let's start with -- to numbers 1

3  and 2.

4          MR. HYDE:  Thank you, Your Honor.

5          THE COURT:  Sure.

6          MR. HYDE:  In a case where there is a -- a state of

7  mind that is being put at issue, such as here where it's

8  whether or not somebody had some type of animus towards black

9  individuals that was used to decide the resolution, that really

10 doesn't have anything to do with fact.  What I mean by true

11 fact, it has to do with what the person knew at the time they

12 made the decision.  If they believed that, you know, I was

13 Superman and they took -- made a decision because of that

14 belief, even though I'm not Superman, that was still a factor

15 in what they made their decision in.

16          And I've had this issue and this discussion all the

17 way back in 2001 when I was before a magistrate in San Antonio

18 on a decision under 143.  And it didn't matter whether or not

19 the person was or was not -- had a criminal background.  It was

20 whether or not the person making the decision in that

21 employment situation believed they had a criminal background

22 and if that influenced their decision in making the selection.

23 And that's the same thing here.

24          So it's our position, Your Honor, that both are true,

25 as well as information which may or may not be true which

1  doesn't have to be asserted for the truth of the matter, still

2  comes in, because that's what the person was thinking at the

3  time, and that's what they knew at the time they made that

4  decision.

5           THE COURT:  Well, I may butcher it a little bit, but

6  that is still against the backdrop of probative value cannot be

7  substantially outweighed by the prejudicial effect, right?

8           MR. HYDE:  Correct, Your Honor.

9           THE COURT:  What bodies of -- well, just thinking

10 ahead to our trial, what -- what are we talking about?  Give me

11 an example.

12          MR. HYDE:  You know, if Mr. Snyder's called and they

13 take the stand, and they ask him bluntly, did race have

14 anything to do with your decision?

15          THE COURT:  He's going to say no.

16          MR. HYDE:  Right.  And they'll ask whether other

17 things that are -- that are circumstantial that may try to move

18 into an impression that race was a question in his mind.

19          All of those, the -- and whether or not that was --

20 that's a bad example.  I apologize, Your Honor.

21          THE COURT:  No.  It's actually okay, because I think

22 that is how it's going to go down.  And then it's going to be,

23 Well, then what were your motivating factors?  And he's going

24 to say what?  And the reason -- I'm not trying to be coy here.

25 I haven't read his deposition.

1          MR. HYDE:  Right.

2          THE COURT:  So there's got to be -- what is he going

3    to say?

4          MR. HYDE:  He's going to say that the independent

5    third-party auditor who came in and identified Mr. Jones'

6    contract, along with like 15 others that were not properly

7    approved or authorized, was a basis that he used, because that

8    was available to -- to the council right before this -- this --

9    the resolution was made, was voted on.

10         THE COURT:  Okay.

11         MR. HYDE:  He'll say that he took advice from the

12   city attorney with regards to the legal issues associated with

13   the contract and believed that -- that that contract was -- was

14   invalid.

15         THE COURT:  So we're going into impeaching evidence

16   about the contract that I've declared as valid as a matter of

17   law?

18         MR. HYDE:  I mean, we -- if those are the questions

19   that they believed back in December of 2020, I think that

20   they're entitled to make those comments.  And even though they

21   may be different than what the Court ultimately ruled in 2023,

22   that doesn't change what they believed in 2020.

23         THE COURT:  Okay.  Anything else that -- what else is

24   he going to say was motivating?  "I didn't do it because he was

25   a black man.  I did it because of this audit," you mentioned.

1          MR. HYDE:  Right.  I would anticipate that the

2    testimony would show that there had been a number of instances

3    with regards to Mr. Jones's work as the city manager which were

4    being corrected because, right before COVID, the City was

5    essentially out of money.  They laid off 44 people.  They --

6    and all of these things were because of -- and, in my client's

7    opinion, were because of mismanagement of the funds and not

8    working through council to execute expenditures is what led to

9    that issue.

10          THE COURT:  But weren't all of those considerations

11    that the City of Hutto should have considered before they

12    entered into the separation agreement with the nondisparaging

13    clauses and those things of that nature?  Why did the City get

14    to take another cut at it?  In other words, if he was a bad

15    city manager, then they shouldn't have entered into the

16    separation agreement.  If he -- if -- if these -- and a

17    digression here -- well, I don't want to go there.

18          MR. HYDE:  And, Your Honor, to answer your question,

19    "if I only knew then what I know now," is that perhaps in

20    December, a year before this December, there was certain facts

21    and beliefs.  And that's why issues like equitable estoppel and

22    some of the defenses we have are in place, is that, you know,

23    for -- for -- as a summary, you know, if they were duped into

24    believing a certain set of facts and then they find out later

25    on that there are different facts, then they can come to a

1  different opinion in December of 2020.

2          THE COURT:  But here's my question for you:  To the

3  extent -- I mean, clearly, there was a separation agreement

4  reached, because the relationship between Jones and the City of

5  Hutto had fractured badly.  And -- and as it -- as -- as much

6  as I can understand, it was partly because of accusations that

7  he had mismanaged, that he had done different things wrong.

8          Didn't that all precede the agreement that was

9  reached?  What new fact was discovered?  You mentioned one,

10  that this audit was in place and they found out all these

11  contracts were void.  But the City didn't void those, only this

12  one?

13          MR. HYDE:  No.  They voided them all.

14          THE COURT:  Voided them all.  They got money back

15  from any of those people?

16          MR. HYDE:  No.

17          THE COURT:  Okay.

18          MR. HYDE:  But I anticipate that what you will find,

19  Your Honor, is that Mr. Jones's was $400,000.  The other

20  employees who received these illegal severance and transition

21  agreements were 7,500, 20,000.  They were of an amount that

22  my -- my client, in their discretion, felt were not enough

23  money to -- to go spend the money to go get them.

24          And so -- and, on the other hand, Your Honor, is that

25  I'm currently waiting on a motion for summary judgment in

```
 1   Williamson County District Court against the developer of
 2   Perfect Game, Wolverine.  We sued them for $630,000 back and
 3   voided their contract for failing to follow statutory
 4   requirements.
 5           The Legacy, which was the second developer, sued us,
 6   and we defeated that case and it's now pending in the Supreme
 7   Court on -- affirmed by the Seventh District Court here in
 8   Texas, that the contracts were improperly prepared because the
 9   city manager never brought them to the city council for
10   approval.  Multimillion dollar contracts.
11           THE COURT:  Okay.
12           MR. HYDE:  And so -- and then I -- in the middle of a
13   $14.7 million securities issuance for a public improvement
14   district, which is questionable and is now going up on appeal,
15   there's five or six different pieces of litigation that concern
16   hundreds of thousands or millions of dollars that the client
17   learned between December of '19 to December of '20 that
18   occurred during his time at the wheel.
19           THE COURT:  Okay.
20           MR. HYDE:  And all of those were terminated also.
21   They were all declared void.
22           THE COURT:  But am I going to be trying all those
23   cases, too, in this one?
24           MR. HYDE.  No.  It's just what information.  So, for
25   instance, information came to light that -- that Mr. Jones used
```

1    funds from a bond, the 2019 bond, which -- where a covenant

2    required three roadwork projects to occur and then drainage

3    projects could occur with whatever was remaining.

