**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ODIS JONES,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Case No. 1:20-CV-1210-ML** |
| | § | |
| **CITY OF HUTTO,** | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFFS' RESPONSE TO CITY OF HUTTO'S RULE 50(b) RENEWED MOTION**
**FOR JUDGMENT AS A MATTER OF LAW, AND IN THE ALTERNATIVE, RULE 59**
**MOTION FOR NEW TRIAL**

Plaintiff Odis Jones respectfully files this Response to the *City of Hutto's Rule 50(b) Renewed Motion for Judgment as a Matter of Law, and in the Alternative, Motion for New Trial*[1] (Dkt. #133) ("JMOL Motion" or "JMOL").

## INTRODUCTION

This case comes down to a classic swearing match between the now Mayor of Hutto and Mr. Jones, in which Mr. Jones' testimony was corroborated by other witnesses and documents, while the Mayor was repeatedly impeached about his characterizations of key events. The jury was the sole judge of their credibility and free to believe either. The verdict reflects their belief in Mr. Jones and the corroborating witnesses.

Mayor Snyder admitted to calling Mr. Jones a "crook" and told the Assistant City Manager that he was "really good at spotting crooks," whom he described as "Black guys that he knew were

---

[1] Although the City adds "Motion for New Trial" in the title, the relief it seeks is rendition of judgment. JMOL at 21. For the reasons stated in the Argument and Authorities above, a new trial should be denied on any of the grounds presented. Mr. Jones will respond to the City's separately filed motion for new trial in a separately filed response.

coming into [his QuikTrip] store and stealing."[2] It is a more than reasonable inference that Mayor Snyder's use of the term "crook" and "crooked" with respect to Mr. Jones revealed a racist animus. The record also supplies reasonableness to an inference that Councilmember Tanner Rose shared this racist animus. Although he did not testify, the record contains numerous examples of his acting in concert with Mayor Snyder, beginning with their joint campaign on a platform to remove Mr. Jones from office. They acted in lockstep to ensure that Mr. Jones lost his severance pay and to publicize it in a way that strongly suggested Mr. Jones had done something illegal. Under the circumstances, their work together to remove a plaque honoring Mr. Jones from City Hall was rightfully viewed as spiteful. When both were interviewed by KVUE about the incident, one of them went so far as to state, "We wanted to remove a dark stain from the City of Hutto."[3]

To escape the damning effect of the racist and other disparaging comments by its Mayor and Councilmember, the City tries to distance itself and its decisions with respect to Mr. Jones, claiming that their actions were not City actions. Its effort is unavailing. The City Councilmembers acted under color of state law in adopting the Resolution that was the action that deprived Mr. Jones of his civil rights and breached his Separation Agreement. And the reasons the City provided in doing so were shown to be pretext. The record tells a compelling story of the campaign by Mayor Snyder and Tanner Rose[4] to ruin Mr. Jones professionally and personally through a series of unsubstantiated and very public accusations. Proof that they "'possessed leverage, or exerted

---

[2] 1RR147.

[3] 1RR146.

[4] At the time, there was another Councilmember named Scott Rose. For clarity and distinction, Plaintiff will add first names for these individuals.

influence over'" the other Councilmembers supports imputing their animus on the other Councilmembers who voted in favor of the Resolution under the "cat's paw" doctrine.[5]

There is ample proof that the Mayor and other Councilmembers made disparaging statements about Mr. Jones in very public and harmful ways. For example, as a result of their direct outreach to city officials in Seguin and Missouri City, Mr. Jones lost a job and other lucrative opportunities and has not been able to obtain employment in a municipal or local government despite his 30 years of experience running city governments, complex municipal projects, and state development boards. Considering the broad range of damages available as the prevailing party and all that Mr. Jones has lost as a result of a campaign designed to ruin him, the record supports the jury's awards of damages. None of the City's challenges to the jury's findings and the Court's disposition of the case supports setting aside the Final Judgment. The JMOL motion should be denied.

**ARGUMENT AND AUTHORITIES**

## I.    Standard of review.

Through the JMOL motion, the City seeks to renew its earlier motion for judgment as a matter of law (Dkt. #109). In considering the City's JMOL Motion, the Court should review all of the evidence in the record, draw all reasonable inferences in favor of Mr. Jones, and refrain from making any credibility determinations or weighing the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). In doing so, the Court

---

[5] *Lott v. Kennedy Indep. Sch. Dist.*, No. SA-08-CV-935-XR, 2010 WL 1544503, at *3 (W.D. Tex. Apr. 16, 2010) (quoting *Roberson v. Alltell Info. Servs.*, 373 F.3d 647, 553 (5th Cir. 2004))

must disregard all evidence favorable to the City that the jury was not required to believe and credit evidence favoring Mr. Jones, as well as "evidence supporting the [City] that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id*. at 151 (quoting 9A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2529, p. 300 (2d ed.1995)). "'The jury's verdict should be affirmed unless the facts and inferences point so strongly and overwhelmingly in the [City's] favor that reasonable jurors could not reach a contrary conclusion.'" *Griggs v. Chicksaw Cnty., Miss.*, 930 F.3d 696, 701 (5th Cir. 2019) (quoting *Alonso v. Westcoast Corp.*, 920 F.3d 878, 882 (5th Cir. 2019)).

