## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **ODIS JONES,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Case No. 1:20-CV-1210-ML** |
| | § | |
| **CITY OF HUTTO,** | § | |
| | § | |
| *Defendant.* | § | |

### PLAINTIFF'S COMBINED RESPONSE AS TO THE CITY OF HUTTO'S
### PRE- AND POST-HEARING BRIEFING ON POST-JUDGMENT MOTIONS

Plaintiff Odis Jones respectfully files this combined response as to *Defendant City of Hutto's Rule 12(h)(3) Challenge to the Court's Subject-Matter Jurisdiction and Brief in Support of Granting its Renewed Motion for Judgment as a Matter of Law* (Dkt. #156) ("Motion to Dismiss" or "MTD") and *Defendant City of Hutto's Post-Hearing Brief in Support of a No Pretextual Ruling* (Dkt. #158) ("Post-Hearing Brief" or "PHB").

### INTRODUCTION

The jury found that the City of Hutto, acting through its Council, deprived Mr. Jones of his equal rights to make and enforce contracts and that his race was a determinative factor in that decision. The City told the jury from the outset of trial that it had to believe at least four Councilmembers met this standard.[1] The jury's verdict proves it did. It assessed the credibility of the witnesses, considered the other evidence, and found as a matter of fact, that race was a determinative factor in the City's denial of Mr. Jones' constitutional rights.

---

[1] 1RR121 ("The city council operates as a governing body. There's seven of them. It takes four votes to do anything. So, without those four votes, it's not city council action.").

The City claims that a headcount analysis is the only way to satisfy this burden, citing *Griggs v. Chickasaw County, Mississippi*.[2] In *Griggs*, the Fifth Circuit found proof that "three of the five board members had retaliatory motive" was sufficient, but it did not foreclose other theories.[3] The cat's-paw and collective-action theories are also options to make the showing that race was a determinative factor for a majority of the Council. Below, Mr. Jones will demonstrate that the record is sufficient to support the jury's decision under all of these theories.

At the hearing, the Court asked a number of questions about Mr. Jones' proof for the headcount theory. The record supports the jury's finding Mr. Jones' race was a determinative factor for at least five of the Council Members who voted to void and rescind his Separation Agreement. The reasons these Councilmembers provided for voiding the Separation Agreement were all over the map, contradicted by the City's official minutes of Council meetings, and were otherwise entirely unsubstantiated. None of the Councilmembers offered a legitimate, non-pretextual reason for taking the unprecedented action of rescinding Mr. Jones' Separation Agreement and demanding back his severance pay. The jury was justified in rejecting these reasons and awarding Mr. Jones substantial damages.

The record also substantiates the incredible effort by Mayor Snyder and Tanner Rose to turn the Separation Agreement on its head starting before the ink was dry. They led an effort to intimidate the councilmembers who supported Mr. Jones into resigning[4] and to replace them with loyal supporters, such as Robin Sutton, who was already demonstrably "anti-Odis" before she

---

[2] *See* MTD.12-14 & n.30 (citing *Griggs v. Chickasaw Cnty., Miss.*, 930 F.3d 696, 704-05 (5th Cir. 2019)).

[3] *Id.*

[4] *E.g.*, 1RR142-43 (Assistant City Manager Byron Frankland testifying that "[s]ome of the [Council]members, Tom Hines, Scott Rose, Doug Gaul, because of the increasing basically harassment, they had resigned their positions" and attributing the harassment to "Tanner Rose and Mike Snyder," who claimed that Mr. Jones had "robbed the City blind" under the watch of the resigning Councilmembers).

became a Councilmember.[5] Their influence and leverage justifies application of the cat's-paw doctrine to impute their proven racial animus to the other Councilmembers. The jury could have reasonably concluded that the decision to revoke the Separation Agreement would never have come before the Council but for this extraordinary and racially-motivated crusade.

Independently of the first two theories, the collective actions of the Council—including its otherwise inexplicable decision to remove the plaque with Mr. Jones' name on it from the new City Hall he helped to build—suffice to show that Mr. Jones' race was outcome determinative for a majority of the Councilmembers. The jury verdict and Judgment should be upheld on one or more of these bases.

The City's belated "jurisdictional" challenges are either entirely dependent upon an incorrect assumption of Texas contract law or merely a recasting of its JMOL challenges to the verdict. The City's Motion to Dismiss should likewise be denied.

### ARGUMENT AND AUTHORITIES

**I.      The evidence supports the jury's reasonable inference that Mr. "Jones' race was a determinative factor" in the City's decision.**

The Court charged the jury to decide: "Was Mr. Jones's race, Black, a determinative factor for the City of Hutto's denial of Jones's right to make and enforce contracts with the City?" Dkt. #124 at 3. It properly instructed the jury as to how to consider the evidence:

> Jones is not required to produce direct evidence of intent, such as statements admitting discrimination. Intentional discrimination may be inferred from the existence of other facts. The City has argued that it has a nonrace-based reason for its conduct. ***If you disbelieve the City's explanations for its conduct, then you may, but need not, find that Jones has proved intentional discrimination.*** In deciding whether race was a determinative factor in the City's decision, you may consider whether the City's stated reasons for its actions was a pretext or excuse for discrimination. However, you cannot find intentional discrimination simply

---

[5] *See* Argument part I.A.1.