4           Instead of spending it on the road, he decided -- he

5    decided that he was going to buy a piece of property for the

6    Perfect Game Economic Development Program, call it drainage,

7    and took $7 million out of that bond without city council

8    approval.

9           THE COURT:  Okay.

10           MR. HYDE:  So these are the things they didn't know

11   in December of '19 when the separation occurred, and these are

12   all things that they learned.  And there was a city council

13   change in May.  There was different people were elected on and

14   different people were elected off.  And so all of the people

15   that were here were not the same people.

16           THE COURT:  Okay.  I'm just telling you, the City

17   struck a bargain.  And they might regret it, but they struck

18   it.  And I'm really not interested in going back and plowing

19   all that old ground.

20           And I -- let me just leave you with this:  First a

21   caution.  Don't call this contract illegal in front of the

22   jury, because I found to the contrary.  And for both sides,

23   don't say "Judge Lane said this is the valid contract."  I

24   don't want to be mentioned during the trial.  It just is what

25   it is.

1          Part of this, these whole motions in limine, I'm

2     doing it more for my benefit, frankly, than you-all's because

3     usually what you do with this, as you know, is I grant them

4     all, at least for now, and we just deal with it as we move

5     forward.  But I want to talk about some of these issues,

6     because I'm going to tell you you're both advancing issues that

7     are going to open doors.  And then the other side is going to

8     respond, and then they're going to open a door.  And this thing

9     is going to turn into a wild ride.  That's why I don't think

10    this is a two-and-half-day trial by any stretch, but I could be

11    wrong.

12         Mr. Lackey, as it relates to this issue, here's the

13    way I framed it in my own mind.  There's whatever happened with

14    Jones and the City up to November 16th, 2019.  But on that date

15    the parties at that time, the way they were constituted, struck

16    a bargain and an agreement.  And the City of Hutto acted

17    consistent with that as -- by January 3rd, 2020, when they sent

18    the money.  And then there's January '20 -- January 3rd, 2020

19    period of time to -- oh, gosh, what is it?  --

20    December 3rd, 2020, when the resolution was passed by the newly

21    constituted city council.

22         I am going to -- I think the parties are bound by the

23    agreement that they struck on November 16th, which required

24    them both -- they had both gave up all of their claims as it

25    related to what happened in the past.  I do not want to go into

1  that.  But when I went back as recently as today and I read

2  your complaint, you talk about a lot of the conduct of

3  Tanner Rose and -- and Snyder from November 16th, '19 to

4  January 3rd, 2020.  They're issuing press releases.  They're

5  complaining, blah-blah-blah.

6        You want to go into that to show breach, as I

7  understand it.  That these guys did this, and in doing they

8  breached the no disparagement clause of the contract.  Okay.  I

9  appreciate that.  But when you do that, don't you open the

10  door?  Because I can keep Mr. Hyde out of what happened before

11  you struck the agreement.  But to the extent you're complaining

12  that the agreement was breached, is your evidence going to be

13  about conduct that happened between November 16th and

14  December of 2020, or is it going to be breached from

15  January 3rd, 2020 to December 2020?  Where is your breach, and

16  what is your breach evidence?

17        MR. LACKEY:  The -- I think that the central breach

18  is the demanding back the money in December of 2020.  But the

19  disparagements that started -- they did start almost as soon as

20  the ink was dry on the separation agreement in terms of the

21  Tanner Rose, Mike Snyder press conferences, the phone calls to

22  Mr. Jones', you know, subsequent employer.  The way that they

23  continue to follow him despite, you know, essentially, a

24  separation agreement.

25        I apologize.  Would it be easier if I just walked up

1  to the podium?

2          THE COURT:  You-all are -- when the jury is here,

3  naturally, you'll be there.  But right now I just want you-all

4  to be comfortable.  What Ms. Deichert is doing, we've found

5  that these microphones have to be a little closer to the

6  speaker than we thought they did.

7          MR. LACKEY:  Okay.  I'll try to speak up as well.

8          THE COURT:  Sure.

9          MR. LACKEY:  So the breaches of the non-disparagement

10 provision began with a press release and Facebook posts in the

11 days after the separation agreement was signed and continued

12 from time to time after that.  Some of those did have to do

13 with allegations that may be related to some of the things that

14 are the subject of our motion in limine.

15         And we would -- I think we would be fine to not get

16 into -- I think listening to Mr. Hyde just now, among the many

17 reasons he mentioned that the City had for its actions in

18 December 2020, you know, two that never came up are the central

19 allegations that are the subject of our first and second

20 motions in limine, the sexual harassment allegations and the,

21 you know, prior performance going back to, you know, his time

22 in Detroit and Ohio and in Iowa.

23         And so, you know, I think that -- you know, I think

24 that for purposes of breach, it cannot have happened before

25 November 23rd, 2019.

1          THE COURT:  Right.  I mean, what I'm working towards

2    here is I'm going to -- I'm -- I'm going to keep out -- I mean,

3    sexual -- the sexual stuff, as I understand it, was

4    investigated, it was closed.  We're not going into that.

5          MR. LACKEY:  Okay.

6          THE COURT:  But to the extent you're accusing these

7    men of being racists for their conduct after November 16th, to

8    Mr. Hyde's point, I think he's -- if you're going to lay that

9    accusation on somebody, they have the right to come back with

10   explaining -- we're not getting into the weeds, but generally

11   explaining what the basis of their -- of their actions was.

12   And that's going to touch on things like competence and some

13   decisions that he made as a -- as the city manager.

14         MR. LACKEY:  I think that as long as it's as a city

15   manager of Hutto, perhaps that's -- that's not really the

16   subject of our motion in limine.  But I think -- and I do

17   think -- I think that I agree with Your Honor that they waived

18   all claims that they had on -- in November 2019.

19         But in terms of the circumstantial evidence that will

20   go to prove what the determining factors were in the avoidance

21   resolution in December of 2020, I think that a broader category

22   of evidence can come in.  And, conversely, they are -- I think

23   that the fact that evidence existed on a claim that did not yet

24   exist in November 2019, I don't -- don't know that the right to

25   bring that evidence has necessarily been waived.

 1            And so incidents in which -- you know, during

 2    Mr. Jones' tenure as city manager he was treated differently,

 3    he was talked down to, I think --

 4            THE COURT:  But didn't you sign an agreement that you

 5    want me to enforce where your man gave up all his claims prior

 6    to November 16th?

 7            MR. LACKEY:  And we are not asserting a Title VII

 8    claim.  We are not asserting any employment-based claim.  We

 9    are asserting a 1981 claim based on actions that were taken

10    after that release was executed.  We agree that that release

11    was executed effective November 2019.

12            But I think that -- I think that the circumstances

13    and facts that happened before that are potential -- are

14    relevant circumstantial evidence to a history in which

15    Mr. Jones was uniquely hated by certain members of the council

16    and certain parts of the community, and that the reason was

17    race.