The City tries to equate the JMOL standard for reviewing the record with the summary-judgment standard. JMOL at 3-4 (collecting cases). Although there is an analytical analogy, there are meaningful differences in the two standards. Summary-judgment motions are decided without a jury and as a matter of law based on affidavits and documentary evidence, while the JMOL standard involves review of fact determinations and defers to the factfinders, including their determination of the credibility of live witnesses firsthand. *See Reeves,* 530 U.S. at 150 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (quoting *Anderson,* 477 U.S. at 255); *see also Bagby Elevator Co., Inc. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010) ("When evaluating the sufficiency of the evidence, we accord great deference to the jury's verdict." (internal quotations and citation omitted)).

In addition to the grounds asserted in its trial motion, the City adds a number of new grounds to its JMOL Motion that it never before urged to set aside the jury's findings. Those additional grounds are waived. *See Transverse, LLC v. Iowa Wireless Servs., L.L.C.*, 617 Fed. App'x 272, 279 (5th Cir. 2015) ("If a party fails to raise an issue in its Rule 50(a)(1) motions at

trial, it may not do so in its post-trial Rule 50(b) motion." (quoting *Arsement v. Spinnaker Expl. Co.*, 400 F.3d 238, 247 (5th Cir. 2005)). They do not afford the Court any supportable basis on which to disregard the jury's findings. *See id.*

## II.     The jury's answers to Questions One and Two are supported by the record.

Question One asked the jury whether the City denied Mr. Jones his right to make and enforce contracts with the City, and Question Two asked whether Mr. Jones' race was "a determinative factor for the City's denial of Jones' right to make and enforce contracts with the City." Dkt. #124 (Q1 & 2). The jury unanimously answered both questions "Yes." *Id.* Its findings are supported by evidence that is more than sufficient.

### A.     The jury properly found acts by which the City violated Mr. Jones' civil rights.

The Civil Rights Act of 1866, 42 U.S.C. § 1981, made it unlawful to discriminate in employment because of race and to retaliate against employees who report or oppose discrimination. *See Johnson v. Ry. Express Ag., Inc.*, 421 U.S. 454, 459-460 (1975). It provides that "[a]ll persons … shall have the same right .. to make and enforce contracts, to sue, be parties, [and] give evidence … as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It is a "sweeping" law designed to "break down *all* discrimination between black men and white men" involving their "basic civil rights," including the right "to make contracts." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 432 & n.54 (1968) (quoting Cong. Globe, 39th Cong., 1st Sess., 599) (emphasis in original). "To prevail, a plaintiff must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

The jury's finding that racial animus was "a determinative factor" in the City's actions that deprived Mr. Jones of the Separation Agreement, demanded that he return the $412,0000 in consideration, and threatened suit if he did not, is fully substantiated in this record. In cases

involving race and retaliation, it is rare to find direct evidence. *White v. Patriot Erectors LLC* , No. 1:20-CV-1219-RP, 2023 WL 3400552, at *3 (W.D. Tex. May 11, 2023). Thus, a circumstantial case relying on inferences of discrimination is adequate to support a jury's verdict. *Id.* This record is more than adequate to support the jury's findings in favor of Mr. Jones.

> 1. **Race was a "determinative factor" in the City's actions as to the Separation Agreement.**

The City Council unanimously voted to adopt Resolution No. R-2020-139 ("Resolution") through which it implemented its discriminatory decision to void Mr. Jones' Separation Agreement, demand return of the $412,000 advanced to him under the Separation Agreement, and take any additional action to effect that return. PX49-A. This action violated Mr. Jones' civil rights, and more specifically his right "to make and enforce contracts." 42 U.S.C. § 1981(a).

The City Council's decision treated Mr. Jones, the first Black City Manager, differently from other similarly situated employees who were white. The circumstances of the various City Managers need not be completely or totally identical, but instead merely comparable. *Turner v. Kan. City So. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012). Here, the City Council treated Mr. Jones differently from other, white City Managers who had been terminated by the City. It also treated him differently from other former, white City employees who had received separation agreements and payments, from whom the City made no attempt to claw back the money.

At least one of these instances involved a situation in which the terminated City Manager (Karen Daly, who pre-dated Mr. Jones) disagreed about the City's direction, and the City Council later discovered some things she had done wrong. 1RR 177-78; 2RR121-23. Yet, Ms. Daly, who is white, received a severance package when she was terminated. 1RR176-77; 2RR121-23, 127-28. And the City never rescinded her separation agreement or demanded that she return the severance pay. Indeed, the City has never taken such actions with respect to ***any*** separation

agreement *other than* Mr. Jones' Separation Agreement. 1RR169-70; *see also* 1RR150-51, 186; *see also* PX26; DX11 (Eide Bailly Report examining 16 severance and settlement payments with former City employees).

These circumstances support a reasonable inference that the City's actions were prompted by impermissible racial discrimination. *See Turner*, 675 F.3d at 893. This inference is particularly strong because the City Council's stated reasons for singling out Mr. Jones for this unprecedented treatment under the Separation Agreement were shown to be pretextual.