> because you disagree with the political or business judgment of the City or believe
> it is harsh or unreasonable.

4RR13-14 (emphasis added); *see also* Dkt. #124 at 3; Dkt. #112 at 7. The emphasized language is

a correct statement of the law, *see, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the

employer's asserted justification is false, may permit the trier of fact to conclude that the employer

unlawfully discriminated."); *see also cf.* Fifth Circuit Pattern Jury Charges 1.5.1. Indeed, the City

proposed this language as proper instruction for the jury. Dkt. #95 at 8 ("Joint Proposed Jury

Instructions and Verdict Forms").

The City also proposed using "a determinative factor" causation in jury question 2. *Id.* at

9. "A determinative factor" is tantamount to but-for causation. *Burns v. Tex. City Refin., Inc.*, 890

F.2d 747, 750 (5th Cir. 1989) ("The evidence of pretext must demonstrate that [race] was a

determinative factor in the sense that the employee would not have been discharged but for the

employer's motive to discriminate because of [race]."). As the Supreme Court has instructed:

> That form of causation is established whenever a particular outcome would not
> have happened "but for" the purported cause. In other words, a but-for test directs
> us to change one thing at a time and see if the outcome changes. If it does, we have
> found a but-for cause.

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. ---, 140 S. Ct. 1731, 1739 (2020) (citing *Gross v. FBL

Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)); *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-

Owned Media*, 140 S. Ct. 1009, 1019 (2020) (plaintiff seeking to recover under § 1981 must prove

that race was "but-for" cause of injury).[6]

Contrary to the City's suggestion, but-for causation does not require a showing that race

was the only factor in the City's decision:

---

[6] Justice Gorsuch authored both the majority opinions in *Bostock* and *Comcast.*

> Often, events have multiple but-for causes. So, for example, if a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision. … So long as the plaintiff's [protected status] was one but-for cause of that decision, that is enough to trigger the law.

*Bostock*, 140 S. Ct. at 739 (emphasis in orig.) (citations omitted). Thus, Mr. Jones' race "need not be the sole or primary cause of [the City's] adverse action." *Id.* at 1744.

The record supports the jury's determination that Mr. Jones' race was in fact a determinative factor for a majority of the Council Members who participated in the actions that ultimately led the City to attempt to void or rescind his Separation Agreement.

### A.    The "headcount" shows that race was a determinative factor for at least five Council Members.

Mr. Jones does not concede that a "headcount" analysis of the individual Council Members is necessary for him to prove the collective Council acted with unlawful purpose. *See* parts I.B&C. Although the Fifth Circuit indicated that a headcount showing was sufficient, it never indicated that such a showing was the only method for satisfying the "majority" burden. *See Griggs v. Chickasaw Cnty., Miss.*, 930 F.3d 696, 704-05 (5th Cir. 2019). But it is unnecessary to make that determination because Mr. Jones carried his burden of proof with respect to five Council Members.

At the October 3 hearing, the Court seemed satisfied that Mr. Jones had proven his case of discrimination as to Mayor Snyder and Tanner Rose, and so he will not repeat those arguments here. The other Council Members who voted to void his Separation Agreement were: Robin Sutton, Patti Martinez, Peter Gordon, and Daniel Thornton. PX55 ¶ 10.4; *see also id.* ¶ 2 (ROLL CALL). As to the first three, there is ample evidence to support a reasonable inference that Mr. Jones' race was a determinative factor in their individual decisions to void the Separation Agreement.

### 1. Robin Sutton

Although Ms. Sutton was not a Council Member at the time of the Separation Agreement, she was present at a number of Council meetings during that timeframe—including the meeting at which the Separation Agreement was adopted—and the minutes reflect that she was quite supportive of then-Councilmember Snyder and critical of City Manager Jones and the Councilmembers who supported him. According to the minutes from Council Meetings that took place before she became a Councilmember, Ms. Sutton was both present and vocal at most meetings. For example, the minutes reflect that she:

- said she was "offended … by voting tonight to give the City Manager close to a million dollars to spend without any oversight" and "frustrated because no one cares anymore," PX50 at COH008064-65 ("PUBLIC COMMENT from October 17, 2019, unsigned minutes).[7]

- "shared that Councilman Snyder cares about the residents of Hutto" in relation to an action item considering the investigation of Mr. Snyder, PX41 ¶ 14.L;[8]

- "expressed her concerns regarding the vetting process for the city manager," PX8 ¶ 12.A;[9]

- called for the resignation of then-Mayor Gaul and Mayor Pro-tem Hines and declared her intention to "run[] for Council in May," PX71 at 2 ("PUBLIC COMMENTS") & ¶ 7.A;[10]

---

[7] The minutes also reflect that Ms. Sutton was critical of the "[r]esolution authorizing the City Manager to execute various construction contracts, professional service agreements and material purchase agreements, … want[ing] to know why the City is giving the City Manager free range with $2,276,285.31." PX50 at COH008075. After an Executive Session was held on this item, Mr. Snyder and Tanner Rose voted against the motion. *Id.*

[8] The minutes also recite that Nicole Calderone criticized the investigation of Mr. Snyder. PX41 ¶ 14L. Ms. Calderone and Ms. Sutton are often mentioned together in the minutes questioning and criticizing the then-current City Manager, City Council, and Mayor. *E.g.*, PX8, PX40, PX41, PX71. Ms. Calderone was described as "most talking about Odis negatively after he left" and being "especially brutal to Mayor Gaul at the time." 1RR145.