18            THE COURT:  Okay.  You have a constitutional right to

19    hate somebody and keep it to yourself, you know.  So -- but the

20    City of Hutto can't act without either the mayor making some

21    type of pronouncement or the city council convening and voting

22    on something.  These guys individually as councilmen have a

23    right to say what they want.

24            Guys, I just -- this thing is going to rapidly get

25    off the rails.  I can tell you right now.  You're going to call

1  them a racist.  They're going the say, Judge -- or ladies and

2  gentlemen of the jury, we're not racists.  We had independent

3  reasons for our conduct, and here's why.  I can narrow that,

4  you know, under the balancing test of prejudice and probative

5  value.  I can shape that a little bit.  But there's something

6  coming in there.

7          But then when that comes in, doesn't that open the

8  door for you to recall Jones as a witness who says, Yeah, when

9  I was trying to apply for jobs, I'm not offering it for the

10 truth of the matter asserted, but I was told that this person

11 or that person told Seguin, blah-blah-blah.  I'm just telling

12 you guys, you guys are both kicking doors wide open, and you're

13 going to open it up to a lot of different stuff.  I'll do my

14 best to keep us on the rails, but it's going to be a challenge.

15          MR. LACKEY:  And, Your Honor, if I understand you

16 correctly, you're suggesting that evidence of alleged

17 wrongdoing that predates November 2019 would be out unless a

18 party opens the door.  And, specifically, it would be our party

19 that would open the door?

20          THE COURT:  Conceivably.  I'm just spitballing it

21 here with you.  I picked those motions in limine to have this

22 discussion with you.  And I touched on it last week, but it

23 really is a bit of a conundrum for me as to -- I understand the

24 complaint lays it very clearly that the breach, in your

25 opinion, began almost immediately after the separation

1   agreement was reached.

2          But, to me, the separation agreement wasn't

3   culminated until January 3rd, which, as I understand it, Rose

4   and Snyder can no longer complain -- they will, but they knew

5   what had happened on November 16th, the train kept going down

6   the tracks, and nothing was done to stop it, and then on

7   January 3rd, a check was written.

8          I guess what I'm suggesting is, does your breach have

9   to do with conduct between November 16th and January 3rd or

10  conduct after January 3rd?

11         MR. LACKEY:  There are some examples that we have

12  urged that are between November 16th and January 3rd.  But we

13  think we have sufficient evidence if we started at January 3rd

14  of continuing disparagements, talking to --

15         THE COURT:  Okay.  I'm just giving you food for

16  thought.

17         MR. LACKEY:  Yeah.

18         THE COURT:  Before I forget, this doesn't relate to

19  the motion in limine.  What -- what's the plan with damages?

20  And the reason I ask that is the City performed under the

21  contract, so this isn't one of those where you can get the

22  412 grand.  You already have it.

23         Your man properly mitigated damages.  He got another

24  job.  I don't know if he's getting paid more or less than he

25  did at Hutto.  How -- how is that going to go -- go here?

1          MR. LACKEY:  I think that, as I said last week, a

2   significant part of the damages are the inconvenience, time,

3   and expense that he's had to put into putting himself back in

4   the position that he'd already bargained for under the

5   separation agreement, in which he can move forward in

6   confidence, that he gets to hold that $412,000 and that the

7   City has a legal obligation not to disparage him.  And it is

8   largely fees, but it is all his time.  It is also some lost

9   opportunities.

10          THE COURT:  Okay.

11          MR. HYDE:  May I, Your Honor?

12          THE COURT:  Yes.

13          MR. HYDE:  First of all, in connection with the

14   disparagement issue, there's -- we filed an affirmative defense

15   under the First Amendment.  And under the *New York Times v.*

16   *Sullivan*, under *Meyer v. Grant*, it says this:  Public officials

17   must have thick skin when encountering inevitable criticism.

18   The Supreme Court explained this to Sullivan.  Vehement,

19   caustic, and sometimes unpleasantly sharp personal attacks come

20   with occupying a government office.

21          And so the standard for purposes of these

22   disparagements have to come beyond that issue.  Otherwise, my

23   first -- my client's First Amendment rights precludes any

24   recovery under this part.

25          THE COURT:  I don't think they're saying that.

1  They're just saying your guy can say whatever he wants, but he

2  can't be a racist.  And I'm not saying he is.  I'm just saying

3  that's what they're going to say.

4          MR. HYDE:  Well, for purpose of the disparagement,

5  that would be some comment or statement that he made to the

6  public that -- about him to put him in a bad light.

7          THE COURT:  You can take that one all the way up to

8  the Supreme Court, that he can say whatever he wants even if

9  he's a racist?

10         MR. HYDE:  No.  I'm not suggesting that.  If -- if

11 the comments that he's going to put into evidence --

12         THE COURT:  Okay.

13         MR. HYDE:  -- are comments by, you know, one of the

14 council members, and those comments were racists, those

15 specific comments, I -- I have not found any direct evidence or

16 circumstantial evidence of that type of -- that's going to come

17 here.  And the opportunity for him to bring that evidence was

18 in our summary judgment, and it wasn't there.

19         THE COURT:  I haven't read the jury instructions.

20 I've got the brain trust working on that right now.  But is

21 there -- do you have a line item in the -- in the jury

22 instructions on First Amendment, and do you find that these

23 defendants -- I mean, I don't know what your special verdict

24 form has or doesn't have.

25         MR. HYDE:  Right.  The one that I put in for that

1   purpose, Your Honor, was a -- there was a disparagement

2   instruction out of the Texas pattern jury charge, since this is

3   a state court claim, and it discusses substantial and both

4   issues.  But I was not -- I was trying to figure out a way to

5   put this in, and I was dumbfounded.  And so that was one of the

6   reasons why I sent the motion in this morning regarding

7   pretrial matters, to raise that issue with regards to how the

8   Court would prefer us deal with that in the charge.

9          Because in -- it appears that I would have to say

10  that you can only find disparagement if you find that the

11  statements that were made by my client were beyond vehement,

12  caustic, substantially sharp, which is allowed by the First

13  Amendment.

14         The other -- the other point on this issue that is a

15  legal issue is that, in the construction of the

16  no-disparagement paragraph, that paragraph in the contract says

17  "the City of Hutto shall not."  In the preceding release

18  language in the page before, it talks about the, you know,

19  employees, agents, representatives, not just the -- that.