> **2.   The City's after-the-fact justifications for its actions were proven to be pretext.**

"Well-established Supreme Court and Fifth Circuit law [] states that a showing of pretext is, itself, typically sufficient evidence of animus to prove discrimination." *White*, 2023 WL 3400552, at *3 (citing *Laxton v. Gap*, 333 F.3d 572, 578 (5th Cir. 2003)). The City's arguments in defending its Resolution were shown to be pretextual and thus support a reasonable inference of discrimination. *Id.* at *8.

The evidence at trial established that the City's stated reasons for voiding the Separation Agreement were invalid or unsubstantiated. The reasons provided in the Resolution and the Borjorquez letter were:

- "[T]he Separation Agreement contains numerous material unlawful provisions including …

    - those under which the Separation Agreement's terms would not be public information;

    - an unenforceable non-compete (non-solicitation) clause; and

    - a provision that the City would impermissibly delegate its legislative and governmental functions." PX49-A.

- "Odis Jones has materially breached one or more of the provisions" of the Separation Agreement; *Id*.[6]

- "[T]he minutes of the November 21, 2019 meeting did not state the terms of the Purported Agreement or authorize any city official to sign on behalf of the City." PX49 at 1; and

- "[T]he payment did not comply with Hutto City Charter Section 8.10. Overspending of Appropriations Prohibited." *Id.*

William Bingham, a McGinnis Lochridge attorney of 50 years, was the City Attorney at the time the Separation Agreement was executed. He disagreed with the recitals in the Resolution to the effect that that the Separation Agreement was not properly adopted by the City Council. 2RR146-47. He explained why—contrary to those recitals—each of the City's legal arguments in the Bojorquez letter was wrong and why the Separation Agreement was authorized and enforceable. 2RR151-53; PX49. The replacement City Attorneys who advised about the Resolution and wrote the demand letter never testified. The jury was entitled to believe Mr. Bingham and not Mayor Snyder. *See Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 255.

In addition to the technicalities it raised at the time, the City's defense at trial offered additional excuses. Mayor Snyder claimed that Mr. Jones engaged in multiple contracts and deals without the City's knowledge that came to light only after the Separation Agreement. On cross-examination, however, Mayor Snyder was repeatedly impeached by evidence that the City Council had approved each of the actions that he accused Mr. Jones of having done illegally and without Council's knowledge. *See, e.g.*, 3RR81-85; *see also* 3RR169. Mayor Snyder also admitted that he

---

[6] The jury found against the City on its defense that its breach was excused by Mr. Jones' own material breach of the Separation Agreement. Dkt. #124 (Q4(B)).

could not recall any discussion about whether the Separation Agreement was properly budgeted and appropriated. 3RR93. The Eide Bailey report—which Mayor Snyder said made him first question the validity of the Jones Separation Agreement—identifies the issues of so-called concern but did not attribute any blame or indicate any wrongdoing. 3RR124.

Moreover, the suggestion that Mr. Jones was stealing from the City was refuted by the "clean" financial audit in late Fall of 2019. 1RR143. A forensic audit ordered by the Acting City Manager completed at the end of 2020 was also clean. 1RR143-44. Yet "[e]ven after the [] receipt of the forensic audit, there w[ere] still ongoing allegations of theft" by "Tanner Rose and Mike Snyder." 1RR144. As former Councilmember Jordan summed up:

Q. And, to your knowledge, has there ever been a finding of any kind that Odis Jones did misappropriate any funds?

A. Nothing.

Q. Or that, you know, he intentionally -- you know, there was any kind of corruption or side dealing?

A. No.

Q. Have there been allegations of that kind of thing by members of the Hutto city council?

A. Many.

Q. And can you give -- and have those ever been backed by evidence in your view?

A. No. I think everything that's been accused has been investigated internally, externally, some of them two or three times, and never has there been a finding to my knowledge to this date.

Q. Would you say that just the sheer number of things that were thrown against the wall about Mr. Jones was unusual?

A. Yes.

Q. And what do you mean by that?

A.   I mean, it's from personal accusations of misconduct with females. There's been accusations of contracts being negotiated, I guess, out on his own, or many things. Misappropriation of funds. We've had multiple audits. They've had a forensic audit. And none of that was found to be the case.

1RR182-83.

The evidence supports the jury's finding that the City's stated reasons for voiding the Separation Agreement were a pretext for discrimination and retaliation. The City has not made "a clear showing of an absolute absence of evidence to support the jury's" answers to Questions One and Two. *See Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998) (internal citations omitted). Thus, it has not provided the Court with any legitimate basis to overturn the jury's verdict.

### 3.   Councilmembers directed racially charged statements and conduct at Mr. Jones.

Additional circumstances further support a reasonable inference that the City's actions were prompted by impermissible racial discrimination. Two Councilmembers, Mike Snyder and Tanner Rose, successfully ran election campaigns based on their stated intentions to "get rid of the city manager and his staff." 1RR133 (indicating that the 2019 City Council election "campaign was basically … 'I'm going to get rid of the city manager and his staff'" and that Mayor Snyder and Tanner Rose "ran on the same platform of 'get rid of Odis.'"). One of those Councilmembers— now the current Mayor of Hutto[7]—boasted to Assistant City Manager Byron Frankland and others in front of City Hall about "the time that he had spent in Kansas City as a store manager of QuikTrip,[8] and he got really good at spotting crooks, you know, … Black guys that he knew were coming into the store and stealing." 1RR147. Mayor Snyder repeatedly referred to Mr. Jones as a

---

[7] Mayor Snyder testified both as the corporate representative for the City and in his individual capacity. 2RR188.