[9] Ms. Calderone also "shared her concerns regarding the city manager" and that "Council should hold the City Manager accountable." PX8 ¶¶ 12.A & 13.A.

[10] This is also consistent with the efforts of Messrs. Snyder and Tanner Rose. They were on a crusade not only to deprive Mr. Jones of the agreement he made with the City but also to oust anyone who supported

- criticized Mayor Gaul and indicated that "[t]he City needs to clean house and move forward," PX99 at 2 "PUBLIC COMMENTS");

- asked for access to the report of the investigation "in to the City Manager's office" and commented on "investigations in the City Manager's office and accountability in leadership and management of the City," PX131 at 2 ("PUBLIC COMMENTS") & ¶ 8.A;

- "commented on the investigation of the City Manager's office, conflict of interest, legal services invoices," PX40 at 2 ("PUBLIC COMMENTS");[11]

- "commented on options for legal services … and status of a forensic audit," PX39 at 2 ("PUBLIC COMMENTS"); PX15 at 1 ("PUBLIC COMMENTS"); and

- commented on the "corrupt government," PX15 at 1 ("PUBLIC COMMENTS").

It would be more than reasonable for the jury to infer that Ms. Sutton was part of the Snyder-Tanner Rose crusade against Mr. Jones from the outset. Given her extensive involvement in their issues relating to Mr. Jones, it is another reasonable inference that she was aware of their racist comments and shared that sentiment. The fact that Ms. Sutton was elected to Council after Messrs. Hines and Scott Rose were harassed into resignation can reasonably be viewed as no mere coincidence. *Compare* PX36 ("ROLL CALL") *with* PX35 ("ROLL CALL"); *see also see also* 1RR142-43. And Ms. Sutton was the one who made the motion to adopt the resolution declaring the Separation Agreement void, PX55 ¶ 10.4, with full knowledge that the Eide Bailly forensic audit report had uncovered no wrongdoing, PX26, and that the reasons provided for voiding the Separation Agreement were pretextual.

---

Mr. Jones, which included then-Mayor Doug Gaul, Mayor Pro-tem Tom Hines, and Councilmember Scott Rose. *E.g.*, 1RR132-33, 142-43.

[11] The "legal services invoices" was another of Mr. Snyder's projects—he had issues with the McGinnis Lochridge legal invoices, *e.g.*, 3RR107, and had successfully motioned to release "1,200+/- pages of legal invoices between McGinnis Lochridge and the City of Hutto from 2017-2020 in a Council Meeting earlier that month. PX131 ¶ 13.F; *see also* PX39 ¶ 15.B. Mayor Snyder took credit for terminating McGinnis Lochridge as city attorneys. 3RR60. Ms. Sutton repeatedly expressed interest in the subject matter. *See also* PX39 ¶ 14.C. Mr. Gordon eventually joined that effort as well. *See, e.g.*, PX34 ¶ 11.4

### 2.  Patti Turner Martinez and Peter Gordon

Ms. Martinez and Mr. Gordon originally voted for the Separation Agreement at the November 2019 Council Meeting when Mr. Snyder was absent. *See* PX8 at 1 ("ROLL CALL") & ¶ 13.A. Then-City-Attorney Bill Bingham prepared the Separation Agreement and believed it to be legally sound and that Council adopted it following its ordinary processes; no Councilmember raised any concerns or debated whether to terminate with cause. 2RR135-37.

In the November 22, 2019, Separation Agreement, Mr. Jones expressly released his claims against the City, including his "claims based on rights under any federal or state anti-discrimination laws." PX2 § 5. Ms. Martinez, Mr. Gordon, and the other Councilmembers were very much aware that Mr. Jones held such claims, having received an August 14, 2019, letter, as well as an email from Mr. Jones informing them that Mr. Snyder had been "continuously engaged in an effort to create a hostile and intimidating work environment" and that he wished to protect his "employment rights." PX62; PX64. In an October 18, 2019, email from Mr. Jones, he further indicated that, "as the first black City Manager," he had "been a target of racist, hateful attacks and often nonsensical vitriol that has led to threats against my life and the lives of my employees." PX67. He informed them that he would be seeking other opportunities as a result. *Id.*

After Mayor Snyder returned from his vacation and published his incendiary "press release" on Facebook calling for an investigation after consulting with "The Texas Rangers" and the "Williamson County District Attorney," PX84, he and Tanner Rose put items relating to the Separation Agreement, Consulting Agreement, and a potential "Chapter 3.16 investigation regarding personnel matters regarding the office of City Manager" on the agenda for the next Council Meeting. PX80; *see also* PX68 ¶¶ 8.A-C (Dec. 5, 2019 Agenda). At the next Council Meeting, Ms. Martinez and Mr. Gordon joined Mr. Snyder in voting to open an investigation "regarding personnel matters regarding the office of City Manager." PX71 ¶ 8.C. In fact, Mr.