20         And so using appropriate statutory construction, this

21  provision was only the City of Hutto.  This provision was

22  broader.  And because it was different, that means it was

23  intentional.  So that means that the only disparaging

24  statements that would be eligible to be brought into this case

25  are statements that are made by the city council as a whole.

```
 1   And that's where my next issue comes up, if you'd like me to
 2   get into that.
 3           THE COURT:  Let me see it.  Again, I don't have the
 4   contract in front of me.  But the contract defines City of
 5   Hutto as the mayor, city council, and all its representatives?
 6   Or how does it define City of Hutto?
 7           MR. HYDE:  Here.  Let me ...
 8           So the separation agreement in paragraph 5 -- I have
 9   a copy if you'd like to look at it yourself, Your Honor.
10           THE COURT:  I'll steal it if you give it to me.
11           MR. HYDE:  There's some other case law on that.
12           So I'm looking --
13           THE COURT:  Hold on a second.  This folder that
14   you've given me has a lot of cases in it.  Does this pertain to
15   this thing you filed today?
16           MR. HYDE:  Yes, Your Honor.
17           THE COURT:  Okay.  And then I don't see the
18   separation agreement in here.
19           MR. HYDE:  I may have not had another copy.
20           On paragraph 5, Your Honor --
21           THE COURT:  Yeah.
22           MR. HYDE:  -- that's the release where it talks about
23   everybody and their brother and cousins are released.
24           You see that?  It's three or four lines.
25           THE COURT:  I do.
```

 1          MR. HYDE:  And as you flip the page -- I think it's

 2    two-sided -- you'll see the disparagement provision.  And the

 3    disparagement provision only refers to the City of Hutto.  It

 4    doesn't have the employees, officials, representatives.

 5          And so our position, Your Honor -- it was in our

 6    summary judgment -- that the scope of that limitation was only

 7    to the City of Hutto as a matter of law.

 8          THE COURT:  Well, we don't have to go into that.  I

 9    don't have time for it right now.  I appreciate it, but I

10    disagree with you, at least initially.  Or I'll let a jury

11    decide.  I'm not so sure it's a matter of law, but you-all can

12    have at it.

13          Anyways, let's go back to where we started.  Let's go

14    back to Plaintiff Jones' first motion in limine.  Let me just

15    look at it again.

16          All right.  I'm granting number 1.  Number 2 is --

17    I'm tempted to deny it.  But, Mr. Lackey, you're going to have

18    to object because I think the proof is in the detail of what's

19    being offered.  I mean, I do think, if you're going to call

20    these -- the City of Hutto and at least some of its

21    representatives racists, then they're going to be allowed to

22    explain that -- and I anticipate this testimony.  I'm not

23    saying it's accurate.  But they're going to hop up on the

24    witness stand and say, No, the reason we revisited this was

25    Mr. Jones was a horrible city manager and his poor performance.

```
 1   And that's what they're going to say.  How do I keep that out?
 2           MR. LACKEY:  Well, Your Honor, Number 2 is really
 3   targeted to things before 2016, when Mr. Jones came to the City
 4   of Hutto.  And to tell you the truth, Your Honor, I don't know
 5   what that evidence is.  We've heard allusions to it and threats
 6   of deposing everybody Mr. Jones ever worked for.  Mr. Jones
 7   tells me there's nothing.  He's only had good work experiences
 8   before he got to Hutto.  There's been nothing in discovery.
 9   But there's been a continuous threat that, oh, even during his
10   deposition, you know, are you sure there weren't issues at
11   Detroit Power and Light?  Are you sure you didn't --
12           THE COURT:  But when you -- let me ask you this.
13           MR. LACKEY:  Oh.  Go ahead.
14           THE COURT:  When you -- you've definitely given the
15   other side interrogatories.  In answering those
16   interrogatories, have they said something like something about
17   his prior employment?
18           MR. LACKEY:  We've heard no detail.
19           THE COURT:  Okay.  Then how are they going to get
20   that in?
21           How are you going to get that in, if you haven't
22   given them notice?
23           MR. HYDE:  We have given them notice, Your Honor.
24           THE COURT:  Where?
25           MR. LACKEY:  The interrogatories that they discuss in
```

 1  our -- did not -- did not effectively request that information,

 2  the past information.

 3          THE COURT:  Okay.  I guess that's another one of

 4  those we'll cross that bridge when we get to it.

 5          Listen.  I'm going to grant Number 2.  It's a motion

 6  in limine for now.  You're going to offer this stuff; we're

 7  going to have to talk about.

 8          Number 3, as I recall, I don't think you had an

 9  objection to that one.

10          Four, do you have any objection?  Wait a minute.

11  This is -- any argument that ...

12          This is usually a grant, Mr. Hyde.

13          Number 4, Plaintiff seeks to stop you from arguing

14  that the taxpayers will be harmed by a verdict.

15          MR. HYDE:  We believe that there's a public policy

16  issue here, Your Honor.

17          THE COURT:  Okay.  It's overruled.  That one's

18  granted.

19          So just to sum up, Plaintiff's motions in limine are

20  granted, but I can fully, as you can tell by the dialog we're

21  having, understand that we're going to have to revisit some of

22  this as we move forward.

23          Much more onerous are the objections I have to

24  Defendant's motions in limine.  Guys, I'm not that smart.  I've

25  got to take them one at a time.  So let me read them.

1          I'm looking at this is document 87-8 which is

2    Defendant's motion in limine and Plaintiff's objections

3    thereto.  You have objections.  Let's see.  All unobjected-to

4    motions in limine are granted, so which ones does that leave me

5    with?

6          MR. LACKEY:  Your Honor, in Document 93-3, we've

7    objected to all of Defendant's.

8          THE COURT:  Everything.  Okay.  Let's take them one

9    at a time.  Let me read them.

10          Mr. Hyde, Number 1?

11          MR. HYDE:  I'm trying to get there, Your Honor.

12          THE COURT:  Well, no, no.  I'm sorry.  You've got it

13    here.  Mr. Lackey, what's wrong with that one?

14          MR. LACKEY:  It's vague and not aimed at any specific

15    piece of evidence that we might plan to put on, that -- you

16    know, now, for example, of what the law is, you know, I think

17    we're allowed to talk about 42 USC 1981 as applied to --

18          THE COURT:  Well, I think you are, too.  As I

19    understood, this is going more towards -- well, Mr. Hyde, it's

20    your request for limine.  Tell me what you're worried about

21    here.

22          MR. HYDE:  Yeah.  I don't want there to be any

23    confusion with regards to who tells the jury the law.  And what

24    the law is reserved to the Court.  And so to the extent that

25    there is some discussion with regards to what someone believes

 1   1981 is, I would like those -- anything that is going to say

 2   "1981 says that I win," those kind of comments, I'd like to

 3   have a limine apply to them.

 4           THE COURT:  Okay.  That's what I thought.  This falls

 5   under what I consider to be kind of good lawyering.  You can't

 6   do that during the case in chief, but you can do it when you

 7   get to final argument.  But by then they will have been read

 8   the jury charge.  And, Mr. Hyde, if you want to object at that

 9   time, I tell the jury, ladies and gentlemen of the jury, you've

10   received the law from -- you know, that whole thing.

11           I'm going to grant this because I don't think it's a

12   problem during the case in chief.

13           MR. LACKEY:  The one place where I think it might

14   become a problem is in the testimony of Bill Bingham, who was

15   the attorney who drafted the separation agreement, the prior

16   city attorney to Dottie Palumbo.

17           THE COURT:  Okay.

18           MR. LACKEY:  And in Dottie Palumbo's testimony to

19   some extent.  You know, I anticipate that Mr. Bingham will

20   testify that he's -- he's had a long career in the Texas

21   Municipal Bar.  He's not heard of this -- he has not -- that he

22   drafted the separation agreement.  That the reasons stated in

23   the December resolution don't make sense to him; that he's not

24   seen those before; and that, you know, that -- that this was

25   done by the book and that Odis Jones and the City of Hutto had

1  struck a deal to bury the hatchet and move on.  And -- and

2  that, you know, that was the purpose of the deal.  And that --

3  you know, so that's what we anticipate calling Mr. Bingham to

4  testify to, in part.