[8] Mayor Snyder continues to work for QuikTrip as an executive. 2RR228.

"crook" and "crooked." 1RR163; *see also* 1RR137-38 ("You know, they made comments about 'crooked Odis Jones.' They both believed that he was receiving kickbacks from developers and contractors and things like that."). Although Mayor Snyder testified that Mr. Frankland and former Councilmember Timothy Jordan were "lying" about these incidents, 3RR115, the jury heard impeachment evidence of Mayor Snyder's own admission during his deposition that "I probably could have said he was a crook." 2RR193.[9]

Mr. Frankland believed that Mayor Snyder was evidencing animus against Black men in his "crook" comments:

```
14:27:13  12  Q.    Now, do you recall -- do you think that -- that the
14:27:32  13  allegations or comments talking about Mr. Jones as a crook or a
14:27:37  14  shyster or that he was stealing money or statements in any way,
14:27:41  15  shape, or form were made on the basis of Mr. Jones' race?
14:27:46  16  A.    I would say yes.
```

1RR:163; *see also* 1RR49.

Furthermore, Mr. Frankland believed there was a connection between the comments that Mayor Snyder made about Black people being crooks and the decision to rescind Mr. Jones' Separation Agreement. 1RR169.[10] When asked why, he responded:

> It had never been done before. Hutto had separated with city managers previous to Mr. Jones arriving there. You know, … I've never heard of it in my 30 years of this business, where a city would go back -- after a council had taken action on a

---

[9] The jury asked a question about this admission, erroneously believing it was to be contained in DX67, and the Court instructed the jurors, as agreed by the parties, that "[t]he testimony you are seeking was not admitted into the evidence in this case." 4RR51-53. As noted above, Mr. Frankland testified clearly and unequivocally that Mr. Snyder called Mr. Jones a "crook" in his presence.

[10] The City ignores this testimony when it selectively references Mr. Frankland's testimony that it believes favors its position, JMOL at 13, violating the requirement that the Court view the record in a light most favorable to the verdict. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).

separation agreement with the city manager, that they would go back and you know undo the contract.

1RR169.

Mayor Snyder also complained to Mr. Frankland in a local restaurant that there were "too many minorities in city government …." 1RR151-52. And in a heated discussion between Mayor Snyder and Mr. Jones in a Council executive session, Mayor Snyder claimed that he was so intimidated by a comment Mr. Jones made about the way things are handled in "the east side of Detroit" that he went to the district attorney's office to press charges against Mr. Jones, claiming he feared for his safety. 3RR94. Mayor Snyder described the argument in a racially charged manner and portrayed Mr. Jones as a dangerous and angry Black man:

> And he was calling me "boy" and how I'm lucky he doesn't open a can of whoop-ass on me and do what they do to me what they do to people on the east side of Detroit.
>
> So from the area of town that I grew up in, I'm not used to people talking to me that way, and I took that as a direct threat to my life.

3RR94-95. Another Councilmember, Peter Gordon, who witnessed the exchange contradicted Mayor Snyder's characterization of Mr. Jones's conduct: "I didn't get the feeling that it was really going to come to blows … or become physically violent." 3RR146.

There is no question that Mayor Snyder and Tanner Rose played a determinative role in revoking the Separation and Consulting Agreements and other retributive actions against Mr. Jones. The initial decision to separate "without cause" was made by a quorum majority of five votes when Mayor Snyder was in Costa Rica on vacation:

> At first, the City Council voted 5-1 (when Snyder was on vacation) for separation and consulting agreements without cause. Tanner Rose was the nay. Mr. Jones assented to the separation agreement, understanding that the political winds had changed and that, "'it's time for me to go'" after three years of service in the role of City Manager.

*          *          *

As I understood it, it was just a mutually agreeable separation. Nothing to do with
performance or anything like that.

1RR134-35.

The only naysayer, Tanner Rose, was "very upset" that the separation was made "without
cause." 1RR136. And when he learned of the vote on his return, Mayor Snyder was furious and
made it his mission to turn it around. 3RR51-53. Mayor Snyder and Tanner Rose went so far as to
"issue[] … a press release" to convey that they did not support the action. 3RR53; PX80, PX84.
The "press release" began setting the stage for the City's future arguments that the Separation
Agreement was void for procedural defects. *See id*. In an effort to publicize the "press release" as
widely as possible, Mayor Snyder posted it on a Facebook page he maintained as "Mike Snyder
Mayor of the City of Hutto." 2RR218; 3RR91; PX84.[11] "Before the ink was dry, just a week" after
executing the Separation Agreement, Mayor Snyder and Tanner rose started their disparagement
campaign against Mr. Jones. 1RR204.

For example, they "spearheaded" a "movement" to remove a plaque honoring Mr. Jones
from the new City Hall building. 1RR:145-46. "Tanner Rose was very explicit in the council

---

[11] The City spends several pages trying to distance itself from Mayor Snyder's "Mayor of Hutto" Facebook
page. JMOL at 10-12. The cases it cites are inapposite because there is proof in this record that Mayor
Snyder was using his "Mayor of Hutto" Facebook page as "a tool of governance." *Kalinen v. Newman*, No.
22-20383, 2023 WL 2645555, at *2-3 (5th Cir. Mar. 27, 2023). Mayor Snyder testified (and other witnesses
confirmed) that he posted multiple City documents on this website, including the Resolution, Bojorquez law
firm demand letter, and the Eide Bailly report. 1RR213; 2RR25-26, 218, 222; 3RR40. He even set up
a Go Fund Me drive to raise money to pay for the City's documents from McGinnis Lochridge and posted
it on the website. 3RR108 ("That way the public who paid to get the access to the documents could also get
access to the documents they paid for.").