Gordon seconded the motion. *Id.* They likewise voted to approve an agreement for a forensic audit that was done by Eide Bailly. *See* PX15 ¶¶ 11.2, 13.1. Ms. Martinez made a motion to approve Eide Bailly's contract for the forensic audit. PX15 at p.30 ¶ 14.[12]

Although the record does not reflect the Council vote to terminate McGinnis Lochridge, the April 2, 2020, unsigned minutes reflect that Dorothy Palumbo was present in her capacity as "City Attorney," and both the termination of McGinnis and the appointment of Ms. Palumbo's firm, Bojorquez Law Firm, PC, required a majority vote of Council. PX12 § 4.04. Thus, Ms. Martinez and Mr. Gordon presumably participated in the decision to terminate McGinnis Lochridge in early 2020, *see* 3RR60:11-16 (Snyder testimony), and to hire Bojorquez. At the very least, they would have known that Mr. Snyder and Tanner Rose wanted the McGinnis lawyers replaced. It should have been no surprise to them that the new lawyers found grounds to void the Separation Agreement. And a reasonable inference is that Ms. Martinez and Mr. Gordon knew that the grounds stated in the Bojorquez letter, PX28, were pretextual because they had voted for the Separation Agreement in the same meeting where the CFO had reported on the financials, and so knew that the claim of overspending of appropriations was false and pretextual. *See* PX8 ¶ 7.A. And they would also have observed that the Separation Agreement was adopted according to the City's ordinary processes and that no Councilmember raised concerns or debated whether the termination should be with cause. 2RR135-37.

Ms. Martinez and Mr. Gordon would also have been aware of the Snyder/Rose/Sutton effort to rid the Council of others perceived as Mr. Jones' supporters. *See* 1RR186-88 (Jordan testimony that Snyder and Tanner Rose threatened his job because he signed a letter of

---

[12] These unsigned minutes were included in the June 2020 Council Meeting Packet as Item 9.3. *See* PX16 at 2.

recommendation for Jones;[13] "[b]ecause of my signing the letter, it was expressed that I had said the City was racist"); *see also* part I.A.1. Indeed, anyone who spent any time around City Hall had to be aware of the race-based, "anti-Odis" crusade, as the testimony of Assistant City Manager Byron Frankland and former Councilmember Timothy Jordan substantiated. *See* JMOL.Resp.9-14.

As the summer of 2020 approached, the divisions between Council were pronounced, especially when it came to launching an investigation relating to the Separation Agreement with Councilmembers Gordon and Martinez voting with Snyder and Tanner Rose:

**11.3.** Consideration and possible action to open a 316 investigation regarding the release of separation, severance and transition agreements and giving the Council the ability to subpoena witnesses as necessary.

*Councilmember T. Rose made a motion to open a 316 investigation, Councilmember Snyder seconded the motion. The motion passed.*

| VOTE: | Ayes | Nays | Abstain | Absent |
|---|---|---|---|---|
| Mayor Doug Gaul | | X | | |
| Mayor Pro Tem Tom Hines | | X | | |
| Councilmember Scott Rose | X | | | |
| Councilmember Mike Snyder | X | | | |
| Councilmember Peter Gordon | X | | | |
| Councilmember Patti Martinez | X | | | |
| Councilmember Tanner Rose | X | | | |

**ACTION:**   The motion **passed** by a vote of 5 ayes to 2 nays.

PX37 ¶ 11.3.

Ms. Martinez and Mr. Gordon were also witnesses to the heated, racially charged exchange between Mr. Snyder and Mr. Jones during the Council executive session in August 2019 that led Mr. Snyder to try and press criminal charges against Mr. Jones. *See* JMOL.Resp.12. It was Mr. Snyder's conversation with Ms. Martinez that purportedly prompted the altercation. 3RR95-96. Mr. Gordon confirmed that he also witnessed the event. 3RR146.

---

[13] Tom Hines, Scott Rose (and possibly then-Mayor Gaul) also signed the letter. 1RR187.

By September 2020, Mayor Pro-tem Hines and Councilmember Scott Rose were off the Council, having been replaced by Councilmembers Sutton and Thornton. *Compare* PX36 ("ROLL CALL") *with* PX35 ("ROLL CALL").[14] The September 17, 2020, Council Meeting minutes record a speech from then-Councilmember Snyder further evidencing the acrimony between the Councilmembers, indicating that Council was "moving in a new direction," and calling for an independent survey of City staff, and Mr. Gordon is reported to have said," I'll second that if you need a second Mayor." PX35 ¶ 5.1.