5         MR. HYDE:  And he's opened the door to information

6  that occurred prior to the date of the settlement, because all

7  of those conversations, the preparation of the settlement

8  agreement, occurred before November 16th.

9         THE COURT:  Right.  I mean, we have to go into that

10  part.  I mean, I'm talking about, what I mean -- pre-November

11  16th, what I mean is -- again, I'm making this up, because I

12  don't know this case, yet.  I'll know -- I'll start learning

13  more about it when I hear it like the jury does.  But my

14  understanding, based on everything I've read, is let's say

15  you've got 10 bullets of things that Mr. Jones did that were

16  bad acts, for lack of a better term.

17        There's some allegations through here through sexual

18  innuendo or "MeToo" type.  I don't know what the details are.

19  But you have a number of bad acts that you want to go into.

20  I'm not getting into the bad acts before the separation

21  agreement.  I'm not getting into the detail of it.  I

22  understand, generally speaking, you people are going to respond

23  to the motivation questions with some of what they've got.  But

24  I see a distinction between what Mr. Lackey is talking about,

25  which is what led up to the formation of the separation

```
 1    agreement, which is going to be a five-to-one vote of the city
 2    council.  And I'm sure there were discussions between the city
 3    manager, the city attorney.
 4           But, nonetheless, I'm going to grant this because
 5    I -- what it is, it's kind of a boilerplate motion in limine,
 6    that we don't want -- I don't want Mr. Bingham up here saying
 7    everything I did was -- I've already ruled on this as a matter
 8    of law, but I don't want him bolstering that.  Let's just say I
 9    worked on the contract.  I did the very best I could.  I'm a
10    seasoned lawyer.  In my opinion, it was whatever.  And then
11    leave it at that.  But this one's granted.
12           MR. HYDE:  Well, Your Honor, one last point.  The --
13    this sounds like it all goes to the issue of the validity of
14    the contract, which you've already ruled as a matter of law.
15    And I don't know that the evidence is relevant or necessary.
16           THE COURT:  I know.  But if you're going to offer up
17    your guy's motivation for what he did, then you're opening the
18    door to them coming back and bringing in Bingham and saying,
19    No.  I'm a trained lawyer.  I've been doing contracts for a
20    long time.  Mike Shaunessy I think was one of these lawyers
21    that I -- and I happen to see him in court.  "I've worked on
22    this.  I've done -- I've been a practicing lawyer."
23           I mean, you guys are both -- that's what I was trying
24    to say earlier.  This whole darn case is a big swearing match,
25    and I'm stuck in the middle of it.  And you guys are trying
```

1    to -- you're doing a good job.  I don't have a problem with

2    that.  But you're asking me to parse which disparaging thing

3    each side is going to say about the other.  And at a certain

4    point, I'm going to try to control this.  But I just see it

5    potentially this thing steam out of control, where we're

6    getting into a lot of stuff that doesn't have to do with

7    whether there was a breach or whether or not, as I understand

8    it, the City's vote on -- in December of 2020 was motivated by

9    racial discrimination and retaliation.

10          But, again, I think one of the things in all of our

11   defense, things crystallize at a trial.  And we're talking in

12   generalities.  But when somebody gets up on the witness stand,

13   we'll have a firm grip of what we're talking about.  But, as it

14   relates to this, this is a boilerplate motion in limine.  You

15   know, don't talk about the law.  I'm going to grant it.

16          Okay.  Number 2.  Okay.  I've read your response to

17   this, and I am going to deny Number 2.

18          That the Court prohibit plaintiff -- I'm on to

19   Number 3.  Same.  Denied.

20          Denied.  I'm denying Number 4.  But, to be clear

21   here, that doesn't mean Mr. Hyde, of course, you can't object

22   to it when it's offered.  If he hasn't laid the proper

23   predicate or foundation, I'm going to grant your objection.  Or

24   sustain it, I should say.

25          Five.  For the same reason, I'm a big boy.  I'll rule

1  on your objections during trial as it relates to foundation,

2  probative value versus prejudice.  I'll deal with it at the

3  time.

4            Not really sure what Number 6 goes to, Mr. Hyde.

5            MR. HYDE:  I'll withdraw it.

6            THE COURT:  Okay.  Number 7, that the Court prohibit

7  the plaintiffs ...

8            I'll grant that.

9            MR. LACKEY:  And, Your Honor, can I just ask one

10  question about that?

11            THE COURT:  Sure.  Sure.

12            MR. LACKEY:  I had contemplated during my opening

13  statement perhaps having the language of the statute and

14  talking about this is the statute that we're here to apply

15  today.  Would that be improper in your -- in your view?

16            THE COURT:  In my view, no.  But it depends how far

17  you go.  I mean, you guys have a jury -- you guys have mutual

18  jury instructions, so that means both sides agree this is the

19  law.  Stick to that, but don't go far afield of that.  Right?

20            MR. LACKEY:  Thank you.

21            THE COURT:  I look at these motions in limine not so

22  much for argument, because lawyers generally know what they can

23  and can't do at opening statement.  This is more towards the

24  witnesses that are called and what they're going to say, as I

25  understand it.  So I'm going to grant Number 7.

```
 1              I moved on now to Number 8.  I'm going deny this.
 2    Again, it's not out of spite.  It's just more of, if it's not
 3    personal knowledge and it's speculation, make a speculation
 4    objection and I'll grant it.
 5              MR. HYDE:  I understand.  Game time decision.
 6              THE COURT:  There you go.
 7              Okay.  What does that one mean, Number 9?
 8              MR. HYDE:  Well, that -- for all of the tort
 9    allegations and the -- the defamation, the intimidation with
10    regards to that evidence, we -- I -- we don't think it's
11    relevant to the case, Your Honor.  And it's only going to 403,
12    have a more prejudicial effect.
13              THE COURT:  Like give me an example.
14              MR. HYDE:  Like the -- the statements by Brad Walker
15    in his deposition, if -- when you get an opportunity to hear
16    that or read that, you'll find that the -- the statements do
17    not create some kind of connection with regards to the
18    allegation of improper conduct and my client.
19              You know, one example is that somebody had put
20    watermelons on the front of Mr. Jones' front door.  But there
21    is no -- absolutely no evidence in this case --
22              THE COURT:  Yeah.  That's not coming in.
23              MR. HYDE:  It doesn't have anything to do with --
24              MR. LACKEY:  That's prior to November 2019.  That
25    would not come in.
```

```
 1          THE COURT:  Yeah.  But did you have it connected to

 2   the City of Hutto?

 3          MR. LACKEY:  Only -- only generally, that it happened

 4   in the city of Hutto.  No, not an official act of the City.

 5          THE COURT:  Okay.  Well, you need more than that.

 6   I'm going to grant that one.

 7          MR. LACKEY:  But, Your Honor, just real quickly.

 8          THE COURT:  Yeah.

 9          MR. LACKEY:  My understanding of this or what I'm

10   concerned about here is disparagements that happened after

11   January 2020, where at one time subject of defamation claims.

12   Those were kicked out because of legal reasons having to do

13   with officials acting in their official capacity.  But they're

14   still circumstantial evidence of the City's motives and the

15   racial motive behind --

16          THE COURT:  Agree.

17          MR. LACKEY:  Likewise, I think Your Honor mentioned

18   this a minute ago, the efforts to intimidate the witnesses.

19   The Intracorporate Conspiracy Doctrine kicks that out as a

20   claim, but it's still relevant evidence.

21          THE COURT:  Of breach.

22          MR. LACKEY:  Of a breach, yes.

23          THE COURT:  And racial discrimination and

24   retaliation, if you make the connection.

25          MR. LACKEY:  Correct.  So that -- that's all that
```