Further and unlike the cited cases, Mr. Jones is not claiming he was blocked or had his posts deleted from
the "Mayor of Hutto" Facebook account. He is challenging the City Council's action in passing a resolution
that voided the Separation Agreement, and there can be no question that in doing so, the Councilmembers
were "acting under color of" state law. 42 U.S.C. § 1983. The postings are also probative of Mr. Snyder's
animus and proof of his persistent and pervasive disparagement of Mr. Jones.

meeting that he wanted to remove any remnant of Odis Jones there." *Id.* During an interview of Mayor Snyder and Tanner Rose by a KVUE reporter in connection with this incident, at least one of them reportedly stated, "We wanted to remove a dark stain from the City of Hutto." 1RR146.

And the City Council launched "a third-party independent investigation." 3RR54. Mayor Snyder and Tanner Rose did not let up until the City Council passed Resolution No. R-2020-139, voiding, or alternatively avoiding and rescinding, the Separation Agreement, and directing the City Attorney to demand that Mr. Jones return the $412,000 already paid to him. PX55.

Thus, the record establishes much more than a simple employment termination.  The record shows that the City Council followed Mayor Snyder and Tanner Rose's lead in a racially based campaign to destroy Mr. Jones's career and reputation in the community, of which his termination as City Manager was one component. Mr. Jones, who has worked in a number of "majority white communities" and has "seen racism," had never experienced anything like it. His experience in Hutto was "really nasty … I think the City became obsessive with just wanting to destroy me, and they wouldn't stop. And that was different." 1RR212.

### 4.    Mayor Snyder and Tanner Rose were the "cat's paws" for the other Councilmembers.

Notwithstanding this proof, the City claims that there is no evidence of racial motivation in the Council vote for the Resolution because Mr. Jones did not present evidence that the other five Councilmembers had a racial bias or conspired with Mr. Snyder and Tanner Rose. JMOL at 9. The City devotes a great deal of space to setting out the district-court divide over whether a minority or majority of the Board must show discriminatory animus, "bad faith," or something similar. JMOL at 5-10. The Fifth Circuit has ostensibly agreed with the majority rule. *Griggs*, 930 F.3d at 701-02. But that is not the end of the inquiry. The next step is determining whether liability has been established through the "cat's paw" theory.

14

Under this theory, "an employer may be held liable 'even if the ultimate decisionmaker [him]self holds no discriminatory animus as long as the plaintiff can demonstrate that [the] decision was influenced by another who does hold such animus.'" *Melvin v. Barr Roofing Co.*, 806 F. App'x 301, 307 (5th Cir. 2020) (per curiam) (unpublished) (quoting *Fischer v. Lufkin Indus. Inc.*, 847 F.3d 752, 758 (5th Cir. 2017)). "'Animus and responsibility for the adverse action can both be attributed to the earlier agent ... if the adverse action is the intended consequence of that agent's discriminatory conduct.'" *Id.* (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)).

To prevail on a cat's paw theory, "a plaintiff must establish that the person with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action. Put another way, a plaintiff must show that the person with retaliatory animus used the decisionmaker to bring about the intended retaliatory action." *Zamora v. City of Hous.*, 798 F.3d 326, 331 (5th Cir. 2015). Accordingly, a cat's paw analysis imputes to other Councilmembers the racial animus of Mayor Snyder and Tanner Rose via proof that they (1) "exhibited discriminatory animus" to Mr. Jones and (2) "'possessed leverage or exerted influence over the titular decisionmaker[,]'" *i.e.*, the Councilmembers. *See Lott v. Kenedy Indep. Sch. Dist.*, No. SA-08-CV-935-XR, 2010 WL 1544503, at *3 (W.D. Tex. Apr. 16, 2010) (quoting *Roberson v. Alltell Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004)).[12]

Here, the racially motivated statements of Mayor Snyder and otherwise inexplicable conduct of Tanner Rose allowed the jury to conclude that race was a determinative factor for at least two of the Councilmembers necessary for a majority vote. In addition, there is significant proof to support a conclusion that race also was a determinative factor for the remaining

---

[12] In *Lott*, the Court applied the cat's paw analysis to a school board but found that, unlike here, there was no evidence that the individual harboring racial animus had the necessary level of influence over other board members. 2010 WL 1544503, at *3.

Councilmembers under the cat's paw doctrine. Mayor Snyder and Tanner Rose's actions give rise to a more than reasonable inference that they possessed leverage over and improperly influenced their fellow Councilmembers to vote for the Resolution.