On December 5, 2020, Ms. Martinez moved to approve the Resolution that voided and rescinded the Separation Agreement containing the recitations that were proven to be pretextual, and Mr. Gordon also voted for it. PX55 ¶ 10.4. And they knew that Mayor Snyder and Tanner Rose's claims that Mr. Jones had engaged in fiscal wrongdoing were also false because they had received the forensic accounting report from Eide Bailly in October of 2020. PX26; *see also* 1RR182-83.

Finally, Ms. Martinez and Mr. Gordon also presumably went along with the decision to allow Mayor Snyder to serve as the corporate representative for the City, 1RR20, PX67 at 6:12-15, despite knowing all of the above. On this record, the jury was entitled to infer that race was a determinative factor in their votes to rescind Mr. Jones' Separation Agreement and that the stated reasons in the Resolution and in Mayor Snyder's testimony as corporate representative for the City were a pretext for unlawful discrimination.

### 3.    The City's reliance on the advice of the City Attorney was pretextual.

The City cites a number of cases in which a defendant offered an unrebutted, legitimate, and non-discriminatory reason for its decision. PHB.2-9. It claims that the Councilmembers relied

---

[14] *See supra* note 4 (citing 1RR142-43).

on the advice of the City Attorney in voting to void the Separation Agreement. The City goes so far as to assert that its advice-of-counsel defense was conclusively proven and not rebutted. PHB.9. As demonstrated above, that defense was significantly undermined by the City's actions in firing the City Attorneys that its Councilmembers disagreed with and hiring new ones to provide new and contrary opinions to support its actions. The City thus manufactured its advice of counsel and so cannot justifiably claim to rely upon it. Moreover, there was ample evidence that the advice of counsel was purely pretext, as the legal justifications for its action were unsubstantiated and contradicted by the City's own minutes.

Notably, the jury was charged on this very issue. The Court specifically cautioned that "you cannot find intentional discrimination simply because you disagree with the political or business judgment of the City or believe it is harsh or unreasonable." 4RR14. The jury followed this instruction and simply found that the reasons given were pretexts for intentional discrimination.

**B.    The record shows that Mayor Snyder and Tanner Rose had significant influence and leverage over the other Council Members.**

The evidence outlined in part I.A. also justifies a reasonable inference that Mayor Snyder and Tanner Rose had significant influence and leverage over Ms. Sutton, Ms. Martinez, and Mr. Gordon such that the cat's-paw doctrine should also apply. Indeed, the principle animating the cat's-paw doctrine seems particularly applicable in this situation where demonstrably racist decisionmakers infect the collaborative process necessary to produce a collective action by the City. *Lott v. Kenedy Indep. Sch. Dist.*, No. SA-08-CV-935-XR, 2010 WL 1544503, at *3 (W.D. Tex. Apr. 16, 2010) (applying cat's paw test in similar context where evidence showed that a board

member "exhibited discriminatory animus" in collaborative decision as to plaintiff's employment).[15]

Cat's paw is not a form of respondeat superior prohibited as a basis for liability under § 1981. MTD.11. Respondeat superior imposes liability on non-actors by virtue of their relationship with the actor. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007) (per curiam) (Under the theory of respondeat superior, "an employer may be vicariously liable for the negligent acts of its employee if the employee's actions are within the course and scope of his employment."); *see also* TEXAS PATTERN JURY CHARGES §10.10 cmt. ("key elements" of respondeat superior involving nonemployee are (1) benefit to the defendant and (2) right of control by the defendant" (collecting cases))s.

By contrast, cat's paw involves both action and influence:

Under the "cat's paw" analysis involving the imputation of an individual's racial animus to a decisionmaker, "[i]f the [plaintiff] can demonstrate that others had influence or leverage over the official decisionmaker …, it is proper to impute their discriminatory attitudes to the formal decisionmaker."

*Lott*, 2010 WL 1544503, at *3 (quoting *Russell v. McKinney Hosp. Venture*, 235 F.2d 219, 226 (5th Cir. 2000)).

Contrary to the City's argument, the *Comcast* ruling does not require rejection of the cat's paw theory. MTD. 12-13. In *Melvin v. Barr Roofing Co.*, the Fifth Circuit applied cat's paw to claims for discriminatory retaliation, which also uses a "but-for" causation standard: "At the pretext stage, a plaintiff may alternatively support but-for causation using the 'cat's paw' theory."

---

[15] The City asserts that Judge Rodriguez did not apply cat's paw doctrine to Lott's § 1981 claims. However, it was unnecessary for him to reiterate the cat's paw analysis as to the § 1981 claims because he resolved both the Title VII and § 1981 claims identically, finding that Lott had failed to establish an element of her prima facie case. *Compare Lott v. Kenedy Indep. Sch. Dist.*, No. SA-08-CV-935-XR, 2010 WL 1544503, at *4 (W.D. Tex. Apr. 16, 2010) ("Lott's admission precludes her from establishing a prima facie case of racial discrimination."), with *id.* at *5 ("Lott was unable to establish the fourth prong to show a prima facie case for racial discrimination.").