1 I -- as long as we're clear that that would not be stepping on

2 the motion --

3          THE COURT:  And guys, again, these are motions in

4 limine.  I'm not -- we can all -- just because I've ruled

5 against you here, that doesn't mean you shouldn't try to offer

6 it later.  But I'm trying to figure out what nine really ...

7          Regarding any allegation of alleged improper act on

8 the part of Defendant that did not survive -- did survive --

9 did not survive.

10          MR. HYDE:  For instance, Your Honor, I think that it

11 would be inappropriate unless they come to the Court and get

12 some -- if they haven't set up a predicate or foundation with

13 regards to referring to any of my clients as people who

14 intimidated, because we know now that the Court dismissed the

15 intimidation.  He can say that they tried to influence them.

16 They can go -- but if they start talking about asserting

17 intimidation, which is something that's been dismissed in this

18 case, that's inappropriate.

19          THE COURT:  Well, it was dismissed against them in

20 their individual capacities, right?

21          MR. HYDE:  Right.  Which means there is no

22 intimidation claim.

23          THE COURT:  But they're agents of the City of Hutto.

24 Because you're the one -- you made the argument that -- that

25 the conduct that Snyder and Rose engaged in was in their

 1    official capacity.

 2            MR. HYDE:  That's right, Your Honor.  And it

 3    continued to be.  The issue this brings up is the other issue I

 4    had with regards to the motion filed today.  And we can get

 5    into it now or later; it's up to you.  But, ultimately, the --

 6    there's a case called *Bonham v. Southwest Sanitation, Inc.*, and

 7    this is a 1994 case out of Texarkana.  And the State -- and

 8    it's being provided to the Court for basically three

 9    propositions:

10            Number one, statements or acts of the mayor or other

11    officers or governing body members are ineffectual to bind the

12    City or County to any agreement.  They're not the City's

13    decisions.  I think the best way that I can try to allow the

14    Court to appreciate this is that we have 535 people in the

15    Legislature in D.C.  And say that they pass a joint resolution

16    of both the Senate and House.  Well, that joint -- that doesn't

17    have anything to do with whether an individual senator or

18    congressman in there has some type of animus with regards to

19    the conduct of that -- of that --

20            THE COURT:  That's true.  But what if the sponsor of

21    the bill or whoever -- the sponsor of the resolution has done

22    or said things that are intimidating, impeding, influencing?

23            MR. HYDE:  It -- so the -- the only -- and this is --

24    I finally figured it out, and this has been eating at me

25    forever.

1          So we brought *Monell* up in our summary judgment, and

2     we brought -- with regards to the issue.  And the problem here

3     is that *Monell* does not create a cause of action for direct

4     discrimination against a governing body.

5          THE COURT:  You may be right.  My -- listen, I could

6     be wrong on some of this.

7          MR. HYDE:  I understand.

8          THE COURT:  I'm not trying to be flippant or

9     cavalier, but I've kind of ruled against you a little bit on

10    that.  And I disagree with you.  I mean, the decision-maker was

11    the City of Hutto.  And the City of Hutto in December of 2020

12    had a vote and disavowed a contract that they signed and acted

13    under.  I mean ...

14         MR. HYDE:  If I may, Your Honor, I agree.  I

15    understand your position.  But this the evidentiary problem we

16    have, as it comes to the next one, which is proof of governing

17    body's acts may only be supplied by authenticated minutes of

18    meeting at which action occurred unless minutes have been lost

19    or destroyed.

20         Plaintiff suing to establish contract.  City had the

21    burden both to plead and prove that the minutes showed the

22    council's act *[unintelligible]*.

23         I bring this up, Your Honor, because, the Fifth

24    Circuit adopted this in 1998 with -- and approved it in *WTF*

25    *of* --

```
1          THE COURT:  And I don't disagree with any of that.
2   But we're talking about proof.  You're trying to get me as a
3   motion in limine to keep out evidence that the motivating
4   factor for the resolution that was passed, at least in
5   terminology for the plaintiff is using, was racially motivated.
6          I'm not keeping that out.
7          MR. HYDE:  Well, Your Honor, and I understand that
8   this is novel.  However, in the 1998 Fifth Circuit case, it
9   specifically states the city council could only act through its
10  governing body.  So what act did we do -- did we commit that is
11  the retaliation?  Is it the act of passing the resolution?
12         THE COURT:  Is it?
13         MR. LACKEY:  Yeah, it is.
14         MR. HYDE:  Okay.  So is there any other act, specific
15  act, that the governing body did?  Because all the other
16  evidence --
17         THE COURT:  Their agent then wrote a letter to
18  Mr. Jones and said -- okay.  That's what I'm saying.  I hear
19  what you're saying.  And I'm saying, with respect, you may be
20  right.  But I'm not being flippant and cavalier with it.  I
21  understand the import of that Fifth Circuit opinion.  I don't
22  disagree with it, but we're talking about evidence.
23         MR. HYDE:  Yes, Your Honor.  But this says the only
24  evidence that is permissible is the minutes of the --
25         THE COURT:  Okay.
```

1          MR. HYDE:  So I have to now object to every piece of

2   evidence other than minutes and --

3          THE CLERK:  You can object and then say, Judge, can I

4   have a running objection on it?  It will be granted.  I mean,

5   you've got to do what you've got to do, and I've got to do what

6   I've got to do.

7          MR. HYDE:  All right.  Thank you, Your Honor.

8          THE COURT:  So I've changed my mind.  Nine is denied.

9          Ten, denied.

10          Eleven, this is just evidentiary stuff.  I'll take

11   the objections as they come.  That's denied.

12          Twelve, same.  Denied.

13          Thirteen, I think that's not even applicable, so

14   that's denied.

15          I mean, national origin?

16          MR. HYDE:  We'll withdraw it, Your Honor.

17          THE COURT:  Okay.  Fourteen.

18          MR. HYDE:  Withdrawn.

19          THE COURT:  I do the same thing, so I'm not being

20   hard on you.

21          Fifteen.

22          MR. HYDE:  Withdrawn.

23          THE COURT:  Sixteen, same.  I'm sure that's

24   withdrawn?