As soon as the "without cause" Separation Agreement was executed, Mayor Snyder and Tanner Rose embarked on a campaign to get the City Council to retract it. They stopped some key drainage, flood prevention, and road projects that Mr. Jones had started. 1RR143. They claimed that Mr. Jones had "robbed the City blind" by "tak[ing] money from the City coffers" and "getting kickbacks from developers"—despite the fact that the City had a "clean financial audit" in the fall of 2019. 1RR143. Then they blamed Mr. Jones for having to lay off over forty city employees in early 2020, although the layoffs were explained by the scaling back of development projects by the "anti-growth" faction in the Council and the COVID pandemic. 3RR166-67 (Gordon testimony). Even the City's financial distress was overstated—it dipped into its reserves, but never went below the minimum required by the Charter and never filed for bankruptcy. 3RR167-68.

Not content to stop at direct efforts to pressure the Council to retract the Separation Agreement, Mayor Snyder and Tanner Rose stirred up their "anti-Odis" base to harass three Councilmembers who eventually resigned as a result and were replaced with new Councilmembers, all of whom voted in favor the Resolution to void the Separation Agreement. 1RR141-43. Mayor Snyder and Tanner Rose even threatened one Councilmember's (Mr. Jordan) job on another Hutto board because he signed a letter in support of Mr. Jones, claiming that signing such a letter was tantamount to saying that "the City was racist." 1RR188.

Mayor Snyder also exerted influence over other Councilmembers through his control of the City Attorneys. The long-time City Attorneys from McGinnis Lochridge were of the opinion that the Separation Agreement was valid and enforceable. 3RR:60, 64-66. Accordingly, not long

after the Separation Agreement was executed, Mayor Snyder fired the City Attorneys from McGinnis Lochridge and replaced them with the Bojorquez Law Firm, who authored and sent the letter claiming the Separation Agreement was void. 3RR60, 65; PX49. Mayor Snyder disagreed with the McGinnis Lochridge opinions that the Separation Agreement was valid and enforceable and instead espoused the contrary opinions of the Bojorquez firm. 3RR64-66; *see also* 2RR149-54, 191-92. Two Hutto Councilmembers testified that they voted to rescind the Separation Agreement because the replacement City Attorneys told them that the contract was not entered into legally and the money was not budgeted and allocated for the severance payment. 3RR163, 181-82.

This evidence is more than sufficient proof that Mayor Snyder and Tanner Rose used the other Councilmembers "to bring about the intended retaliatory action," thus substantiating that their discriminatory and retaliatory animus was the but-for causation for the City's unconstitutional actions. *Zamora*, 798 F.3d at 331. The fact that Mayor Snyder was chosen to be the City's corporate representative at trial, when his conduct was a primary basis for the lawsuit, highlights the extent—and enduring power—of his influence.

### III.   The City breached the Separation Agreement.

The City not only violated Mr. Jones' civil rights, it voided the Separation Agreement, demanded his back his severance pay, published its discriminatory actions in social media, and made unsubstantiated, disparaging accusations.[13] The City went great lengths to ensure that he would never work for city government again, despite his prior illustrious, 30-year career in the field.

---

[13] The Court has previously rejected the City's attempt to define "disparagement" under the Texas Pattern Jury Charge standards. JMOL at 20.

Mayor Snyder and Tanner Rose posted on social media and commented to outsiders that Mr. Jones "ruined our town" and "ruined our city …." 1RR140. The resolution and letter demanding repayment were also published on the "Mayor of Hutto" Facebook page. 1RR213; 2RR218. Although they tried to distance many of the postings by saying that they did not pertain to Mr. Jones, Mr. Jordan confirmed that this social media was disparaging as to Mr. Jones and that the disparagement continues. 1RR183.

Beyond social media, then-Councilmember Mike Snyder and Tanner Rose "ran on the same platform of 'get rid of Odis ….'" 1RR133. They both disparaged Mr. Jones after he left his position as City Manager, calling him a "crook" and "crooked" within the walls of City Hall. 1RR137-38. As the former Assistant City Manager of Hutto testified, "You know, some of these comments, ***even from other members of the council***, was, you know, they supported Odis and they -- that he robbed the City blind. … [T]hey alleged that, you know, he was -- he had -- Odis had taken money from the City coffers, and Odis was getting kickbacks from developers and all this." 1RR143 (emphasis added). And Mayor Snyder and Tanner Rose both communicated their belief that Mr. Jones "was receiving kickbacks from developers and contractors and things like that." 1RR138.

These disparaging comments were made beyond City Hall's four walls and even the Hutto community. Former City Councilmember Jordan testified that the disparaging comments had been shared with members of the Missouri City Council. 1RR184. And when Mr. Jones tried to get a development project with the City of Seguin, he was informed by the City Manager there that "because of the allegations of misappropriation of funds and signing illegal contracts, that [the City Manager] did not feel comfortable, he felt that I had a bad reputation." 2RR68.

These facts support the jury's unanimous finding that the City of Hutto breached its Separation Agreement with Mr. Jones by disparaging him. The City has failed to meet its burden of demonstrating that "'the facts and inferences point so strongly and overwhelmingly in the [City's] favor that reasonable jurors could not reach a contrary conclusion.'" *See Griggs*, 930 F.3d at 701 (quoting *Alonso*, 920 F.3d at 882). There is no basis on which to overturn the jury's verdict.