806 F. App'x 301, 306 (5th Cir. 2020) (per curiam) (unpublished) (citing *Fischer v. Lufkin Indus. Inc.*, 847 F.3d 752, 758 (5th Cir. 2017)).[16]

The Fifth Circuit has also applied the doctrine to claims brought under the Age Discrimination in Employment Act, which also uses a but-for causation standard. *EEOC v. DYNMcDermott Petroleum Operations Co.*, 537 Fed. App'x 437, 442, 443-44 (5th Cir. 2013) (per curiam). It is premised on the notion that "courts do not 'blindly accept the titular decisionmaker as the true decisionmaker.'" *Id.* at 443 (citing *Russell,* 235 F.3d at 227). "The relevant inquiry th[e Fifth Circuit] has applied in a circumstantial evidence case is whether the [discriminator] had influence or leverage over [the decisionmaker's] decision making." *Id.* (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003)).

The leverage or influence that unlawfully motivated Mayor Snyder and Tanner Rose over the other Councilmembers is demonstrated in part I.A. They threatened to take away a former Councilman's job because he signed a letter of support for Mr. Jones. 1RR188. And they intimidated and harassed then-Mayor Doug Gaul, Mayor Pro-tem Tom Hines, and Councilmember Scott Rose to resign from their positions on City Council. 1RR142-43. Presumably, they wanted to populate the Council with likeminded Councilmembers, such as Ms. Sutton, who was elected soon afterward. Their extensive influence and leverage over the others justifies a reasonable inference that their proven discriminatory animus inappropriately infected the Council decisions affecting Mr. Jones. Indeed, the jury could reasonably infer and conclude that but for Snyder and Rose's ongoing, multi-pronged, race-based vendetta to continue pursuing Mr. Jones long after his

---

[16] "At the pretext stage, a 'heightened but-for causation requirement applies.'" *Melvin v. Barr Roofing Co.*, 806 F. App'x 301, 305 (5th Cir. 2020) (per curiam) (unpublished) (quoting *Garcia v. Prof'l Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019).

departure from the City's employ, the resolution to revoke the Separation Agreement would not have even been on the Council's agenda.

### C.    The Council's collective actions support the jury's determination.

Even going beyond the headcount and cat's-paw theories, the collective actions of the Council in this case reveal that Mr. Jones' race was a determinative factor for a majority of Councilmembers. To void and rescind the Separation Agreement and demand back the severance pay was unprecedented—both in Hutto and elsewhere. Notably, the prior City Manager had been terminated with questions about her work, yet she was not treated like Mr. Jones. Nor were the dozen other former City employees who received separation agreements.

The Council did a complete about-face on the Separation Agreement after firing the City Attorneys who prepared and defended it. *See* part I.A.2. They hired new counsel who came up with unsubstantiated reasons for voiding the agreement.

The Council went so far as to remove the plaque honoring Mr. Jones as City Manager and the others who had contributed to building the new city hall—to "remove a dark stain" on the City[17]—something that the jury apparently credited as proof of a discriminatory animus. In fact, the jury sent a note asking whether it could require that the plaque removed from Hutto city hall be replaced." 4RR59.[18] The decision to take down the plaque was motivated by no rational reason other than unlawful racial animus.

---

[17] 1RR146.

[18] Mr. Snyder testified in his 30(b)(6) deposition that the plaque removal involved Council action. DX67 at 59:11-23. The jury's second note indicated that they were focused on this deposition, asking for the "page number *within Defense 67* where Mr. Snyder had answered a question about "his experience in QT with black people." 4RR49 (emphasis added). The deposition index would have indicated where the discussion of the plaque could be found as well:

> plaque  58:18,20,22 59:2,
>          12,14,15,22,25 60:7,8,18

DX67 (index).

Every one of the City's stated reasons for its collective action—as stated in the Resolution, the Bojorquez letter Council authorized, and the testimony of its corporate representative, Mayor Snyder—was proven to be false and pretextual. *See* JMOL.Resp.7-10.

The totality of the evidence shows that race was an integral and causative factor of every decision Council made in the year after Mr. Jones' termination. The jury apparently did not believe any of the pretextual reasons that Councilmembers gave for the Resolution, and its findings were amply supported by the evidence, which permitted a very reasonable inference that Mr. Jones—the first Black City Manager for Hutto—was deprived of his civil rights because of unlawful discrimination. The jury heard repeatedly about the City's actions, taken as a body, and the City's explanations for those actions, and it rightly determined that if the City took a majority vote, that majority was animated by racial animus. Its decision should be respected.

## II.     The Court has jurisdiction.

The City's belated attempt to blow up the Judgment by claiming that the Court lacks subject-matter jurisdiction is without merit. Mr. Jones does not question that the Court can and must consider its subject-matter jurisdiction at any point in the case. But the City's invocation of Federal Rule of Civil Procedure 12(h)(3) is meaningless here because the Court clearly has federal-question jurisdiction over Mr. Jones' constitutional claim and supplemental jurisdiction over his contract claim.