25          MR. HYDE:  Yes, Your Honor.

```
 1              THE COURT:  That one's granted.  If you have it,

 2   Mr. Lackey, just approach the bench first.

 3              Denied.  I'm going to deny anything with sufficient

 4   predicate or authentication.  Those are going to be trial

 5   objections.

 6              Same, denied.

 7              Twenty.

 8              MR. HYDE:  That's a predicate, Your Honor.

 9              THE COURT:  Yeah.  Denied.

10              Twenty-one, same.

11              Is there any problem with granting that one,

12   Mr. Lackey?

13              MR. LACKEY:  No, Your Honor.  I just -- you know, I

14   think that calling Mr. Jones's accuser as a witness has already

15   been taken care of on the other motions in limine.  But, to the

16   extent that she was not disclosed by address or phone number,

17   we would have the same objection to her being called.

18              THE COURT:  Okay.  Twenty-three, well, that's a

19   grant, but I don't think it matters.

20              Goodness gracious.

21              Twenty-four.  I mean, these are boilerplate.  That

22   one's granted, but ...

23              Twenty-five, I'm going do deny that.  This is just

24   don't do it.

25              I mean, settlements are out.  That's granted.
```

```
 1              I don't know if that applies.  Twenty-seven is
 2    granted or withdrawn, I'm sure.
 3              MR. HYDE:  Granted, Your Honor.
 4              THE COURT:  Pardon?
 5              MR. HYDE:  We ask for it to be granted.
 6              THE COURT:  Okay.  It's granted.  But to what -- I
 7    don't know what you've achieved with that grant.
 8              I think this went to another case, Number 28.  Am I
 9    right?
10              MR. HYDE:  Yes, Your Honor.  Withdrawn.
11              THE COURT:  Withdrawn.
12              Mr. Lackey, Number 29, I mean, are we even going to
13    get into that?
14              MR. LACKEY:  I don't know that -- considering some of
15    your other grants, I think I would have to talk to my client.
16    You know, I think that he may be prepared to talk about this
17    has been a strain on myself and my family.  That might come out
18    of his mouth in an innocent way.  I don't know that I need to,
19    you know -- I don't know that I need to counsel him beforehand
20    to avoid that.  But if Your Honor thinks I should, then I will.
21              THE COURT:  Well, listen, Mr. Jones can testify as to
22    the effect on him.  And to the extent your family is affected
23    by something, that affects Jones.  So I'm not -- Mr. Jones is
24    going to do that.  But do you anticipate any extrinsic evidence
25    from somebody else or a child or wife coming in here?
```

```
1              MR. LACKEY:  No, Your Honor.
2              THE COURT:  Okay.  Mr. Jones can do what he needs --
3    that one's -- that one's denied.
4              Thirty.  I mean, I'll grant it, but I don't know what
5    that accomplished.
6              Okay.
7              MR. HYDE:  Your Honor, just for background --
8              THE COURT:  Sure.
9              MR. HYDE:  -- the -- there are some anticipated
10   questions with regard to the attorney-client privilege, in that
11   the City of Hutto has also filed a suit in Travis County
12   District Court against the McGinnis Lochridge firm and those
13   witnesses.
14             THE COURT:  Oh, wow.
15             MR. HYDE:  And so, by doing so, that waived the
16   attorney-client privilege with regard to their representation
17   of the City.
18             However, the interactions with other lawyers or
19   lawyers subsequent to that representation are attorney-client
20   privilege and remain attorney-client privilege.
21             THE COURT:  How long did McGinnis Lochridge
22   lawyers -- when were they released by the City of Hutto?
23             MR. HYDE:  February of 2020.
24             THE COURT:  So what are you -- you're concerned with
25   attorney-client after that point, after February of 2020?
```

1           MR. HYDE:  Yes, Your Honor.

2           THE COURT:  You're not going into that, are you?

3           MR. LACKEY:  Certainly not with the intent of -- of

4   breaking the privilege.  You know, I think that if Mayor Snyder

5   or Dottie Palumbo is testifying -- who is the current city

6   attorney, is testifying and I ask them something on cross and

7   the answer happens to be, maybe even unbeknownst to me,

8   something that happened in executive or was part of a

9   conversation.

10          THE COURT:  Well, I granted that one anyway.

11          MR. LACKEY:  Yeah.  No.  I think that --

12          MR. HYDE:  I just --

13          MR. LACKEY:  I have no objection to the --

14          THE COURT:  Again, everything in the devil is in the

15  details and the proof that's offered.

16          MR. HYDE:  And, Your Honor, if I may?

17          THE COURT:  Yeah.

18          MR. HYDE:  One comment I do need to approach the

19  Court and opposing counsel, is that Ms. Palumbo's son was found

20  dead in his dorm room about two weeks ago.

21          MR. LACKEY:  Oh, Lord.

22          THE COURT:  Ugh.

23          MR. HYDE:  And right now I believe it appears to be

24  natural causes.  They're having an autopsy.  It's going to be

25  several months.  But she has not been -- she has not returned

 1  to work.  Her son -- you know, her son was in college in his

 2  early 20s.

 3          And so if -- if I can modify, I was intending to use

 4  her as a witness in person, but I may need to either dig

 5  through the existing deposition and see whether or not that

 6  will be sufficient or make some other arrangements for her to

 7  be able to provide testimony, if that would be ...

 8          THE COURT:  Well, here's my thought.  I mean,

 9  nothing's absolute.  And if you're able to establish good

10  cause, then perhaps we can come up with an alternative.  But

11  we'll cross that bridge when we get to it.

12          MR. HYDE:  Yes, Your Honor.

13          MR. LACKEY:  And for a situation like that, I'd be

14  willing to, you know, offer any -- you know, if there was a

15  substitute witness and I could depose them after a day of trial

16  just to know what they would say or something like that, I --

17  I'm all yours on how to work through that situation.

18          MR. HYDE:  Thank you.

19          THE COURT:  Okay.  All right.  We've gone through the

20  motions in limine.  Mr. Hyde, you have filed a motion for leave

21  to file a supplement to your first amended answer and

22  affirmative defenses.  I have read it.  Obviously, Plaintiff

23  hasn't had an opportunity to respond.

24          Do you want -- let me start with you, Mr. Hyde.  Is

25  there anything else you want to add to the written motion?

1          MR. HYDE:  The -- that was my attempt at the -- the

2    motion filed to was to provide additional supplemental issues

3    for today.  So other than the -- I think I stated it pretty

4    clearly --

5          THE COURT:  Okay.

6          MR. HYDE:  -- with the prior statement, Your Honor.

7          MR. LACKEY:  Your Honor, in our view, the orders on

8    the summary judgment eliminated some claims from the case, but

9    I haven't added any new ones.  The Court's deadline to amend

10   pleadings elapsed June 30, 2021.

11         THE COURT:  Does their request to amend their

12   complaint one, two, three, four days before trial, does it

13   represent any prejudice to the plaintiff?

14         MR. LACKEY:  To the extent that I -- I don't know

15   what some of these defenses even mean, for example,

16   contributory negligence, I don't think we have a negligence

17   claim.  You know, I have not had a chance to depose witnesses

18   with these pleadings in mind.  Defendant pleads illegality.  I

19   don't know what's that's a reference to.  Defendant pleads

20   payment.  I assume that means the fact that they paid the

21   $412,000.