**IV.   The City has offered no basis for disturbing the jury's damages findings.**

    **A.   The jury's damages findings are supported by legally and factually sufficient evidence.**

Having prevailed on his civil rights claim, Mr. Jones can recover a broad range of compensatory damages, including lost or diminished earnings and earning capacity, out-of-pocket expenses, personal humiliation, mental distress, embarrassment, and attorneys' fees. *See, e.g.*, *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 302, 307 (1986); *see also Doe v. Neal*, No. SA–14–CA–102–XR, 2015 WL 3688259, at *3 (W.D. Tex. June 12, 2015) (citing *Benoit v. Bordelon*, 596 F. App'x 264, 269–70 (5th Cir. 2015)); 42 U.S.C. § 1988. Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citing Restatement (Second) of Torts § 903 (1979)). As the Court instructed the jury, "the law does not require that Jones prove the amount of his losses with mathematical precision but only with as much definiteness and accuracy as the circumstances permit." Dkt. #112 at 10.

Mr. Jones has lost his career and his professional accomplishments in municipal government have been eviscerated as a result of the City's targeted, persistent, and ruinous conduct. As Mr. Jones testified:

> They hunted me down like a rag doll. For three years they're out in public, you know, calling me a crook and making me out to be a villain. So, no, I was not able to move on. It made it really hard for me to provide for my family. And, no, I was not able to move on.

1RR198. He explained the devastating effects on his career from the postings:

> on the City's website, the City's saying that I, you know, was just bad, you know, terrible city manager. All sorts of things that – that just hurt me and a career I was passionate about. Made me out to be a villain, somebody doing illegal things. You know, they claimed that I had signed illegal contracts.

*        *        *

> [Mayor Snyder and Tanner Rose], [a]s council folks, they felt that my performance was – was terrible in the City, and I mistreated the residents.

1RR204-05.

Mr. Jones, who is 51, has worked in state and municipal governments since college. 1RR195, 208. Before coming to the City of Hutto as its City Manager, he had years of high-level experience working for cities with extensive needs, including his employment as Head of Development for the State of New Jersey, Head of Development for the City of Cincinnati, and part of the team managing Detroit (2013-16) through its bankruptcy and restoring its utility services. 1RR208-09. He had a proven compensation track record before making around $282,000 a year ($23,500/month) as the City Manager of Hutto at the time of the Separation Agreement 2RR10. He was guaranteed a year's salary as severance if terminated without cause. *Id.*

This financial information is corroborated by the forensic accounting report from Eide Bailly, providing a breakdown of his earnings and benefits that were the basis of his severance pay:

Figure 1

| Description | Amount |
|---|---|
| Severance Pay | $283,250.00 |
| Sick Leave | 33,973.66 |
| Vacation | 28,059.45 |
| Administrative Leave | 8,715.39 |
| Vehicle Allowance | 8,400.08 |
| Salary | 4,357.76 |
| Miscellaneous | 251.93 |
| **Total** | **$367,008.27** |

PX26 at Fig. 1. These annual amounts are further corroborated by the severance payment from the City, representing one year's salary and unpaid benefits of $412,000.[14] Considering his age of 51 years, 1RR195, and the age of retirement at 67,[15] Mr. Jones stood to earn approximately $4.5 million without taking into account raises, promotions, inflation, or other such factors. His proven 30-year track record in state and municipal government renders this projection not only reasonably certain but also extremely credible.

Mr. Jones' children attended school in Hutto, and he and his wife planned to stay in their home there. 2RR8-9. However, as mentioned above, when he tried to get a development project with the City of Seguin, he was informed by the City Manager there that "because of the allegations of misappropriation of funds and signing illegal contracts, that he did not feel comfortable, he felt that I had a bad reputation." 2RR68. In order to take a City Manager job elsewhere for less money (around $250,000 annually), Mr Jones moved his family to Missouri City. 1RR214; 2RR11. After Mayor Snyder and Tanner Rose contacted the mayor of Missouri City, Mr. Jones was fired by

---

[14] The components of the $412,000 severance payment are detailed on Attachment 8 to PX26.

[15] *See* Social Security benefits, https://www.ssa.gov/benefits/retirement/planner/1960.html (last visited June 15, 2023).

Missouri City within a year. 1RR214-15; 2RR12-13. A jury was entitled to infer that Mayor Snyder

and Tanner Rose made disparaging comments about Mr. Jones that led to his termination from

Missouri City.

Mr. Jones then tried to find other jobs both inside and outside of municipal government.

2RR13-14. But after Missouri City, he was not able to obtain another job in city government.

2RR14. Yet even then, the disparaging comments continued:

> I was trying to make ends [meet] and odd jobs to keep things moving in the
> household. And every time I either had a job interview or I had a conversation, it
> was always about, hey, what happened to this thing in Hutto? Did you steal money
> down there? Did you do something illegal down there?
>
> That's a question my entire career I had never been asked. And I just realized that
> I've got  to stop them or I'm not going to be able to get a job. I'm not going to be
> able to move forward. I've got to -- and the only person I knew that could stop them
> is this [C]ourt.

1RR216-17.

As a result, Mr. Jones has suffered significantly:

> [T]his whole process has been hell. You know, I never imagined that I'd be even
> here. … [I]t's been stressful for me, my family. I gave everything I had, I tried to
> play by the rules and I didn't get a chance to enjoy the benefits of my agreement
> like my White counterparts did.
>
>            *         *         *
>
> I've lost a lot of wages, benefits, career has been tarnished, a lot of stress, a lot of
> strain, so it's been hard. … at one point I was ended up having a stress attack is
> what the doctor called it.
>
>            *         *         *
>
> This was beyond what I had dealt with over 30 years of being in the business.