### A.     The Separation Agreement is not an at-will contract.

The City asserts that the Separation Agreement is terminable at will because it does not contain a term for its duration. MTD.2-5. The only authority it cites is *Clear Lake City Water Auth. v. Clear Lake Utilities Co.*, 549 S.W.2d 385, 390 (Tex. 1977), which provides no support for the City's argument. That case involved a contract between a conservation and reclamation district and a utilities company for the exclusive right to provide water and sewer services to landowners

in a designated area. *Id.* at 387. The district claimed that the contract was no longer in effect because the district had lawfully terminated it. *Id.* The Supreme Court agreed with the district that the contract, which was indefinite in duration, had to be treated as terminable at will. *Id.* at 391 ("[C]ontracts which contemplate continuing performance (or successive performances) and which are indefinite in duration can be terminated at the will of either party.").[19]

By contrast, the Separation Agreement did not contemplate continuing or successive performance, nor did it lack a definite term. Instead, the agreement contains "Effective Dates" and other dates for various obligations, including a one-time severance payment due to Mr. Jones by January 1, 2020. PX2 ¶ 2. It also provided a specific term for Mr. Jones to continue receiving healthcare benefits and a one-year non-solicitation covenant. *Id.* ¶¶ 2, 7. The City paid the consideration, and Mr. Jones honored the non-solicitation provision. Those parts of the Separation Agreement were thus fully performed before the City attempted to void or rescind it.

As part of the additional consideration for the agreement, the parties made mutual promises of confidentiality and non-disparagement. PX2 ¶ 6. Like most settlement agreements, there is no stated time-limit on the confidentiality and non-disparagement promises. But that does not make the Separation Agreement terminable at will. *See e.g. WesternGeco, L.L.C. v. Input/Output, Inc.*, 246 S.W.3d 776, 784 (Tex. App.—Houston [14th Dist.] 2008, no pet.). In that case, the court of appeals rejected a similar argument that a non-solicitation clause in a settlement agreement that was silent as to the duration of that promise allowed the solicitation clause to be terminable at will. *Id.* at 782-83. It reasoned that:

---

[19] Particular to its analysis was the fact that the district was a political subdivision of the State of Texas that could not legally "bind itself in such a way as to restrict its free exercise of these governmental powers … [or] abdicate its governmental functions, even for a 'reasonable time.'" *Clear Lake City Water Auth. v. Clear Lake Utilities Co.*, 549 S.W.2d 385, 391 (Tex. 1977) (quoting *Banker v. Jefferson Cnty. Water Control & Improvement Dist. No. 1*, 277 S.W.2d 130, 134 (Tex. Civ. App. 1955, writ ref'd n.r.e.)).

> [i]mplying an agreement that [the non-solicitation] covenant … is terminable at will is not necessary to effectuate the purposes of the Settlement Agreement as a whole as gathered from the written instrument; in fact, it would contradict these purposes.

*Id.* at 784. Likewise, here, if the City's argument were accepted, then any settlement agreement would become "terminable at will." That is, of course, not the state of Texas law, and so it is not surprising that the City cannot cite any on-point authority for its newly minted theory.

The City also asserts without any citation to record or authority that Mr. Jones "*has failed to plead or prove that the City Council performed some act which interfered with a vested contractual property interest.*" MTD.5. Saying it does not make it so. Mr. Jones pled that the City interfered with his vested contractual property interest by immediately and publicly casting aspersions on the legality of the Separation Agreement and ultimately rescinding the Separation Agreement that became a vested property interest when executed—and certainly in the year it was fully performed before the City attempted to void it.

### B.     Mr. Jones has standing to bring and recover on both his constitutional and contract claims.

The City's strategic decision not to counterclaim for return of the consideration for the Separation Agreement is ***not*** evidence that the City "treated" the Separation Agreement as "terminated, which Hutto had the legal right to do." MTD.4. The City's real-time actions, including its demand letter to Mr. Jones for return of the $412K, PX49-A, provides the proof that the City was seeking rescission of the Separation Agreement—not termination. More to the point, the language the City used in the Resolution itself characterized the contract as "void," "avoided," and/or "rescinded" but never "terminated." *Id.* Mr. Jones had standing to bring both the § 1981 and contract claims at the time he filed suit, and the City's strategic inaction does not impact his continued standing to recover for these claims.

What the City is really arguing is that it could not have breached the Separation Agreement because it was entitled to terminate it. *See* MTD.4. That argument is long-since waived, substantively wrong, and jurisdictionally irrelevant. First, the City is too late to make such an argument after judgment because it is a merits defense. Second, and even if it were timely, the City did not have the right to terminate the Separation Agreement. *See* part II.A. Third, because the City is wrong about the legal effect of the Separation Agreement, it has no basis for challenging Mr. Jones' standing or this Court's subject-matter jurisdiction.