22         MR. HYDE:  That's correct.

23         MR. LACKEY:  Pleads release.  I assume --

24         THE COURT:  But aren't all those things that should

25   have been pled originally?  And the other part of that for me

 1  is, well, shouldn't they have been pled a long time ago?

 2           MR. HYDE:  Your Honor, we believe that the statements

 3  that we've made both in our summary judgment and -- and our

 4  amended answer with regards to the elements of the assertions

 5  that we've made, that we've raised those in plain statement to

 6  the Court already.  We've thought that instead of having to go

 7  through and pull each one of those out and bring those to the

 8  Court, that we'd first want to bring it to the Court's

 9  attention and see if we would be able to streamline a method by

10  which to pull those out.

11           THE COURT:  Four days before trial, no.  It's denied.

12  I get pleadings all time that are pled in the alternative.  I

13  mean, as I understand it, the primary motivation for this

14  eleventh-hour effort to amend the answer is because I ruled

15  against you on the validity of the contract.

16           But you have to be pretty horsey to think you were

17  always going to win that.  Maybe you always did, or the City of

18  Hutto's certainly taken that position as it relates to attempts

19  to discuss the case with the other side.  So, I mean, maybe you

20  made a mistake there.  I mean, shouldn't you have pled it in

21  the alternative?  If the Court finds that the contracts valid,

22  then it raises these defenses.

23           I mean, I'm just not doing it right now.  We're way

24  past discovery.  Plaintiff probably could have filed a motion

25  for summary judgment on some of the affirmative defenses that

 1   you propose, like contributory negligence.  What does that

 2   mean?  That's another throwaway.

 3          The magic words are I find -- I do not find that

 4   there's good cause to amend the answers at this late date.  It

 5   should have been done a long time ago.  So that's denied.

 6          I'm not going to look at 98 while we're all sitting

 7   here.  Docket 98 is what you filed today, Mr. Hyde.  I will

 8   look at it.  I'll be well-versed on this by the time we get

 9   together on Monday morning.

10          Yeah.  Go ahead.

11          MR. HYDE:  I would just like to respond, Your Honor.

12          MR. LACKEY:  I suppose, Your Honor, if you're going

13   to consider it by Monday morning, I'm not quite sure which rule

14   this is.  It looks like a motion to reconsider under Rule 59 or

15   60.  But those are --

16          THE COURT:  I'm not --

17          MR. LACKEY:  -- for post-judgment.  I guess my

18   question is only:  Do I need to file a responsive brief by

19   Monday?

20          THE COURT:  No, you don't.  And if it's a motion to

21   reconsider -- again, I haven't read it -- I'm not

22   reconsidering.  And, I mean, the only line I've seen is

23   "Statements or acts of the mayor or other officers or governing

24   body members are ineffectual."

25          That's unpersuasive as heck.  So, yeah, I'll look at

 1  this, but I'm not revisiting the decisions I've made.

 2          Again, I might be wrong, but ...

 3          MR. HYDE:  We've discussed a number of that today,

 4  Your Honor.

 5          THE COURT:  Yeah.  Okay.  Okay.  We've been at it for

 6  an hour and 35 minutes, but that doesn't mean we don't have

 7  other issues to discuss.  I've definitely touched on what I

 8  wanted to talk to you-all about.  Is there anything I missed?

 9          Mr. Lackey, we'll start with you.

10          MR. LACKEY:  On the jury instructions --

11          THE COURT:  Yes.

12          MR. LACKEY:  -- I think you suggested that -- that,

13  you know, you were going to look at those over the weekend,

14  perhaps.

15          THE COURT:  Yes.

16          MR. LACKEY:  Would it be helpful to submit a brief or

17  to briefly say why I think on some of the places where there is

18  a split that our instructions are preferable?  I have

19  arguments.  How would you like me to present them?

20          THE COURT:  That's a great -- a great point.  I --

21  what I don't want to get into is motions and responses and

22  replies.  What I'd rather is trial memorandums, and -- I like

23  trial memorandums.  I'm not -- you know, if you have time and

24  you want to respond, great, but you can do that orally.

25          But to answer your question, I would prefer that you

```
 1  file some type of trial memorandum on any legal issue or point,
 2  including the jury instructions, that's important to you.  And
 3  you have my word we will look at it.  But, yes, I would find
 4  that helpful.  Same for you, Mr. Hyde.
 5          MR. HYDE:  And I think that would be more of what I
 6  filed today, and I'll continue to do so, Your Honor.
 7          THE COURT:  Okay.  Yeah.  Again, really, I really
 8  am -- I want to get this right.  But I think you guys both even
 9  will acknowledge that we are in a factual -- we're in a factual
10  setting where this is really like a law school challenge, you
11  know.  What evidence is coming in?  Is it hearsay?  Is it
12  404(b)?  Is it -- does 403 keep it in or keep it out?  I mean,
13  that's why they pay me the big bucks, so I'll do my best next
14  week.
15          But, again, what I want to leave you with is:  You
16  got "tough guy Mark" last week.  I was trying to motivate both
17  sides to really maybe reconsider your positions and talk about
18  it.  But if you don't want to do that, I'm not going to
19  penalize you for that.  I understand it.  I do also respect the
20  idea that "I want my day in court."  So we'll do that.  And
21  I'll be optimistic.  Maybe it's two and a half days, but I
22  think it's more like four.
23          Oh.  And I'll leave you with this:  Have your
24  witnesses ready.  What I mean by that is, one's coming off the
25  stand, get somebody off your table to go get the next one and
```

 1   bring them back in.  Bring the next one in.  I want to go boom,

 2   boom, boom.  I do not want to waste jury time.

 3           MR. LACKEY:  To that point, Your Honor, you know, we

 4   would like to request to invoke "the Rule."  I don't know when

 5   the appropriate time would be.

 6           MR. HYDE:  No objection.

 7           THE COURT:  Yeah.  So the Rule's invoked.  In my

 8   experience, that's usually not my -- I don't have to worry

 9   about it.  You guys have to police that, and I trust that you

10   will.

11           I'm sure there's something I've forgotten, and I'm

12   sure there's something you-all have forgotten, too.  But we'll

13   get together on Monday and figure it out together.

14           All right.  Thank you for being prepared, gentlemen.

15   I appreciate it.  And I'll see you-all on Monday.

16       (Proceedings concluded at 3:40 p.m.)

17

18

19

20

21

22

23

24

25

1        **REPORTER'S CERTIFICATE**

2        I, Arlinda Rodriguez, do hereby certify that the foregoing

3  was transcribed from an electronic recording made at the time

4  of the aforesaid proceedings and is a correct transcript, to

5  the best of my ability, made from the proceedings in the

6  above-entitled matter, and that the transcript fees and format

7  comply with those prescribed by the Court and Judicial

8  Conference of the United States.

9

10  /S/ Arlinda Rodriguez                    March 20, 2023

11

12  ARLINDA RODRIGUEZ                        DATE

13

14

15

16

17

18

19

20

21

22

23

24

25