2RR17-18, 22. In addition to these injuries, Mr. Jones incurred legal fees of "north of a half million

dollars" by the time of trial. 2RR17.

The City has failed to meet the demanding "no-evidence" standard to set any of the jury's damages findings aside.

**B.      Consequential damages and attorneys' fees awards are appropriate.**

The City's other challenges are equally unavailing to overturn the jury's damages findings.

First, the City claims that "a jurisdictional governmental immunity defense"—which it admittedly raises for the first time in this litigation—precludes any award of consequential damages, including attorneys' fees. JMOL at 14-15 (citing TEX. LOC. GOV'T CODE § 271.153(b)(1)). This argument founders on its initial premise because the jury found an unconstitutional deprivation of Mr. Jones' rights. Mr. Jones is entitled to damages and attorneys' fees under both 42 U.S.C. § 1981 for violations of his civil rights and breach of the Separation Agreement. For the constitutional torts, federal—not state—law governs his recovery, and the Civil Rights Act permits Mr. Jones as the prevailing party to recover a wide range of damages and attorneys' fees. *See* part IV.A. Further, by its own terms, the Texas Local Government Code applies only "in an adjudication brought against a local governmental entity ***for breach of a contract*** subject to this subchapter …." (emphasis added)). It does not purport to reach the recovery for the civil rights violations.

Second, the City fails to show that the jury actually awarded consequential damages and attorneys' fees for breach of contract. The contract-damages finding appears on a general verdict form, not granulated. Dkt. #124 (Q4.C). The City did not object to the lack of separate answer blanks for various measures of damages. 3RR207-19. As a result, there is no basis for the Court to conclude that any of the excluded damages are included in the jury's contract-damages finding. Indeed, the general verdict form does not supply any details allowing the Court to ascertain which portion of the award would include them. By failing to object, the City has forfeited this argument. *Cushman v. GC Serv., L.P.*, 897 F. App'x 24, 30 (5th Cir. 2010) ("'If a party fails to object with

23

specificity to a proposed [jury] instruction, the right to challenge the instruction on appeal is waived.'" (quoting *Texas Beef Grp. v. Winfrey*, 201 F.3d 680, 689 (5th Cir. 2000)).

C.   **The Court properly awarded damages for both the constitutional torts and the breach of contract based on the jury's verdict.**

The jury found very different amounts in the answer blanks for the constitutional tort and contract claims. Dkt. #124 (Q.3 & Q.4(C)). And the Court properly awarded both. Contrary to the City's argument that the constitutional "tort" actually sounds in contract and produces a double recovery, JMOL at 16-17, "[d]amages awarded under 42 U.S.C. § 1983 are governed by common law tort principles." *Doe*, 2015 WL 3688259, at *3 (citing *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir.1994)); *see also Stachura*, 477 U.S. at 306 ("[Section] 1983 creates "a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." (internal quotations and citations omitted)). And as the City itself points out, certain forms of damages that are recoverable under § 1983, *see* part IV.A, are not recoverable for a breach of contract under Texas law. *See* JMOL at 15-16.

In sum, the City has failed to meet its burden under Rule 50(b) and the JMOL motion, requiring that the motion be denied, including its belated request for attorneys' fees.

### PRAYER

For these reasons, Plaintiff Jones respectfully requests that the City of Hutto's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial be denied in its entirety.

Respectfully submitted,

/s/ *Marcy Hogan Greer*
Douglas W. Alexander
  State Bar No. 00992350
  dalexander@adjtlaw.com
Marcy Hogan Greer
  State Bar No. 08417650
  mgreer@adjtlaw.com
ALEXANDER DUBOSE & JEFFERSON LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303

Kirsten M. Castañeda
  State Bar No. 00792401
  kcastaneda@adjtlaw.com
ALEXANDER DUBOSE & JEFFERSON LLP
8144 Walnut Hill Lane, Suite 1000
Dallas, Texas 75231-4488
Telephone: (214) 369-2358
Facsimile:  (214) 369-2359

Edward M. "Ted" Smith
  State Bar No. 00791682
  tsmith@cornellsmith.com
Andrew Broadaway
  State Bar No. 24082332
  abroadaway@cornellsmith.com
CORNELL SMITH MIERL BRUTOCAO BURTON,
LLP
1607 West Avenue
Austin, Texas 78701
Telephone: (512) 328-1540
Facsimile:  (512) 328-1541

Jay D. Ellwanger
  State Bar No. 24036522
  jellwanger@equalrights.law
Holt M. Lackey
  State Bar No. 24047763
  hlackey@equalrights.law
ELLWANGER LAW LLLP
8310-1 N. Capital of Texas Hwy., Ste. 190
Austin, Texas 78731
Telephone: 737-808-2260

COUNSEL FOR PLAINTIFF ODIS JONES

## CERTIFICATE OF SERVICE

I certify that, on June 15, 2023, this document was served in compliance with the Federal Rules of Civil Procedure, by filing this document with the Court's CM/ECF system which served the document on all parties electronically to all counsel of record.

/s/ *Marcy Hogan Greer*
Marcy Hogan Greer