### C.      The City erroneously recasts its *Monell* argument as jurisdictional.

The City's argument about *Monell*, MTD.7-10, likewise does not impact jurisdiction. As the City essentially acknowledges, the *Monell* argument is a legal insufficiency argument that the City is simply rearguing in its Motion to Dismiss. The City quotes *Steel Co. v. Citizens for a Better Env't* for the proposition that a federal claim can be so "'devoid of merit as not to involve a federal controversy,'" MTD.7 (quoting 523 U.S. 83, 89 (1998)), but this case is nowhere close to that level, as best evidenced by the Court's rulings and the jury verdict. The City's misguided traipse through the evidence that favors its position, MTD.7-10, simply reasserts its previously trodden ground and fails even to approach the "devoid of merit" standard it invokes.

### D.      The cat's paw analysis is a theory of liability, not jurisdiction.

The City then goes on to continue its assault on the cat's paw doctrine, which is one of the bases for proving Mr. Jones' constitutional claim against it. Here again, this is a merits inquiry, not jurisdictional, and was addressed above at part I.B. The City fails to show that the theory is entirely "devoid of merit" such that it deprives the Court of jurisdiction over Mr. Jones' constitutional claim.

### E.     Texas statutory immunity as to consequential damages cannot void the entire lawsuit.

Finally, the City reasserts its argument based on statutory immunity under the Texas Local Government Code, but argues that it grants complete immunity from the lawsuit, meaning that "the verdict should be vacated." MTD at 16-18 (citing TEX. LOC. GOV'T CODE § 271.153(b)(1)). The City's last attempt to torpedo the Judgment based on a lack of subject-matter jurisdiction proves too much. The statute provides only that a party cannot recover consequential or punitive damages, TEX. LOC. GOV'T CODE § 271.153(b)(1), and in fact, it expressly waives immunity for breach of contract claims like this one. *See id.* § 271.152. The provision on which the City relies characterizes it as a "limitation" on recovery, not a separate immunity: "Damages awarded in an adjudication brought against a local governmental entity arising under a contract subject to this subchapter ***may not include***: (1) consequential damages, except as expressly allowed under Subsection (a)(1) …." *Id.* § 271.153(b)(1) (emphasis added). This is an affirmative defense that the City should have pled and raised before judgment, not a jurisdictional defect. At most it affects the remedies available in Plaintiff's suit; in no way does it affect the Court's jurisdiction over the suit.

## III.     Damages for § 1981 claims.

At the hearing, the Court asked the undersigned about decisions in other cases awarding substantial damages under § 1981. One such recent verdict and judgment is *Yarbrough v. Glow Networks, Inc.*, No. 4:19-CV-905-SDJ, 2022 WL 1143295 (E.D. Tex. Apr. 18, 2022). At trial, the employees did not seek lost wages; they sought only damages for "pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life" and proceeded solely under Section 1981. *Id.* at *1. The jury awarded each of the 10 plaintiffs $2 million in past damages and $1

million for future damages, as well as $4 million in punitive damages. *Id.* The Court awarded each plaintiff $7 million, plus pre- and post-judgment interest. *Id.* at *3.

The vicious campaign waged against Mr. Jones by the City of Hutto and the irreparable damage done to his career and family easily justifies the relief the jury awarded here. *See* JMOL.Resp.19-23. In addition to the lost compensation he proved based on City financial data and without contradiction, he testified to the terrible consequences he suffered as a result of the City's actions. *Id.* Considering the broad range of remedial damages available for civil rights violations, the jury's award should be upheld.

PRAYER

For these reasons and those set forth in his prior briefing and argument, Plaintiff Jones respectfully requests that the City of Hutto's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial be denied in their entirety.

Respectfully submitted,

/s/ *Marcy Hogan Greer*
Douglas W. Alexander
  State Bar No. 00992350
  dalexander@adjtlaw.com
Marcy Hogan Greer
  State Bar No. 08417650
  mgreer@adjtlaw.com
ALEXANDER DUBOSE & JEFFERSON LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303

Kirsten M. Castañeda
  State Bar No. 00792401
  kcastaneda@adjtlaw.com
ALEXANDER DUBOSE & JEFFERSON LLP
8144 Walnut Hill Lane, Suite 1000
Dallas, Texas 75231-4388
Telephone: (214) 369-2358
Facsimile:  (214) 369-2359

Edward M. "Ted" Smith
  State Bar No. 00791682
  tsmith@cornellsmith.com
Andrew Broadaway
  State Bar No. 24082332
  abroadaway@cornellsmith.com
CORNELL SMITH MIERL BRUTOCAO BURTON, LLP
1607 West Avenue
Austin, Texas 78701
Telephone: (512) 328-1540
Facsimile:  (512) 328-1541

Jay D. Ellwanger
 State Bar No. 24036522
 jellwanger@equalrights.law
Holt M. Lackey
 State Bar No. 24047763
 hlackey@equalrights.law
ELLWANGER LAW LLLP
8310-1 N. Capital of Texas Hwy., Ste. 190
Austin, Texas 78731
Telephone: 737-808-2260

COUNSEL FOR PLAINTIFF ODIS JONES

## CERTIFICATE OF SERVICE

I certify that, on October 23, 2023, this document was served in compliance with the Federal Rules of Civil Procedure, by filing this document with the Court's CM/ECF system which served the document on all parties electronically to all counsel of record.

/s/ *Marcy Hogan Greer*
Marcy Hogan Greer