**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **ODIS JONES,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| | § | **1:20-CV-1210-ML** |
| **CITY OF HUTTO,** | § | |
| **Defendant.** | § | |

## MEMORANDUM & ORDER

Before the court are Defendant City of Hutto's ("Hutto") Rule 50(b) Renewed Motion for Judgment as a Matter of Law, and in the Alternative, Rule 59 Motion for New Trial ("Motion for JMOL") (Dkt. 133), Defendant City of Hutto's Rule 59 Motion for New Trial (Dkt. 134), and Hutto's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 156) and all related briefing as well Hutto's Post-Hearing Brief in Support of a No Pretextual Evidence Ruling (Dkt. 157). The court held a hearing on the Motion for JMOL and Motion for New Trial on October 3, 2023.

## I.     PRELIMINARY NOTE ON PROCEDURE AND POSTURE

Hutto filed other briefs in addition to its Motion for JMOL, Motion for New Trial, and Motion to Dismiss. In October 2023, Hutto filed a "Post-Hearing Brief in Support of a No Pretextual Evidence Ruling" ("Pretext Brief") (Dkt. 158). The brief's substance amounts to nothing more than the argument that the jury should have credited some testimony as Hutto would have preferred and the re-urging of an argument in support its Motion for JMOL. A brief submitted seven months after trial was not the proper vehicle to argue for how the jury should interpret conflicting evidence or to take issue with the jury instruction.[1] Accordingly, the court will not address the arguments

---

[1] "If a party fails to object with specificity to a proposed instruction, the right to challenge the instruction on appeal is waived." *Tex. Beef Grp. v. Winfrey*, 201 F.3d 680, 689 (5th Cir. 2000).

contained in Hutto's Pretext Brief beyond what it must to resolve the properly submitted post-trial motions.

The evening before the October 3, 2023 hearing on Hutto's Motion for JMOL and Motion for New Trial, Hutto submitted its "Rule 12(h)(3) Challenge to the Court's Subject Matter Jurisdiction and Brief in Support of Granting Its Renewed Motion for Judgment as a Matter of Law" ("Jurisdiction Motion") (Dkt. 156). A legitimate challenge to the court's subject matter jurisdiction warrants thoughtful consideration. Accordingly, Hutto's argument that the court lacked jurisdiction is resolved below. However, the court will not entertain Hutto's motion to the extent that the Jurisdiction Motion transitions into a brief further arguing support of its Motion for JMOL.

To sum up, the court will proceed to resolve the motions properly before it: the Motion for JMOL, the Motion for New Trial, and the challenge to the court's subject matter jurisdiction.

## II.   BACKGROUND

The history in this case has been recounted numerous times, and the court declines to regurgitate that history now. A truncated version of the facts of this case follows.

In 2016, the Defendant the City of Hutto ("Hutto") hired Plaintiff Odis Jones ("Jones") to be city manager. As Hutto's first Black city manager, Jones worked closely with the Hutto City Council ("City Council"), an elected body comprising seven councilmembers. Jones alleges that in July 2019, he began experiencing racial discrimination by two newly elected councilmembers, Mike Snyder and Tanner Rose. Dkt. 32 at ¶ 18. On August 14, 2019, Jones informed the City Council that he felt these actions constituted violations of the law. *Id*. at ¶ 20.

In November 2019, as a result of the alleged discrimination Jones and Hutto began discussing Jones's departure from the city manager position. Dkt. 32 at ¶ 25. On November 21, 2019, the City Council voted to enter into a separation agreement ("Separation Agreement") with

Jones. PX8 13.4. Under the terms of the Separation Agreement, Jones's tenure as city manager would terminate on December 31, 2019, and he would receive twelve months of severance pay, in accordance with his 2018 employment agreement ("Employment Agreement") with Hutto. PX2 & PX1.

The Separation Agreement further contained a Non-Disparagement Provision, providing that Hutto would not disparage Jones after his departure. Under the terms of the Separation Agreement, both Hutto and Jones agreed to waive and release any legal claims that the parties had or may have had against one another. Jones and Hutto also entered a Consulting Agreement, under which Jones would continue to offer consulting services to Hutto until July of 2020. *See* Dkt. #1-3.

Less than one month after entering into the Separation Agreement and Consulting Agreement, the City Council decided to open a second investigation into previously investigated allegations against Jones. *Id* at ¶ 31. After the second investigation again found the allegations against Jones to be unsubstantiated, Jones alleges that the City Council, specifically Snyder and Rose, "came up with a scheme, which was later put into action, to attempt to extort and/or blackmail [Jones] out of receiving the severance payments under the Separation Agreement." *Id*. at ¶ 34.  Jones alleges the City Council planned to threaten to publicly embarrass him and force him to give up the severance payment. *Id*.  According to Jones, no such plan or scheme had ever been attempted against any non-Black employee.  *Id*.

On December 3, 2020, the City Council voted to pass Resolution R-2020-139 (the "Recission Resolution"), which purported to declare the Separation Agreement void.  PX8 (Dkt. 113-1 at 48). Jones alleges that this action by the City Council as well as two letters that purported to rescind the Separation Agreement and demanded Jones return the $412,000 severance sent by

the City Manager and City Attorney ("Bojorquez Letter") the following day constitute breaches of his Separation Agreement.

In his Amended Complaint, Jones alleged claims of racial discrimination and retaliation against the City of Hutto, Snyder, and Rose. Dkt. 32 at ¶¶53–60. Jones further alleges that since the filing of this suit, Snyder, Rose, and Hutto City Manager Warren Hutmacher conspired to deter, intimidate, or threaten witnesses from testifying on his behalf in the instant federal case. *Id.* at ¶¶61–62. Jones also brought claims of breach of contract, declaratory judgment, and a cause of action under the Texas Whistleblower Act against Hutto, and several state law intentional tort claims against Snyder and Rose. *Id.* at ¶¶63–82.

On February 16, 2023, the court issued memorandum opinion and order granting in part and denying in part the parties' cross Motions for Summary Judgment (Dkts. 65 & 67-1). Dkt. 90. In its order, the court narrowed the claims to be tried to one claim under 42 U.S.C. § 1981 and a state law breach of contract claim. Beginning on February 27, 2023, a jury heard evidence on those issues and at the end of a one-week trial, awarded Jones the sum of $8 million in damages for his § 1981 claim and $4.5 million for his breach of contract. Dkt. 124. A final judgment was signed on March 21, 2023. Dkt. 127.

## III.   Challenge to Jurisdiction

### A.   Legal Standard: Rule 12(h)(3) Motion to Dismiss

Article III of the Constitution limits the jurisdiction of federal courts. *Castillo v. Cho Ok Sang*, No. SA-22-CV-00777-JKP, 2023 U.S. Dist. LEXIS 46083, at *3–4 (W.D. Tex. 2023) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 471 (1982). Article III limits the use of judicial power "to declare the rights of individuals and to measure the authority of governments" in the resolution of "cases" and "controversies." *Valley*

*Forge*, 454 U.S. at 471. Thus, a federal court must dismiss a case for lack of subject matter jurisdiction if the court lacks "the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n v. City of Madison*, 143 F.3d 1006, 1011 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir.1996)). Federal courts "must presume that a suit lies outside [of their] limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). The Fifth Circuit has held that, under Federal Rule 12(h)(3), federal courts "have the responsibility to consider the question of subject matter jurisdiction *sua sponte* if it is not raised by the parties and to dismiss any action if such jurisdiction is lacking." *Castillo*, 2023 U.S. Dist. LEXIS 46083, at \*3–4 (quoting *Giannakos v. M/V Bravo Trader*, 762 F.2d 1295, 1297 (5th Cir. 1985)). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED. R. CIV. P. 12(h)(3).

Article III standing—the "irreducible constitutional minimum"—requires a plaintiff establish three things: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) that the injury will be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury in fact must be "particularized" and "concrete." *Spokeo v. Robins*, 578 U.S. 330, 340 (2016). "Particularized" injuries "affect the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). Concrete injuries are "physical, monetary, or cognizable intangible harm[s] traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion v. Ramirez*, 141 S. Ct. 2190, 2206 (2021).

## B. ANALYSIS

Hutto argues that this court lacks subject matter jurisdiction over Jones's claims because Jones suffered no injury and therefore lacks standing. Hutto argues that the Settlement Agreement that gave rise to Jones's § 1981 and breach of contract claims was an at-will contract. Dkt. 156 at 1. Hutto contends that it could not have breached the Settlement Agreement because the agreement could "legally be terminated at any time" by either party.[2] *Id.* at 4. Hutto's position is that because Hutto could not and thus did not breach the Settlement Agreement, Jones suffered "no invasion of a legally protected interest" and thus lacks an injury that could give rise to standing. *Id.* at 4. Jones responds that Hutto's standing argument is meritless because the Separation Agreement is not an at-will contract. Dkt. 160 at 16.

Hutto contends that because either party could terminate the Separation Agreement at will, the City Council's passage of the Recission Resolution (and subsequent actions) was not a breach and therefore Jones suffered no injury. *Id.* at 3–4. Hutto argues that the Separation Agreement is an at-will contract because the "non-disparagement clause in the Agreement has a term of indefinite duration." Dkt. 161 at ¶14. Hutto relies solely on *Clear Lake City Water Authority v. Clear Lake Utilities Company* to support its argument. Dkt. 156 at 2 (citing 549 S.W.2d 385, 387 (Tex. 1977)). Hutto provides no analysis but asserts that "Texas law entitles any party to a contract to terminate the contract at-will [sic] when the contract does not have a Term provision . . . ." *See id.* at 2–5.[3]

---

[2] Hutto also "notes that neither party has treated the Separation Agreement [as] void." Dkt. 156 at 4. Hutto does not elaborate on the significance of this statement nor did the court discern its significance. The court notes that Hutto's statement is contrary to the facts. For instance, the Recission Resolution stated the Separation Agreement was "void" or voidable"; that "Hutto desire[d] to declare the Separation Agreement Void;" that "Hutto desire[d] to avoid" it, and that "Hutto desire[d] to rescind" it. Dkt. 113-2 at 333–36 (Demand Letter & Resolution No. R2020-139). Moreover, the Council "declare[d] the Separation Agreement . . . void" and "directed" the city manager "promptly to rescind" it. *Id.*

[3] Hutto cites *Oakrock Exploration v. Killam*, 87 S.W.3d 685 (Tex. App.—San Antonio 2002, pet. denied) for the proposition that "[t]he duration of an agreement is an essential term." Dkt. 156 at 2 n.2 (citing 87 S.W.3d at 691).

"[C]ontracts which contemplate continuing performance (or successive performances) and which are indefinite in duration can be terminated at the will of either party." *Clear Lake*, 549 S.W.2d at 390 (citing cases). The *Clear Lake* parties were feuding over the exclusive right to provide water and sewer services to a development. *Id.* at 391. One of the parties, the Authority, was "a conservation and reclamation district." *Id.* at 391. The Authority was a political subdivision that operated as a governmental agency and performed governmental functions. *Id.* The agreement between the Authority and the other party, the Utilities, prevented the Authority from extending water service to additional customers and restricted the Authority from setting rates for potential customers. *Id.*

The "Authority could not, by contract or otherwise, bind itself in such a way as to restrict its free exercise of [] governmental powers, nor could it abdicate its governmental functions, even for a 'reasonable time.'" *Id.* The Texas Supreme Court reasoned that an agreement that obligated the Authority to provide water to the Utilities and that deprived the Authority of discretion to determine "whether, on any particular date, it is in the best interests of all of its customers and the public in general, to extend water and sewer service to a particular person or entity . . . ha[d] the effect of potentially *controlling and embarrassing* Authority in the exercise of its *governmental powers*." *Id.* (emphasis added).

There is no such risk here as the Separation Agreement does not contemplate Jones providing essential government services nor does it permit him to wield Hutto's governmental

---

*Oakrock* is inapposite because the appeals court was analyzing whether a series of letters contained terms essential to *oil and gas contracts*. *Oakrock*, 87 S.W.3d at 691 ("The *term of the lease*, the drilling commencement date, time and amount of payments in lieu of drilling operations, and amounts to be paid for produced gas *are essential elements in describing an oil and gas lease*.") (emphasis added). "Because the March 7th letters lacked these essential terms, the letters did not sufficiently identify the subject matter of the agreement between the parties." *Id.* Thus, the letters did not constitute an enforceable oil and gas contract. *Id.*

powers.[4] *Clear Lake* clearly is not on point,[5] and the court will proceed to examine whether the Separation Agreement contained essential terms necessary to be enforceable.[6]

"While Texas courts favor validating transactions rather than voiding them, a court may not create a contract where none exists and generally may not add, alter, or eliminate essential terms." *MKM Eng'rs, Inc. v. Guzder*, 476 S.W.3d 770, 778 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *Eastman Gas Co. v. Goodrich Petroleum Co.*, 456 S.W.3d 319, 326 (Tex. App.—Texarkana 2015, pet. denied)). "A settlement agreement containing all necessary terms is enforceable as a matter of law." *Id.* (citing *McCalla v. Baker's Campground*, 416 S.W.3d 416, 416 (Tex. 2013) (per curiam).

"The essential terms for a settlement agreement are the amount of compensation and the liability to be released." *Redwine v. Cansler*, No. 05-21-00191-CV, 2022 Tex. App. LEXIS 6888, at *16 (Tex. App.—Dallas Sep. 12, 2022, no pet. h.) (citing *Disney v. Gollan*, 233 S.W.3d 591,

---

[4] Jones responds to Hutto's argument by contending that *Clear Lake* does not provide support for Hutto's argument. Dkt. 160 at 16. Jones contrasts the agreement in *Clear Lake* with the Separation Agreement, which "did not contemplate continuing or successive performance." *Id.* at 17.

[5] Contrary to Hutto's briefing, contracts relating to the provision of essential governmental functions were not the only type of contracts the Texas Supreme Court considered in *Clear Lake*. The Court noted that other agreements "which are indefinite in duration and which contemplate the expenditure of substantial sums of money or other investments by one of the parties preparatory to or in accordance with [] performance under the contract, the courts *often* imply a term of reasonable duration during which time the agreement is *not* terminable at will. *Id.* at 391 (emphases added).

Texas appeals courts have addressed the two lines of cases referenced in *Clear Lake*.

> There is uncertainty as to the legal standard for determining the duration of an agreement that contains no express term. In some cases courts indicate that the implied term should be terminable at will, while in other cases courts state that the implied term should be for a reasonable time. In . . . *Clear Lake City Water Authority v. Clear Lake Utilities Co.*, the Texas Supreme Court noted both lines of cases. However, the *Clear* [] court stated that it did not need to decide which line of cases to follow because the court was required to imply the contract was terminable at will given that one of the parties was a governmental entity incapable of contracting [away its governmental powers] for a reasonable time for performance.

*WesternGeco v. Input/Output*, 246 S.W.3d 776, 783 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (citing *Clear Lake*, 549 S.W.2d at 390–91) (internal citations omitted).

[6] As Hutto points out the Texas Government Code provides the definition of a contract enforceable against a municipality. Dkt. 156 at 2 n.2 (quoting Tex. Loc. Gov. Code § 271.151(2)(A) ("'Contract subject to this subchapter' means: (A) a written contract stating the **essential terms** of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity . . .") (emphasis added).

595 (Tex. App.—Dallas 2007, no pet.) & *Padilla v. LaFrance*, 907 S.W.2d 454, 460-61 (Tex. 1995)); *see also, Wyles v. Cenlar FSB*, No. 7-15-CV-155-DAE, 2016 U.S. Dist. LEXIS 56974, at *5 (W.D. Tex. 2016) (Ezra, J.) ("the essential terms of the [settlement] contract [are] . . . the amount of compensation and the liability to be released" (quoting *Disney*, 233 S.W.3d at 595)); *and see Johnson v. BP Expl. & Prod. (In re Deepwater Horizon)*, 786 F.3d 344, 357 n.26 (5th Cir. 2015) (collecting cases holding that the monetary amount of settlement payment and the release of specific claims are generally material terms but that the specific language of the release is not material).

The court need not add, alter, or eliminate essential terms for the Separation Agreement to be enforceable. It contained the essential terms. The Separation Agreement included an amount of compensation ("a severance payment of [12] months of Jones'[s] [] base salary plus unpaid sick leave and vacation time") and Section 5 contained a mutual liability waiver and release. Dkt. 113-1 at 6–8 (Separation Agreement).

Moreover, contrary to Hutto's suggestion, a durational term for the non-disparagement provision is not necessary for the Separation Agreement to be enforceable.[7] The non-disparagement provision took effect "now," PX 2 ¶6, but notably, it did not require a duration.

"It goes without saying that non-disparagement clauses are common in situations where two parties terminate their employment relationship by contract." *Cooper Tire & Rubber Co. v. Farese, Farese & Farese Prof. Ass'n*, 423 F.3d 446, 457 (5th Cir. 2005) (citing *EEOC v. Severn Trent Servs.*, 358 F.3d 438, 440 (7th Cir. 2004)). Non-disparagement provisions without durational

---

[7] Additionally, Hutto's broad argument that the Separation Agreement lacked durational terms generally is without merit. *See* Dkt. 156 at 2. As Jones pointed out in his Response, the Separation Agreement did not lack a definite term because it contained, *inter alia*, "'Effective Dates' and other dates for various obligations, including a one-time severance payment" to Jones as well as "a one-year non-solicitation covenant." Dkt. 160 at 17.

terms serve "valid legal purpose[s]." *Id.* at 458. Indeed, a perpetual non-disparagement clause is "common sense" and "unexceptionable." *Severn Trent Servs.*, 358 F.3d at 440.

Hutto's challenge of the court's subject matter jurisdiction, relying solely on *Clear Lake*, fails. Hutto's sweeping contention that "Texas law entitles a party to a contract to terminate [it] at []will when [it] does not have a Term provision . . . ," Dkt. 156 at 2, is incorrect. *See Clear Lake*, 549 S.W.2d at 390–91. The Separation Agreement contained the essential terms for a settlement contract to be enforceable, and it was not terminable at will. Accordingly, a breach of the Separation Agreement by Hutto is an injury to Jones that gives him standing to sue. The court is satisfied that it has jurisdiction under 28 U.S.C. § 1331 over Jones's § 1981 claim and supplemental jurisdiction under 28 U.S.C. § 1367(a) over his breach of contract claim.

## C.  IMMUNITY

Hutto also challenges the court's subject matter jurisdiction to adjudicate Jones's breach of contract claim. Hutto contends that governmental immunity defeats the court's jurisdiction.

Sovereign immunity has two components: (1) immunity from suit and (2) immunity from liability. *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 594 (Tex. 2001). First, the state retains immunity from suit unless it has been expressly waived by the Legislature. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997) (superseded by statute on other grounds). Like sovereign immunity, the legislature may waive governmental immunity by statute. *City of Galveston v. State*, 217 S.W.3d 466, 469 (Tex. 2007). A statute shall not be construed as waiving immunity absent "clear and unambiguous language." TEX. GOV'T CODE § 311.034; *Tooke v. City of Mexia*, 197 S.W.3d 325, 328–29 (Tex. 2006).

Second, immunity from liability shields the state from money judgments even when the legislature has given consent to sue. *General Servs. Comm'n v. Little-Tex Insulation Co.*, 39

S.W.3d 591, 594 (Tex. 2001). Nevertheless, <u>immunity from liability is waived when the state</u> <u>contracts with a private party</u>. *Id.* Immunity from liability constitutes an affirmative defense, not a jurisdictional bar. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004).

"In Texas, sovereign immunity deprives a trial court of subject matter jurisdiction for lawsuits in which the state or certain governmental units have been sued unless the state consents to suit." *Miranda*, 133 S.W.3d at 224; *accord Shamrock Psychiatric Clinic v. Tex. Dep't of Health & Human Servs.*, 540 S.W.3d 553, 559 (Tex. 2018). Consenting to suit in certain circumstances, the legislature waived local governmental entities' immunity from suit in section 271.152 of the Local Government Code. TEX. LOC. GOV'T CODE ANN. § 271.152 (West 2016) ("Waiver of Immunity to Suit for Certain Claims"); *see Zachry Constr. Corp. v. Port of Hous. Auth.*, 449 S.W.3d 98, 106 (Tex. 2014) (recognizing that the statute "waives immunity from contract suits for local governmental entities").

The legislature has authorized cities to enter into certain contracts. *City of Carrizo Springs v. Howard*, No. 04-18-00061-CV, 2018 Tex. App. LEXIS 4233, at *6 (Tex. App.—San Antonio June 13, 2018, no pet.) (citing TEX. LOC. GOV'T CODE ANN. § 271.151(2)(A) (addressing contracts for "services to the local governmental entity"); *City of Hous. v. Williams*, 353 S.W.3d 128, 135 (Tex. 2011). "If a city enters into a contract for services, the contract invokes 'section 271.152's waiver of immunity [if] it (1) [is] in writing, (2) state[s] the essential terms of the agreement, (3) provide[s] for goods or services, (4) to the local governmental entity, and (5) [is] executed on behalf of the local governmental entity.'" *Carrizo Springs*, 2018 Tex. App. LEXIS 4233, at *6 (citing *City of Pearsall v. Tobias*, 533 S.W.3d 516, 522 (Tex. App.—San Antonio 2017, pet. denied); *see also City of Galveston v. CDM Smith, Inc.*, 470 S.W.3d 558, 566 (Tex. App.—

Houston [14th Dist.] 2015, pet. denied) ("Waiver of immunity is triggered by the mere act of entering into a contract for goods or services.").

Chapter 271 does not contain a definition for the term "services," but the term is generally "broad enough to encompass a wide array of activities." *Kirby Lake Dev. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 839 (Tex. 2010); *see also Williams*, 353 S.W.3d at 131, 135 (holding city ordinances, collective bargaining agreements, and meet-and-confer agreements are contracts for "services" under § 271.152; and holding employment agreements are contracts for services). "In ordinary usage the term 'services' has a rather broad and general meaning," and "[i]t includes generally any act performed for the benefit of another under some arrangement or agreement whereby such act was to have been performed." *Kirby Lake*, 320 S.W.3d at 839 (citing *Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 895 (Tex. 1962)); *accord Williams*, 353 S.W.3d at 135. As the Texas Supreme Court explained, services "includes what an employee provides his employer by his efforts," and "is certainly broad enough to include services provided by employees." *Williams*, 353 S.W.3d at 135; *see also* TEX. GOV'T CODE § 851.001(8) (defining "employee" in terms of providing "services").

Municipal immunity is derivative of the state's sovereign immunity and is not as broad. Municipal corporations often function in a governmental capacity on the state's behalf but at other times function as "a private corporation," *City of League City v. Jimmy Changas, Inc.*, 670 S.W.3d 494, 499 (Tex. 2023) (quoting *City of Tyler v. Ingram*, 139 Tex. 600, 164 S.W.2d 516, 519 (Tex. 1942)), "for the private advantage and benefit of the locality and its inhabitants." *Id.* (quoting *Wasson Ints., Ltd. v. City of Jacksonville (Wasson I)*, 489 S.W.3d 427, 433 (Tex. 2016)). Because "sovereign immunity is inherent in the State's sovereignty," municipalities "share that protection when they act 'as a branch' of the State but not when they act 'in a proprietary, non-governmental

capacity.'" *Wasson Ints., Ltd. v. City of Jacksonville (Wasson II)*, 559 S.W.3d 142, 146 (Tex. 2018) (quoting *Wasson I*, 489 S.W.3d at 430).

The common law has long recognized this dichotomy when cities are sued in tort, and the Texas Supreme Court held in *Wasson I* that it also applies when cities are sued for breach of contract. *See Wasson I*, 489 S.W.3d at 439. To determine whether a municipality engaged in a governmental or proprietary function when it entered into a particular contract, courts look to both the common law and to Texas statutes. *League City*, 670 S.W.3d at 499.

"The distinction has not been a clear one," and determining which functions are proprietary and which are governmental is not always a cut-and-dried task. *See Tooke*, 197 S.W.3d at 343. In the tort-claims context, the legislature passed the Texas Tort Claims Act ("TTCA"), which defines specific functions as proprietary or governmental. *See* Tex. Civ. Prac. & Rem. Code § 101.0215. The TTCA generally defines governmental functions as those "that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." *Id.* § 101.0215(a). It then provides a non-exhaustive list, enumerating thirty-six governmental functions. *Id.* Proprietary functions, on the other hand, are generally defined by the TTCA as "those functions that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality, including but not limited to" three specific functions that are not relevant here. *Id.* § 101.0215(b).

**D.  ANALYSIS**

Hutto argues that as a city, it is immune from suits for breach of contract claims related to its governmental functions. Hutto argues that this court lacks jurisdiction over Jones's breach of contract claim because of Hutto's immunity.

In support of its argument, Hutto cites one case without analysis, noting hiring and firing employees "is clearly a governmental function." Dkt. 156 at 15. In the case Hutto cites, the parties were engaged in an unlawful termination suit, implicating the Texas Labor Code's Anti-Retaliation Law and the Political Subdivisions Law. *City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex. 1995). There, the parties conceded "the hiring and firing of city employees is clearly a governmental function." *Id.* at 292.

But *Barfield* does not stand for the proposition Hutto asserts. The hiring and firing of city employees are governmental in nature. *City of White Settlement v. Super Wash*, 198 S.W.3d 770, 776 (Tex. 2006) (citing *Barfield*, 898 S.W.2d at 291). But in the very next sentence after the one Hutto cites, the Texas Supreme Court included a caveat: a city "is immune from liability for the retaliatory termination claims . . . unless that immunity has been waived." *Barfield*, 898 S.W.2d at 291. And Hutto waived its immunity.

Again, "absent waiver, governmental entities retain immunity from suit." *City of Pearsall v. Tobias*, 533 S.W.3d 516, 522 (Tex. App.—San Antonio 2017, pet. denied) (citing *Williams*, 353 S.W.3d at 134). The waiver of immunity set forth in section 271.152 provides as follows:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of contract, subject to the terms and conditions of this subchapter.

*Id.* (quoting TEX. LOC. GOV'T CODE ANN. § 271.152).

Here, Hutto is a local government entity capable of entering into contracts. TEX. LOC. GOV'T CODE ANN. § 271.151(3) (providing that "local governmental entities" includes municipalities); *see also Williams*, 353 S.W.3d at 135 (concluding that home-rule city is a type of municipality). Because Hutto is a chartered home-rule city, it meets section § 271.152's requirement that it be "authorized by statute or the constitution to enter into a contract." *See*

*Williams*, 353 S.W.3d at 135; *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998) (noting that home-rule cities possess all powers of the state that are "not inconsistent" with "the Constitution, the general laws, or the city's charter," except where limited by statute)).

Hutto's charter specifically provides Hutto is "capable of contracting and being contracted with, suing and being sued, impleading and being impleaded, answering and being answered unto, in all courts and tribunals, and in all amounts whatsoever, subject to the laws of the State of Texas." CITY OF HUTTO CHARTER art. 2 § 2.01. Hutto's charter also dictates that the city council "shall" hire a city manager, leaving the city council discretion as to the specific selection procedure. *Id.* at art. 4 §§ 4.019(a) & (c).

Accordingly, Hutto's immunity is waived if it entered into a contract for services, and the contract invokes § 271.152's waiver of immunity. Thus, Hutto's immunity is waived if the Separation Agreement (1) is in writing, (2) states the essential terms of the agreement, (3) provides for goods or services, (4) to the local governmental entity, and (5) is executed on behalf of the local governmental entity. *See Carrizo Springs*, 2018 Tex. App. LEXIS 4233, at *6.

There is no question that the Separation Agreement was in writing, *see, e.g.,* Dkt. 1-2 (Separation Agreement) and that the Separation Agreement stated the necessary essential terms. *See supra* at 9–10 *and see Dall./Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 368-69 (Tex. 2019) (contract must state essential terms with reasonable degree of certainty sufficient to confirm the parties actually intended to be contractually bound and to enable a court to understand and enforce the parties' obligations and provide an appropriate remedy).[8] The

---

[8] "An agreement's essential terms are those that parties would reasonably regard as 'vitally important ingredients' of their bargain." (citing *Fischer v. CTMI*, 479 S.W.3d 231, 237 (Tex. 2016)). "Whether particular terms are essential generally depends on the specific contract at issue." *Fischer*, 479 S.W.3d at 237. "A contract must state its essential terms with 'a reasonable degree of certainty and definiteness,' sufficient to confirm that both parties actually intended to be contractually bound and to enable a court to understand and enforce the parties' obligation and provide an appropriate remedy when breached." *Dall./Fort Worth Int'l Airport*, 576 S.W.3d at 368–69 (citing *Fischer*, 479 S.W.3d at 237).

Separation Agreement provided for services. *See Williams*, 353 S.W.3d at 131, 135 (holding city ordinances, collective bargaining agreements, and meet-and-confer agreements are contracts for "services" under § 271.152; and holding employment agreements are contracts for services). The Separation Agreement, *inter alia*, released Jones's claims against Hutto, bound him to a non-disparagement agreement, and bound him to a non-solicitation agreement. Dkt. 1-2 ¶¶5–7, *see also* ¶4. Lastly, the sitting mayor executed the contract on behalf of Hutto. *Id.* at 1, 3 (signature block).  Thus, the Separation Agreement was a contract for services that contained all of the elements to effect a waiver of immunity under § 271.152. *See Carrizo Springs*, 2018 Tex. App. LEXIS 4233, at \*6.

The court is satisfied that Hutto is not immune from this suit which arose out of a contract it entered into.

## IV.   RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.   Legal Standard: Rule 50

"A motion for judgment as a matter of law. . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Sauls v. 24 Hour Fitness USA*, No. 22-10182, 2023 U.S. App. LEXIS 17209, at \*3–4 (5th Cir. 2023) (quoting *Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 235 (5th Cir. 2001)) (citations omitted). Thus, "[a] jury verdict *must* be upheld unless 'there is *no* legally sufficient evidentiary basis for a reasonable jury to find' as the jury did." *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998) (citing Fed. R. Civ. P. 50(a)(1)) (emphasis added). "[I]f reasonable persons could differ in their interpretations of the evidence, then the motion should be denied." *Pineda v. UPS*, 360 F.3d 483, 486 (5th Cir. 2004) (citing *Thomas v. Tex. Dep't of Criminal Justice*, 220 F.3d 389, 392 (5th Cir. 2000)).

"A post-judgment motion for judgment as a matter of law should only be granted when 'the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict.'" *Thomas*, 220 F.3d at 392 (quoting *Waymire v. Harris County, Tex.*, 86 F.3d 424, 427 (5th Cir. 1996)). The jury's verdict is afforded great deference, and when evaluating the sufficiency of the evidence all evidence is viewed in the light most favorable to the verdict and all inferences are drawn in favor of the verdict. *Pineda*, 360 F.3d at 486 (citing *Thomas*, 220 F.3d at 392).[9] Thus, "[t]he jury's verdict should be affirmed unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Griggs v. Chickasaw Cty.*, 930 F.3d 696, 701 (5th Cir. 2019) (quoting *Alonso v. Westcoast Corp.*, 920 F.3d 878, 882 (5th Cir. 2019)) (quotation omitted).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are *jury* functions, not those of a judge." *Reeves v. Sandreson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (emphasis added). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151 (citing 9A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2529, p. 299 (2d ed. 1995)). Accordingly, "the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (quoting WRIGHT & MILLER at 299).

---

[9] "[C]ourts [generally] prohibit parties from using a Rule 50(b) motion to assert a ground that was not included in [a pre-verdict Federal Rule of Civil Procedure 50(a)] motion." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 290 (5th Cir. 2019) (internal quotation marks, brackets, and citation omitted).

**B. Analysis**

Hutto renews[10] its motion for judgment as a matter of law. Dkt. 133. Hutto argues that the trial transcripts and evidence (collectively the "Record") "clearly and convincingly prove that any reasonable jury would not have a legally sufficient evidentiary basis to find for" Jones on either his § 1981 claim or his breach of the Separation Agreement claim ("breach of contract claim"). *Id.* at 2. Hutto seeks judgment as a matter of law on both of Jones's claims and an equitable award for attorney's fees. *Id.* Jones opposes the Hutto's Motion. *See* Dkt. 160.

*1. 42 U.S.C. § 1981 Claim*

42 U.S.C. § 1981 "ensures that all person in the United States have the same right to make and enforce contracts and prevents impairment of those rights by government and non-government actors." *Meyers v. La Porte Indep. Sch. Dist.*, 277 F. App'x 333, 335 (5th Cir. 2007) (per curiam). "To prevail [on a § 1981 claim], a plaintiff must initially plead and ultimately prove that, **but for race**,[11] it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (emphasis added).

Section 1981 does not provide an independent cause of action. *Oden v. Oktibbeha County*, 246 F.3d 458, 462–63 (5th Cir. 2001). To remedy violations of § 1981, a plaintiff must assert a cause of action under § 1983. *Id.* Section 1983 "provides that any person who, under color of state law, deprives another of 'any rights, privileges or immunities secured by the Constitution and laws,

---

[10] Hutto moved for judgment as a matter of law at trial at the close of Jones's case. Dkt. 109.

[11] "Causation in fact—i.e., proof that the defendant's conduct did in fact cause the plaintiff's injury—is a standard requirement of any tort claim." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346 (2013) (citing Restatement of Torts § 9 (1934) (definition of "legal cause"); § 431, Comment a (same); § 279, and Comment c (intentional infliction of physical harm); § 280 (other intentional torts); § 281(c) (negligence)). This includes federal statutory claims of workplace discrimination. *Id.* (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (in intentional-discrimination cases, "liability depends on whether the protected trait" "actually motivated the employer's decision" and "had a determinative influence on the outcome"); *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702 (1978) (explaining that the "simple test" for determining a discriminatory employment practice is "whether the evidence shows treatment of a person in a manner which but for that person's sex would be different" (internal quotation marks omitted))).

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. "Municipalities are persons susceptible to suit under § 1983, but they cannot be found liable on a theory of vicarious liability or *respondeat superior*." *St. Maron Props. v. City of Hous.*, 78 F.4th 754, 759–60 (citing *Monell*, 436 U.S. at 690–92).

The Supreme Court extended *Monell's* requirements to § 1981 claims against municipal employers. *See Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 735–36 (1989). Since Jones seeks to hold a municipality liable for a constitutional violation, he faces an additional requirement. *Edelstein v. City of Brownsville*, No. 20-40211, 2021 U.S. App. LEXIS 27010, at *7–8 (5th Cir. 2021). He must also prove that his "injury 'was caused by an existing, unconstitutional municipal policy, which . . . can be attributed to a municipal policymaker.'" *Id.* (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion)).

There are three ways to establish an official policy under *Monell*: (1) written policy statements, ordinances, or regulations; (2) a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy; or (3) even a single decision may constitute municipal policy in rare circumstances, when the official or entity possessing final policymaking authority for an action performed the specific act that forms the basis of the § 1983 claim. *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214–15 (5th Cir. 2019). This case falls within the first category because the City Council passed a resolution—the Recission Resolution—rescinding the Separation Agreement, directing the city attorney to claw back the settlement payment, and threatening litigation against Jones.[12]

---

[12] "In addition to culpability, there must be a direct causal link between the municipal policy and the constitutional deprivation." *Piotrowski v. City of Hous.*, 237 F.3d 567, 580 (5th Cir. 2001).

A "policymaker" is the person or entity that "possesses final authority to establish municipal authority with respect to the action ordered." *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 602 (5th Cir. 2001) (emphasis added) (quoting *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 698 (5th Cir. 1998)). Who constitutes a final policymaker is a "question of state law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (plurality opinion). Under Texas law, the final policymaker for the city is the city council. *St. Maron*, 78 F.4th at 761; *see also Bolton v. City of Dall. Tex.*, 541 F.3d 545, 550 (5th Cir. 2008) (citing TEX. LOCAL GOV'T CODE ANN. § 25.029).

There is no dispute that the City Council "passed the [Recission] Resolution" and "directed the City Attorney to communicate the" City Council's position to Jones's attorney. Dkt. 133 ¶12.

In a § 1983 action, a plaintiff is "required to show that a majority of" a body had illicit animus. *Griggs v. Chickasaw Cty.*, 930 F.3d 696, 704 (5th Cir. 2019); *Howell v. Town of Bell*, 827 F.3d 515, 527 (5th Cir. 2016) ("the dispositive question is simply whether [] animus is [] chargeable to the board itself"); *and see Lozman v. City of Riviera Beach*, 138 S Ct. 1945, 1954 (2018) (Plaintiffs must "prove the existence of an official policy motivated by retaliation").

Where a plaintiff presents no direct evidence of discrimination, a claim is analyzed using the framework set forth in *McDonnell Douglas Corp. v. Green*. *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). But "[w]hen, as here, a case has been fully tried on its merits, [the Fifth Circuit does] not focus on the *McDonnell Douglas* burden-shifting scheme," and "[i]nstead, [] inquires whether the record contains sufficient evidence to support the jury's ultimate findings." *Bryant v. Compass Grp. USA*, 413 F.3d 471, 475–76 (5th Cir. 2005) (quoting *Smith v. Berry Co.*,

165 F.3d 390, 394 (5th Cir. 1999), and citing cases).[13] Accordingly, the court must determine whether there was evidence that race was the but-for reason for at least four councilmembers' votes.

Hutto argues "[t]here is no evidence of any racial motivation in the City Council [] vote for" the Recission Resolution. Dkt. 133 ¶9. Hutto contends that there is no evidence that four councilmembers—Sutton, Thornton, Gordon, and Martinez—had a discriminatory animus. *Id.* Hutto goes a step further and suggests the "Record undisputedly shows that a majority of the [City Council] voted [for] and passed the Resolution for the reasons stated in the Resolution, closing the door on any § 1981 liability." *Id.*[14]

Jones argues the jury found "that racial animus was a 'determinative factor'" in Hutto's passing the Recission Resolution. Dkt. 143 at 5. Jones notes that Question One on the Verdict Form asked: "Was Mr. Jones's race, Black, a determinative factor . . . ?" The jury unanimously answered: "Yes." *Id.* Noting that direct evidence of racial retaliation is rare, Jones contends that circumstantial evidence supports the jury's finding that Jones's race was a determinative factor. *Id.* Jones states "a circumstantial case relying on inferences of discrimination is adequate to support a jury's verdict." *Id.* at 5–6 (citing *White v. Patriot Erectors*, No. 1:20-CV-1219-RP, 2023 WL 3400552, at *3 (W.D. Tex. May 11, 2023).[15]

---

[13] "Where a case has been fully tried . . . [courts] should examine whether the plaintiff has met his ultimate burden of proving that the employer terminated him because of age." *Black v. Pan Am Labs.*, 646 F.3d 254, 259 (5th Cir. 2011) (*quoting Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 574 (5th Cir. 2003)).

[14] Hutto's brief goes on to analyze an argument that is irrelevant: that Snyder's Facebook posts were statements made under the color of law. Dkt. 133 at ¶¶15–18. As Hutto's Motion acknowledges, the "evidence which is probative and relevant to the § 1981 claims is the action of the [City Council][] considering and approving the [Recission] Resolution." *Id.* ¶18.

[15] "A plaintiff can prove intentional discrimination through either direct or circumstantial evidence." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001) (citing *Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998)).

Jones asserts the following show that his race was a determinative factor: (1) the City Council treated Jones differently from all previous city managers, all of whom were white; (2) Hutto's reasons for passing the Recission Resolution were pretextual; (3) councilmembers directed racially charged statements at Jones; and (4) Mayor Snyder and Councilmember Rose "were the 'cat's paws' for the other Councilmembers." *Id.* at 6, 7, 10 & 14. The court interprets Jones's position as providing three routes to liability: disparate treatment, pretext, and cat's paws (relying on racial animus attributable to Snyder and Rose).

i.   Jones treated differently from previous city managers

Jones contends that passing the Recission Resolution treated him differently from all other city managers, who were white, which is evidence that Jones's race was a determinative factor. Dkt. 143 at 6. At trial, Jones noted that Hutto has never rescinded another separation agreement. *See id.* To demonstrate differences in treatment, Jones points to Karen Daly's termination. *Id.*

The Fifth Circuit has "made clear that nearly identical is not synonymous with identical." *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012) (internal quotations omitted) (quoting *Lee v. Kan. City S. Ry. Co*, 574 F.3d 253, 260 & 260 n.25 (5th Cir. 2009)). "Applied to the broader circumstances of a plaintiff's employment and that of his proffered comparator, a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical." *Id.* Thus, "'[s]imilarly situated'" means "'in all *relevant* respects alike.'" *Golden Glow Tanning Salon, Inc. v. City of Columbus*, 52 F.4th 974, 978 (5th Cir. 2022) (quoting *Tex. Ent. Ass'n*, 10 F.4th at 513). "[T]he inquiry is case-specific," *id.*, and, "'similarly situated' is not a requirement susceptible to rigid, mechanical application." *Lindquist v. City of Pasadena*, 669 F.3d 225, 233 (5th Cir. 2012)).

Jones contends that Daly is "a most appropriate comparator" Dkt. 150 at 4. Daly was Jones's immediate predecessor, 1RR176, and she separated from city employment after a disagreement with the City Council. 1RR177–78. There were also allegations of improprieties. *Id.*

Hutto replies that Jones was not similarly situated to Karen Daly. Dkt. 146 ¶¶9–10. Hutto contends that "'[s]imilarly situated' means 'in all relevant respects alike." Dkt. 146 ¶9–10 (citing *Tex. Ent. Ass'n v. Hegar*, 10 F.4th 495, 513 (5th Cir. 2021) and *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). Hutto states Daly and Jones had different supervisors and their separations, which occurred in different years, were carried out by different city attorneys, rendering them unalike. *Id.*

Daly was an appropriate comparator. Jones and Daly held the exact same position—city manager. Daly was city manager immediately before Jones was city manager. 1RR176. Hutto made a severance payment to Daly, *id.* at 177, and Hutto made a severance payment to Jones. She and Hutto had a non-disparagement agreement, *id.*, and Jones and Hutto had a non-disparagement agreement. In fact, Daly was a uniquely appropriate comparator: she bumped heads with the City Council, and she faced allegations of mishandling development projects. *Id.* at 177–78. However, Hutto did not attempt to claw back her severance payment.

Hutto proposes imposing a comparator standard that will be nearly impossible for people serving as city managers or in similar roles to meet. According to Hutto, any time the composition of a city council changes, it is a new body—a body that has no relationship to the previous city council's actions. *See* Dkt. 146 ¶10. In cases like this one, justice would be foreclosed for a municipal employee that suffered unconstitutional discrimination, if a city council's composition changed by even a single member. Hutto's proposed standard has no limiting principle and might extend further: a city council member's *absence* for a vote would suffice to alter a body's

composition to foreclose liability. Alas, this is not how (local) government works; in this country, ordinances passed by city councils remain in effect (unless and until otherwise repealed or enjoined) regardless of the composition of succeeding councils.

There was evidence that the City Council treated Jones differently from *every* other city manager. The evidence the jury saw and heard included an independent, third-party report that examined sixteen severance and settlement payments with former Hutto employees. DX11 (Eide Bailly Report). Hutto did not rescind any of those payments, nor did Hutto attempt to claw back any of them.

The jury also heard former Hutto police chief and former Hutto city manager Byron Frankland's testimony about rescinding the Separation Agreement in which he stated that "[i]t had never been done before." 1RR169. Frankland testified that in thirty years of working with municipalities, he "never heard" of a city going back on a separation agreement. *Id.* at 169–70.

In its Reply, Hutto reminds the court that the jury also heard evidence that Snyder "said that black people are crooks." Dkt. 146 ¶12 (referring to 1RR169). The jury heard that Frankland believed that Snyder's "black people are crooks" statement was connected to the Recission Resolution because Hutto had never rescinded a separation agreement. 1RR169–70. Frankland was asked: "Did you believe there was a connection between the comments Mr. Snyder made [that black people are crooks] and the [Recission Resolution]?" *Id.* at 169. Frankland answered: "Yes. I do believe that was part of why that decision [to pass the Recission Resolution] was made." *Id.*

Hutto contends that Frankland's testimony had "nothing to do with Jones'[s] [Black] race" and in fact that Frankland's testimony "is evidence race was not a but-for cause." Dkt. 146 ¶12. However, the jury heard the testimony and was entitled to draw a conclusion.

The jury also heard from Councilmember Gordon that the City Council amended many contracts but that Hutto never sought to cure the deficiencies in Jones's Separation Agreement. 1RR164.

A reasonable jury could conclude that Jones was treated differently from other city managers. Having heard testimony, observed witnesses, and having had the ability to review, *inter alia*, the Eide Bailly report, the jury was entitled to weigh the evidence and infer that Jones, the only former city manager to have a severance payment clawed back and the only Black city manager in Hutto history, was treated differently because of his race.

ii.  Recission Resolution reasons were pretextual

Hutto asserts that "[t]he Record undisputedly shows that a majority of the CC [*sic*] voted and passed the [Recission] Resolution for the reasons stated in the [Recission] Resolution, close the door on any § 1981 liability." Dkt. 133 ¶9. Jones argues that he showed at trial that Hutto's reasons for passing the Recission Resolution were pretextual. Dkt. 143 at 7. Hutto also argues that Jones did not rebut its purported non-discriminatory reason for passing the Recission Resolution. Dkt. 146 ¶11.

"Once a plaintiff shows pretext, 'No further evidence of discriminatory animus is required because once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation.'" *White v. Patriot Erectors*, No. 1:20-CV-1219-RP, 2023 U.S. Dist. LEXIS 82544, at *8 (W.D. Tex. 2023) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)); *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 147–48 (2000). The showing of pretext alone may often be enough evidence of animus to find racial discrimination. *Laxton*, 333 F.3d at 578 ("once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation . . . ."). "Direct evidence" of discriminatory intent "is

rare in discrimination cases," and plaintiffs typically rely on inferences of discrimination instead, including a showing of pretext. *White*, 2023 U.S. Dist. LEXIS 82544, at *8 (quoting *Rutherford v. Harris Cnty., Tex.*, 197 F.3d 173, 180 (5th Cir. 1999)). The Supreme Court has held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employee was unlawfully terminated." *Reeves*, 530 U.S. at 148.

Hutto contends that it passed the Recission Resolution based on the advice of counsel. Dkt. 146 ¶11.[16] The Recission Resolution and the Bojorquez Letter, which Hutto's counsel sent Jones as a result of the Recission Resolution, stated that the Separation Agreement contained "material unlawful provisions." PX8-A (Dkt. 113-1 at 48) (Recission Resolution); PX11 (Bojorquez Letter). The Bojorquez Letter contained three reasons for pursuing recission of the Separation Agreement. PX11 (Dkt. 113-1 at 52). First, the City Council's minutes did not contain the terms of the Separation Agreement or specifically authorize a Hutto representative to sign the Separation Agreement. *Id.* Second, the severance payment did not comply with overspending provisions in Hutto's charter. *Id.* Third, Jones breached the Separation Agreement by disparaging Hutto. *Id.*

The jury heard from Councilmember Gordon that the City Council was made to feel that it had no choice but to vote to rescind the Separation Agreement because it was legally defective and "couldn't stand on its own." 1RR163. Councilmember Thornton's testimony focused on the Separation Agreement vis-à-vis the budget. He testified that the Bojorquez City Attorney told him, along with the other councilmembers, that the Separation Agreement "was not entered into legally; that the money was not budgeted and allocated for that purpose; and so the money should not have been spent, because it needed to be budgeted and allocated before it could be spent." 1RR181–82.

---

[16] Hutto also says that there was no evidence that its attorneys "were motivated by race." Dkt. 146 ¶11.

The jury also heard the testimony of William Bingham of the law firm McGinnis Lochridge, who stated he has practiced law for fifty-three years. 2RR129. Bingham served as Hutto's city attorney for six years, including when the Separation Agreement was adopted. *Id.* at 13. Bingham drafted the Separation Agreement, and he disagreed with the recitals contained in the Recission Resolution. *Id.* at 135, 146–47. Bingham was asked "was the [S]eparation [A]greement also properly adopted?" *Id.* at146. He answered: "I believe it was." *Id.* Bingham was asked if Hutto followed "all of its ordinary processes to make sure the agreement was properly executed[.]" He answered it did. *Id.* The attorney(s) who advised the City Council ahead of the Recission Resolution vote and drafted the Bojorquez Letter did not testify. The jury was entitled to credit Bingham's testimony.

The jury heard testimony that undermined the budgetary reasons given for passing the Recission Resolution. The Bojorquez Letter and the Recission Resolution stated that Jones's severance payment was not properly budgeted and appropriated, but Snyder could not recall ever discussing whether Jones's severance payment was properly budgeted or appropriated. 3RR93. And Bingham, who was present for the executive session in which the Separation Agreement was considered, was asked if "there [were] any concerns raised at that time [by the City Council] about whether [Hutto] had sufficient money budgeted to pay the severance payment?" *Id.* at 135–36. He did not recall any concerns. *Id.* at 136.

Hutto ignores that its advice-of-counsel argument cuts both ways. The City Council passed a resolution authorizing the Separation Agreement, relying on the advice of counsel. 2RR135–40; *see* 2RR141; *and see* PX7. And the jury heard the testimony of Hutto's former counsel that the Separation Agreement was not problematic. Then the jury heard that Hutto hired *new* counsel that supplied reasons for rescinding the Separation Agreement. That move was something the assistant

city manager with 30 years of experience testified he had never seen. 1RR169. Thus, the jury was presented with conflicting evidence. The jury was entitled to do its job and make credibility determinations. Based on those determinations, the jury could reasonably conclude that the stated reasons for passing the Recission Resolution and sending the Bojorquez Letter were pretexts. And pretext alone may be enough evidence of animus to find racial discrimination. *Laxton*, 333 F.3d at 578.

At trial, Hutto offered new, additional reasons for attempting to rescind the Separation Agreement, but those reasons were called into question as well. Snyder testified that Jones executed contracts illegally without proper authorization or the City Council's knowledge. 3RR81–82. But Snyder was impeached with evidence that the City Council authorized each of the transactions Snyder cited. *See, e.g., id.* Snyder also testified that Jones signed other Hutto employees' transition agreements without authorization. *Id.* at 85. Snyder was again impeached, this time with the Eide Bailly audit, which contained the agreements Snyder alleged Jones signed. *Id.* at 86. Hutto's new reasons for rescinding the Separation Agreement offered at trial were further undermined by former Councilmember Jordan's testimony that: "I think everything that's been accused has been investigated internally, externally, some of them two or three times, and never has there been a finding to my knowledge to this date." 1RR182–83.

Hutto claims that "Jones failed to rebut Hutto's legitimate, non-discriminatory reason for entering into the [Recission] Resolution." Dkt. 146 ¶11. But Jones did not need to rebut Hutto's reason. "It goes without saying that, when a race-discrimination claim has been fully tried, as has this one, this court need not parse the evidence into discrete segments corresponding to a prima facie case, an articulation of a legitimate, nondiscriminatory reason for the employer's decision, and a showing of pretext." *Decorte v. Jordan*, 497 F.3d 433, 437-38 (5th Cir. 2007) (internal

quotations omitted) (citing *Bryant*, 413 F.3d at 476). The testimony of various witnesses, including Mayor Snyder, undermined Hutto's stated reasons.

The court need only determine whether the record contains sufficient evidence for a reasonable jury to have made its ultimate finding that Hutto's stated reasons for passing the Recission Resolution were pretext or that, while true, were only one reason and race was another motivating factor. *See id.* "'There must be more than a mere scintilla of evidence in the record' to prevent judgment as a matter of law in favor of the defendant." *Moss v. Tex. Dep't of Criminal Justice*, No. 05-11403, 2006 U.S. App. LEXIS 16820, at *5 (5th Cir. 2006) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001)). Multiple witnesses' testimony and numerous documents in the Record are more than a mere scintilla. Accordingly, no further evidence of discriminatory animus was required because once Hutto's justification has been eliminated, discrimination may well be the most likely alternative explanation. *See Laxton*, 333 F.3d at 578.

### iii. Councilmembers' racially charged statements & cat's paws

Hutto argues that there was not evidence that a majority of the City Council voted for the Recission Resolution for discriminatory reasons. Yet, the jury also heard evidence that Snyder and Rose were motivated by racial animus, and Jones argues they were the "cat's paws" that influenced at least two other councilmembers' votes for the Recission Resolution.

Jones contends that Snyder harbored racial animus. The jury heard from former assistant city manager Frankland that Snyder said that during his time in Kansas City he "got really good at spotting crooks" which he described as "Black guys that he knew were coming into the store and stealing." 1RR147. Frankland connected Snyder's Black-guys-as-crooks comment to Jones

because Snyder referred to Jones as a "crook" and "shyster" and Snyder and Rose "made comments about 'crooked Odis Jones.'" 1RR163,137–38.

The jury also heard from Snyder himself that he probably "said [Jones] was a crook." 2RR193. Snyder also testified that he was so intimidated by Jones in a meeting that he feared for his physical safety and went to the district attorney's office to press charges against Jones. Snyder testified that "So from the area of town where I grew up in, I'm not used to be people talking to me that way, and I took it as a direct threat to my life." 3RR94–95. The jury also heard Snyder's account be undermined by Gordon, who was present at the meeting and testified that he did not think the interaction was as intense as Snyder said. 3RR146.

During Hutto's cross-examination of Frankland, counsel for Hutto asked: "do you recall—do you think that—that the allegations or comments talking about Mr. Jones as a crook or a shyster or that he was stealing money or statements **in any way, shape, or form were made on the basis of Mr. Jones'[s] race**?" 1RR163 (emphasis added). Frankland replied: "I would say **yes**." *Id.* (emphasis added).

The jury heard that Snyder complained that generally there were "too many minorities in city government . . . ." 1RR151–52. And the jury heard about a media interview in which Snyder and Rose discussed their effort to remove a plaque that featured Jones's name saying they "wanted to remove a dark stain from" Hutto. 1RR146. Indeed, Frankland testified that Rose "was very explicit in [a] council meeting that he wanted to remove any remnant of Odis Jones there." 1RR145–46.

The court is satisfied that the evidence adduced would allow a jury to conclude that Snyder and Rose harbored racial animus. The court proceeds to determine whether their racial animus could have affected at least two other councilmembers' votes for the Recission Resolution.

A plaintiff may support but-for causation using the "cat's paw" theory. *Melvin v. Barr Roofing Co.*, 806 F. App'x 301, 306 (5th Cir. 2020) (unpublished)[17] (citing *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017). "An employer can be held liable for a discrimination claim . . . even if the ultimate decisionmaker himself holds no discriminatory animus as long as the plaintiff can demonstrate that his decision was influenced by another who does hold such animus." *Goode v. Greenstream Int'l*, 751 F. App'x 518, 523 (5th Cir. 2018) (quoting *Fisher*, 847 F.3d at 758) (internal brackets omitted). "Where a plaintiff offers remarks as circumstantial evidence . . . he need only show (1) <u>discriminatory animus</u> (2) on the part of a person that is either primarily responsible for the challenged employment action *or* <u>by a person with influence or leverage over the relevant decisionmaker</u>." *Id.* (quoting *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441-42 (5th Cir. 2012) (internal brackets omitted)) (emphasis added).

"Cat's paw" analysis remains viable in the but-for causation context. *Simmons v. Pac. Bells*, 787 F. App'x 837, 842 (5th Cir. 2019) (citing *Zamora v. City of Houston*, 798 F.3d 326, 331–32 (5th Cir. 2015)).[18] "[E]mployment discrimination claims brought under § 1981 are analyzed under the same evidentiary framework as Title VII claims." *Taylor v. Seton-Brackenridge Hosp.*, 349 F. App'x 874, 877 (5th Cir. 2009) (citing *Roberson v. Alltel Information*

---

[17] An "unpublished opinion is persuasive authority . . . ." *Test Masters Educ. Servs. v. State Farm Lloyds*, 791 F.3d 561, 567 (5th Cir. 2015); *see* USCS Ct App 5th Cir, Loc R 47.5.4 ("opinions issued on or after January 1, 1996, are not precedent . . .").

[18] "A plaintiff asserting a Title VII discrimination claim must show only that the employer's discriminatory motive 'was a motivating factor' for an adverse employment action." *Wantou v. Wal-Mart Stores Tex.*, 23 F.4th 422, 436 (5th Cir. 2022) cert. denied sub nom. *Wantou v. Wal-Mart Stores Tex.*, No. 22-263, 143 S. Ct. 745 (2023) (quoting *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015)). "In *University of Texas Southwestern Medical Center v. Nassar*, however, the Supreme Court clarified that a plaintiff asserting a Title VII retaliation claim must meet a higher standard of causation." *Id.* (internal citation omitted). "Such a plaintiff 'must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.' *Id.* (quoting *Zamora*, 798 F.3d at 331). "In *Zamora*, we confirmed that the Cat's Paw analysis remains viable in the context of the but-for causation required for Title VII retaliation claims." *Id.* (citing *Zamora*, 798 F.3d at 332–33 and *Brown v. Wal-Mart Stores East*, 969 F.3d 571, 577 (5th Cir. 2020)).

*Servs.*, 373 F.3d 647, 651 (5th Cir. 2004)).[19] "The relevant inquiry" the Fifth Circuit applies "in a circumstantial evidence case is whether [the actor holding discriminatory animus] had influence or leverage over [the decisionmaker's] decisionmaking." *EEOC v. DYNMcDERMOTT Petroleum Operations Co.*, 537 F. App'x 437, 443 (5th Cir. 2013) (citing *Laxton*, 333 F.3d at 584).

The jury heard evidence that Snyder and Rose's influence over councilmembers was significant and well known. The evidence included, *inter alia*, testimony that Snyder and Rose attempted to get a person removed from his job for signing a letter supporting Jones, 1RR187; testimony that Snyder and Rose engaged in a campaign of "increasing [] harassment" against other councilmembers and the then-mayor for supporting projects involving Jones that Snyder and Rose opposed,[20] 1RR412; testimony that the "harassment" campaign was "anti-Odis [Jones]." *Id.*

Jones adduced evidence specifically about Councilmember Robin Sutton's shared views with Snyder and Rose. That evidence included that Sutton shared Snyder and Rose's antipathy toward Jones before she joined the counsel. *See, e.g.,* PX8, PX13, PX15, PX40, PX41, PX50, PX71, PX99 & PX131. Sutton was a vocal supporter of Snyder's, and the jury was presented evidence that Sutton voiced her support for Snyder in conjunction with an investigation into Snyder's conduct as a councilmember. PX41 ¶14.L. After joining the City Council,[21] Sutton seconded Rose's motion to approve Snyder as Mayor Pro Tem.[22] PX35 ¶9.2. Sutton also moved

---

[19] A plaintiff asserting a Title VII or § 1981 retaliation claim must meet the higher but-for standard of causation than when alleging discrimination under the same statute. *Wantou*, 23 F.4th at 436 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, (2013)).

[20] The jury also heard testimony that in spite of a financial audit in 2019 and a subsequent forensic audit that were "clean," Snyder and Rose "alleged" that Jones "robbed the City blind" and "had taken money from City coffers . . . ." 1RR143.

[21] Several members of the City Council resigned or did not seek reelection the year Sutton joined the City Council. The jury heard testimony that at least one former councilmember attributed that to people who were "anti-Odis [Jones]" who would show up at meetings and bash councilmembers other than Snyder and Rose to the point that "there was no conducting any type of city business because of [the] public comment [session] and some of the things that . . . that the [anti-Odis] people were alleging." 1RR142.

[22] Sutton voted to approve Snyder as Mayor Pro Tem. PX35 ¶9.2.

to adopt a version of the Recission Resolution (Councilmember Rose seconded Sutton's motion). PX55 ¶10.4. From that evidence, the jury could reasonably infer that Sutton would cast her votes in accordance with Snyder and Rose's positions. This is strong circumstantial evidence that Snyder and Rose had influence over Sutton's votes.

For the City Council to act, a majority vote was required. A majority was four votes. Snyder, Rose, and Sutton are three. Therefore, Jones needed to show at least one more councilmember was influenced by Snyder or Rose. Councilmembers Patti Turner Martinez and Peter Gordon voted for the Recission Resolution. Thus, if there is evidence that Snyder or Rose influenced the vote of either, there was sufficient evidence for a jury to attribute Snyder and Rose's racial animus to a City Council majority that voted for the Recission Resolution.

There was evidence that would allow the jury to conclude that Snyder influenced Gordon. At the September 17, 2020 City Council meeting, Snyder made remarks in which he said: Hutto is "moving in a new direction, if you're on board, that's awesome. . . . Now I'm not saying everyone needs to be perfect, but it's obvious who this is directed at. **Those that it is better get on the bus or move on**." PX35 ¶5.1 (General Comments from City Council) (emphasis added). Gordon volunteered "I'll second that if you need a second []."[23] *Id.* At the same City Council meeting, Gordon voted to approve Snyder as mayor pro tempore. *Id.* ¶9.2.

The jury also heard from Snyder about the influence that he and Rose had over Martinez. Snyder testified that Martinez intended to resign from the City Council, but "We talked her into staying." 3RR74. Martinez was on notice that Jones expressed to the City Council that Snyder "continuously engaged in an effort to create a hostile and intimidating work environment" for Jones, PX62, and that "as the first black City Manager," he was "a target of racist, hateful attacks."

---

[23] The statement did not require a second.

PX67. She voted to enter into the Separation Agreement, but after being "talked into staying" on the City Council, she moved to adopt the original version of the Recission Resolution. PX55 ¶10.4.[24]

The jury was presented evidence that Martinez and Gordon voted to approve the Separation Agreement before voting to rescind it. PX8 ¶13A. Thus, the evidence showed that Martinez and Gordon would have been aware that under the Separation Agreement Jones released his discrimination-related claims against Hutto; would have been aware that the Eide Bailly forensic audit did not conclude wrongdoing on Jones's part; would have been aware of the allegedly racially-based "anti-Odis" campaign; and would have been aware that some councilmembers appeared to discontinue their service on the City Council in part because of the "anti-Odis" campaign. Martinez and Gordon also supported Snyder's efforts to retroactively publish Jones's Separation Agreement online. PX39 ¶15.B. Martinez seconded Snyder's motion to retroactively release all severance agreements and post them to Hutto's website. *Id.* The jury was permitted to draw conclusions based on Martinez's and Gordon's changed positions after Snyder and Rose gained more political support on the City Council.

Additionally, Jones adduced evidence that Snyder wished to replace the McGinnis Lochridge attorneys as Hutto's counsel. PX39 ¶13.E. The Record includes the fact that Snyder moved to direct Hutto staff to issue a request for proposal for new counsel. *Id.* Rose, Gordon, and Martinez voted for Snyder's motion. *Id.*

There was sufficient evidence for the jury to conclude that Snyder and Rose harbored racial animus. And there was sufficient evidence that Snyder and Rose held influence over at least

---

[24] Councilmember Thornton seconded Martinez's motion. *Id.*

two other councilmembers' votes. Thus, racial animus may be attributed to (at least) a four-vote majority of the City Council by a cat's paw theory.

### 2. § 1981 Conclusion

There was ample evidence to support the jury's finding of racial discrimination. Three separate theories support a racial discrimination conclusion: disparate treatment, pretext, and cat's paws.

Hutto argues that the jury could not have concluded that Jones was treated differently than other city managers, urging the court to adopt a near-perfect comparator standard. It is undisputed that Jones was treated differently than all other city managers—all white—in Hutto's history, and there is no perfect comparator. But the law does not require a near-perfect comparator, and the jury was permitted to draw a conclusion based on Hutto's treatment of Jones. It could conclude that Hutto treated Jones differently because of his race.

Hutto's justification for passing the Recission Resolution was the advice-of-counsel argument, which Hutto maintains was not pretextual. However, the reasons given in the Recission Resolution (and Bojorquez Letter) were called into question if not disproved. Where reasons are shown to be pretexts, it is logical that the true motivation is illicit. The jury was entitled to conclude—indeed, it was instructed—that if it found Hutto's reasons to be pretexts, it could infer discrimination.

Finally, the jury was presented with evidence of Snyder and Rose's racial animus. The jury was also presented evidence that Snyder and Rose wielded outsized influence over their fellow councilmembers, including one—Sutton—who was aligned with Snyder and Rose even before she joined the City Council. Thus, the jury was entitled conclude that Sndyer and Rose's racial animus extended to a majority of the City Council through a cat's paw theory.

In sum, there was sufficient evidence that supported three independent theories by which the jury could conclude that Hutto took the actions it did because Jones is Black.

### 3. Breach of Contract Claim

Hutto argues that Jones "has provided no evidence of any disparagement directed by" the City Council. Dkt. 133 ¶32.[25] Jones disagrees, contending that Hutto disparaged Jones by passing the Recission Resolution, Dkt. 150 at 5, and Jones alleges that putting the Recission Resolution on the Hutto's website and on social media furthered the disparagement. Dkt. 143 at 17.

Hutto's argument that the verdict on the breach of the contract claim should be overturned is short and simple. Hutto leads its argument with a definition of the term "disparagement." Dkt. 133 ¶33. Significantly, the definition of "disparagement" Hutto represents as the one in "the Jury charge in this case," *id.*, was <u>not</u> the definition in the Jury Charge. *Compare* Dkt. 112 (Jury Charge) *with* Dkt. 133 ¶33 (Defendant's [Renewed] Motion for Judgment as a Matter of Law). Hutto goes on to say that "[t]here is no evidence causally connecting approval of the [Recission] Resolution with any disparaging comment." Dkt. 133 ¶34. These statements are effectively the "meat" of Hutto's argument that there was no evidence of breach.

The Jury Charge in this case instructed in relevant part that "to prove a breach of contract, Jones must prove: (1) the existence of a contract between Jones and City; (2) the City's failure to perform some or all of its obligations under the contract; and (3) Jones's damages resulting from the City's breach." Dkt. 112 (Jury Charge) at 7. The jury was also provided a definition of disparagement: "'Disparagement' occurs when a person publishes[26] a disparaging false statement

---

[25] Notably, Hutto's argument seemingly is limited to "one of the two alleged discriminatory acts . . . ." Dkt. 133 ¶28.

[26] "'Publication' occurs if the defamatory statements are communicated orally, in writing, or in print to some third person who is 'capable of understanding their defamatory import and in such a way that the third person did so understand.'" *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017) "'[P]ublication' simply requires communication of a defamatory statement to a third person." *Dietrich v. Chambers*, No. 03-18-00846-CV, 2020 Tex. App. LEXIS 8700, at *12 (Tex. App.—Austin Oct. 28, 2020, no pet.) (citing *Exxon Mobil*, 520 S.W.3d at 579; Publish,

about the person, and, when she publishes the statement, she knows the falsity of the statement **or** acts with reckless disregard of whether the statement is false **or** acts with ill will **or** intends to interfere with the economic interests of the other person." *Id.* (emphasis added).[27] The parties worked collaboratively with the court to craft the jury charge. Neither Jones nor Hutto objected to the jury charge.[28]

As Jones points out in his Sur-Reply: "The breach was of course [Hutto's] action in passing the [Recission] Resolution, rescinding Mr. Jones'[s] Separation Agreement and demanding back his severance payment." Dkt. 150 at 5. The Recission Resolution provides *inter alia*: "**WHEREAS, Odis Jones has materially breached** one or more provision [*sic*] of the Separation Agreement including, without limitation, the provision by which he undertook not to disparage the City of Hutto; . . ." PX8 (emphasis after comma added).

The jury also heard that Hutto, acting through the City Council, removed a plaque from its City Containing Jones's name. "Was there [City] Council action around removing that plaque?" Snyder, as Hutto's corporate representative, answered, "Yes." DX67 59:11–23; *see* 1RR145–46

---

Black's Law Dictionary (10th ed. 2014) ("To communicate (defamatory words) to someone other than the person defamed.").

   [27] "'Publication' simply requires communication of a defamatory statement to a third person." *Dietrich v. Chambers*, No. 03-18-00846-CV, 2020 Tex. App. LEXIS 8700, at *12 (Tex. App.—Austin Oct. 28, 2020, no pet.) (citing *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017)).

   [28] "[F]ailing to raise [an objection] at the charge conference," forfeits objection to the charge. *Sonder USA v. 635 N. Scott St.*, No. 22-30360, 2023 U.S. App. LEXIS 26368, at *15 (5th Cir. 2023) (citing FED. R. CIV. P. 51(d); *Jimenez v. Wood Cnty.*, 660 F.3d 841, 845 (5th Cir. 2011) (en banc)). "[A] party's failure to adequately object to a jury instruction means that the party has waived that objection on appeal." *Id.* at *15 n.7 (citing *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 240 (5th Cir. 2014); *Thompson v. Gaar*, 59 F.3d 1240 (5th Cir. 1995)).

   The final charge conference included the following exchange:

> THE COURT: Very good. And just to be real clear—I'm not trying to trick you-all—think like an appellate lawyer. Do you have an objection to this charge that you need to preserve?

> MR. LACKEY [Counsel for Jones]:  No, Your Honor.

> MR. HYDE [Counsel for Hutto]:  No, Your Honor

4RR3.

(Frankland testimony regarding plaque removal).[29] The jury heard Frankland's testimony that he believed Hutto, through the City Council, removed the plaque because Jones's name was on it. 1RR146.

These actions, among others, were sufficient evidence for the jury to conclude that Hutto breached the Separation Agreement's non-disparagement provision. The jury heard Jones's testimony that Hutto's actions affected a potential relationship between Jones and the city of Seguin. 2RR68.

Hutto's undisputed action, through the City Council, causing the enaction of the Recission Resolution enabled the spread of the disparaging information. The Recission Resolution was publicly available because after Hutto passed the Recission Resolution and directed the sending of the Bojorquez Letter, Snyder posted both on his "Mayor of Hutto" Facebook page.[30] 1RR213; 2RR218. The jury also heard testimony that there was City Council action to remove a plaque from Hutto's city hall that bore Jones's name.

*4. Conclusion*

At bottom, Hutto urges the court to be an *ex post* jury and enter its own verdict. Hutto urges that the court isolate pieces of evidence, credit snippets of testimony favorable to it, and write off testimony favorable to Jones. That is not the court's role. Nor is it permissible under the law. The jury's verdict must be afforded great deference, *Pineda*, 360 F.3d at 486, and the court must evaluate the sufficiency of the evidence as viewed in the light most favorable to the verdict and

---

[29] The jury also heard Frankland's testimony that Snyder and Rose "spearheaded" the effort to remove the plaque. 1RR145. Frankland further testified that: "Tanner Rose was very explicit *in the council meeting* that he wanted to remove any remnant of Odis Jones there. And I believe there was a follow-up news story that came in from KVUE where they did interviews with Tanner Rose and Mike Snyder, and, you know, the same question was asked. And the answer that given was 'We wanted to remove a dark stain from the City of Hutto.'" *Id.* at 146 (emphasis added).

[30] While the "Mayor of Hutto" Facebook page is not an official Hutto page nor did the City Council vote to post the Recission Resolution and Bojorquez Letter, the court is troubled by the notion that Hutto's pretextual actions would be disseminated by its mayor, Snyder, seemingly in conjunction with his "anti-Odis" agenda and yet Hutto would argue that it is absolved of any wrongdoing.

draw all inferences in favor of the verdict. Here, reasonable people could differ in their interpretations of the evidence, and the facts and inferences certainly do not point so strongly in favor of Hutto that a rational jury could not have reached a contrary verdict. *See Griggs*, 930 F.3d at 701; *Thomas*, 220 F.3d at 392. Accordingly, the court will not disturb the jury's verdict on either the 42 U.S.C. § 1981 constitutional claim or the breach of contract claim.

### C. DAMAGES

In addition to challenging the jury's findings of liability on Jones's § 1981 and breach of contract claims, Hutto challenges the jury's award of damages to Jones.

#### 1. *Breach of contract damages*

The court concluded that Hutto waived its immunity under Texas Local Government Code § 271.152. *Supra* at 16. Hutto contends that this waiver limits the damages Jones may recover for his breach of contract claim. Dkt. 133 ¶21. Specifically, Hutto contends that Jones may not be awarded consequential damages or attorney's fees. *Id.* Hutto further contends that based on the waiver, the entire damages award must be vacated. *Id.*

For his part, Jones does not address Hutto's argument head-on. *See generally* Dkts. 143 & 150. Jones broadly contends that Hutto "fails to show that the jury actually awarded consequential damages and attorneys' fees for breach of contract." Dkt. 143 at 23. This is correct; however, Texas law imposes limits on damages that may be awarded in breach of contract actions under § 271.152.

Texas Local Government Code § 271.153 provides:

the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to the following:

(1) the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration;

(2) the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract;

(3) reasonable and necessary attorney's fees that are equitable and just; and

(4) interest as allowed by law, including interest as calculated under Chapter 2251, Government Code.

(b) Damages awarded in an adjudication brought against a local governmental entity arising under a contract subject to this subchapter may not include:

(1) consequential damages, except as expressly allowed under Subsection (a)(1);

(2) exemplary damages; or

(3) damages for unabsorbed home office overhead.

TEX. LOC. GOV'T CODE § 271.153(a–b).

The jury was instructed that if it found that Hutto breached a contract, it must consider

damages. The jury was further instructed to consider the following elements of damages:

(1) The difference, if any, between the value of the contract agreed to by the parties and the value of the performance by [Hutto].

(2) Reasonable and necessary expenses incurred by Jones in protecting his reputation and right to payment under the Separation Agreement.

(3) Lost profits that were a natural, probable, and foreseeable consequence of [Hutto's] failure to comply. Damage to credit or reputation that was a natural, probable, and foreseeable consequence of [Hutto's] failure to comply. Do not add any amount for interest on damages, if any.

Dkt. 112 (Jury Instructions) at 11.

Texas law prohibits consequential damages of the nature of jury instruction number 3.

*Compare* TEX. LOC. GOV'T CODE § 271.153(b)(1) *with* Dkt. 112 at 11 #3; *Cherokee Cty.*

*Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade*, 305 S.W.3d 309, 314 (Tex. App.—

Houston [14th Dist.] 2009, no pet.) ("consequential damages 'result naturally, but not necessarily,

from the defendant's wrongful acts'") (quoting *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998)). Thus, Jones could only recover for elements one and two.

Neither party disputes that Jones was paid a $412,000 severance payment, which he has retained. Accordingly, the jury could not have awarded the "difference" between what Hutto actually paid and the value agreed upon by the parties because there was no unpaid difference.

Jones testified that he spent more than $500,000 in legal fees protecting his reputation *and* right to payment under the Separation Agreement. 2RR17. Jones's testimony went uncontested.

Accordingly, the maximum amount of breach of contract damages the jury could have awarded based on the evidence in the record is the $500,000 in legal fees.

Jones contends therefore that "there is no basis for the Court to conclude that any of the excluded damages are included in the jury's contract-damages finding," and goes on that "the general verdict form does not supply any details allowing the Court to ascertain which portion of the award would include" consequential damages.  Dkt. 143 at 23. Jones is correct that the contract-damages finding appeared on a general verdict form. Dkt. 124 (Q4.C). But § 271.153 specifically limits the damages available in a breach of contract action against a municipality. TEX. LOC. GOV'T CODE § 271.153(a–b).

Jones goes on to note—again, correctly—that Hutto did not object to the jury instruction and verdict form. 3RR207–19. After working on the jury charge and verdict form with the parties for hours upon hours, the court shares Jones's frustration regarding Hutto's complaints. And indeed, Hutto forfeited the vast majority arguments regarding the jury instructions. *Cushman*, 897, F. App'x at 30.

But the jury was instructed contrary to the law, warranting reevaluation of the damages award based on the incorrect instruction. *See Harrison v. Otis Elevator Co.*, 935 F.2d 714, 717

(5th Cir. 1991) (if a jury charge misstates the substantive state law, reversal of the judgment may be warranted) (citing *Campbell v. Otis Elevator Co.*, 808 F.2d 429, 431 (5th Cir.1987)).

Here, the maximum recovery that is supported by Texas law and the evidence in the case is Jones's attorney's fees. Jones was entitled to attorney's fees on both his § 1981 claim and his breach of contract claim. Although not required, Jones did not provide evidence specifying for what portion of his attorney's fees stemmed specifically from protecting his contract rights.[31] *See* 2RR17.

Jones acknowledges the concern that the lack of specification could lead to a double recovery. Dkt. 150 at 10. Based on the risk of a double recovery, Jones is willing to remit his $4.5 million contract claim damages award. *Id.*

Because the jury instruction was contrary to the law, and the amount the jury awarded is not supported by the record, Jones's damages could at most be his attorney's fees. Because the jury awarded attorney's fees for Jones's § 1981 claim, and because Jones did not specify what portion of his legal expenses was spent specifically enforcing his contract rights, the breach of contract damages award is excessive enough "to appear contrary to right reason . . . ." *Laxton v. Gap*, 333 F.3d 572, 586 (5th Cir. 2003). Accordingly, Jones's election to remit the entire $4.5 million contract damages award is appropriate. To be clear, to the extent that Jones's § 1981 attorney's fees include attorney's fees for his breach of contract claim, the jury's award is proper because "[a]n exception to the fee-segregation requirement exists 'when the fees are based on claims arising out of the same transaction that are so intertwined and inseparable as to make segregation impossible.'" *Transverse v. Iowa Wireless Servs.*, 992 F.3d 336, 344 (5th Cir. 2021)

---

[31] "An exception to the fee-segregation requirement exists 'when the fees are based on claims arising out of the same transaction that are so intertwined and inseparable as to make segregation impossible.'" *Transverse v. Iowa Wireless Servs.*, 992 F.3d 336, 344 (5th Cir. 2021) (quoting *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017)).

(quoting *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017)); *Church of Scientology v. Cazares*, 638 F.2d 1272, 1290 (5th Cir. 1981) ("where a civil rights claim is made, a successful claimant may also collect attorneys' fees concerning legal actions or counts which come from or arise out of the same nucleus of facts") (collecting circuit cases) (internal quotations omitted).

### 2.  *§ 1981 Damages immunity*

Hutto raises for the first time in its Motion for JMOL "a jurisdictional governmental immunity defense." Dkt. 133 ¶21. Hutto contends that Texas law precludes consequential damages that result from a breach of contract, which requires this court "to vacate the *entire damages award* . . . ." *Id.* (citing TEX. LOC. GOV'T CODE § 271.153(b)(1)) (emphasis added).

The court is not persuaded by Hutto's assertion that § 271.153 bars the entire damages award. As Jones points out, Hutto ignores the limitations explicit in the statute. Section 271.153 limits: "the total amount of money awarded . . . *for breach of a contract subject to this subchapter* . . . [And limits] Damages awarded . . . *under a contract subject to this subchapter* . . . ." TEX. LOC. GOV'T CODE § 271.153(a),(b) (emphasis added).

Moreover, § 271.153 does not create immunity but provides a waiver of immunity where it already exists. "Section 271.158 provides that the Act only waives immunity and does not grant it." *Zachry Constr. Corp. v. Port of Hous. Auth.*, 449 S.W.3d 98, 107 (Tex. 2014); TEX. LOC GOV'T CODE § 271.158 ("Nothing in this subchapter shall constitute a grant of immunity to suit to a local governmental entity."); *see also Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 553 (Tex. 2019) (§ 271.153 "limits 'the total amount of money awarded' . . . to certain categories of damages, along with interest and attorney's fees") (quoting TEX. LOC GOV'T CODE § 271.153(a)).

Hutto cites no authority that § 271.153 extends beyond its terms from a specific class of breach of contract to federal constitutional civil rights torts. The Fifth Circuit is clear that

constitutional torts are just that: torts and not breaches of contract. *Braden v. Tex. A&M Univ. Sys.*, 636 F.2d 90, 92 (5th Cir. 1981) ("Section 1983 liability is imposed for subjecting a person to the deprivation of rights secured by the Constitution and the laws of the United States, not for breach of contract."). Accordingly, the court will proceed to its analysis of Hutto's merits argument regarding constitutional tort damages.

### 2. § 1981 Damages

The jury awarded Jones $8 million in damages for his § 1981 claim.

A "trial court has wide discretion in awarding damages." *Id.* (quoting *Wheat v. United States*, 860 F.2d 1256, 1259 (5th Cir. 1988)). "[C]ompensatory damages awarded under § 1983 [are upheld] 'unless the amount is clearly erroneous or so gross or inadequate as to be contrary to right reason.'" *Benoit v. Bordelon*, 596 F. App'x 264, 269–70 (5th Cir. 2015) (quoting *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994)). "'Physical injury, pain and suffering, personal humiliation, mental distress, and embarrassment' are all compensable under § 1983." *Id.* (quoting *Jones v. Conner*, No. 99-60828, 2000 U.S. App. LEXIS 39423, at *1 (5th Cir. Aug. 13, 2000)). Furthermore, "compensatory damages may be awarded for more than out-of-pocket expenses, including for impairment of reputation, humiliation, or mental anguish." *Oby v. Sander*, 778 F. App'x 326, 327 (5th Cir. 2019) (unpublished) (citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)).

The record contains sufficient evidence to support the jury's § 1981 damages award. The record contains substantial evidence about Jones's earning history. It was undisputed that Jones made nearly $300,000 per year as city manager in Hutto and evidence was adduced that he was earning $250,000 in the same role in Missouri City, Texas.

Thus, based on his age, 51, 1RR195, the jury could make the simple, logical inference that Jones would work for well over another decade before retiring but for Hutto's violation of his rights, yielding $4 to $4.5 million in lost wages (not accounting for inflation, promotions, etc.).

The record also contains evidence supporting the award of damages for *inter alia* reputational impairment, personal humiliation and embarrassment. *See Oby*, 778 F. App'x at 327 and *Benoit*, 596 F. App'x at 269–70. The jury heard from multiple witnesses that for years Jones was called a crook and that he harmed Hutto. *See supra* at 39. Jones testified that Hutto's city website included information that he "was just bad, you know, terrible city manager. All sorts of things that—that just hurt [him] and a career [he] was passionate about." 1RR204. He testified further that "every time [he] either had a job interview or [he] had a conversation, it was always about, hey, what happened to this thing in Hutto? Did you steal money down there? Did you do something illegal down there?" *Id.* at 216–17. Jones testified prior to leaving Hutto, he never was subject to such questions. *Id.* at 217.

It was undisputed that before working for Hutto, Jones worked in significant, high-level roles in Cincinnati, Detroit, and New Jersey. Jones also testified that a representative of Seguin, Texas indicated that "the allegations of misappropriation of funds and signing illegal contracts, that he [the Seguin representative] did not feel comfortable, he [the Seguin representative] felt that I had a bad reputation and I was—I felt angry and upset because I had signed a contract with Hutto not to do that to me and it barred me from an opportunity to provide for my family." 2RR68.

Hutto focuses on a prohibited-double-recovery theory. Dkt. 133¶¶25–26. The jury awarded Jones damages both for his § 1981 claim and for his breach of contract claim. Hutto, quoting but not citing law,[32] contends that because the § 1981 constitutional tort and breach of contract "both

---

[32] Hutto's brief contains uncited quotations. *See, e.g.*, Dkt. 133 ¶25.

seek consequential damages . . . the Jury Verdict is a prohibited double recovery and should be vacated on this basis . . . ." Dkt. 133 ¶26.

Jones responds that he "can recover a broad range of compensatory damages, including lost or diminished earnings and earning capacity, out-of-pocket expenses, personal humiliation, mental distress, embarrassment, and attorneys' fees." Dkt. 143 at 19 (citing cases and citing 42 U.S.C. § 1988).

Hutto's double-recovery argument rests on its assertion—devoid of any supporting law— that damages for the § 1981 constitutional tort claim should be analyzed as if they are a second breach of contract claim. "Section 1983 liability is imposed for subjecting a person to the deprivation of rights secured by the Constitution and the laws of the United States, not for breach of contract." *Braden*, 636 F.2d at 92. Thus, Hutto's position is contrary to the law as "[d]amages awarded under 42 U.S.C. § 1983 are governed by common law tort principles." *Combs v. Holman*, 134 F. App'x 669, 670 (5th Cir. 2005). Section "1983 'creates a species of tort liability' informed by tort principles regarding 'damages and the prerequisites for their recovery.'" *Cty. of L.A. v. Mendez*, 581 U.S. 420, 431 (2017) (quoting *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306, (1986). Thus, "when §1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Id.* (quoting *Stachura*, 477 U.S. at 306).

Indeed, "[d]amage awards premised on more than one theory do not amount to a double recovery 'if the theories of liability arise from two separate and distinct injuries,  and there has been a separate and distinct finding of damages on both theories of liability.'" *Joy Pipe, USA, L.P. v. ISMT Ltd.*, 703 F. App'x 253, 259–60 (5th Cir. 2017) (quoting  *Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72, 80 (Tex. App.—El Paso 1998, pet. denied) (citing *Birchfield v. Texarkana*

*Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987))). But, "[w]here the one-satisfaction rule applies, a plaintiff 'has a right to a judgment on the theory entitling him to the greatest or most favorable relief.'" *Id.* (quoting *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988)).

Because the court concluded that Jones's offer to remit his entire breach of contract damages award, Hutto's double-recovery argument is moot.

### 3. *Maximum recovery rule*

Hutto argues that the "damage awards are excessive under the current federal case law." Dkt. 134 ¶3. Hutto presents no argument regarding the maximum recovery rule in its Motion for New Trial. *See generally* Dkt. 134. But it does provide a cursory two-sentence argument in its Reply. Dkt. 146 ¶24.

"In the Fifth Circuit, courts apply a loosely defined maximum recovery rule when evaluating whether and to what extent a damages award is beyond the maximum possible award supported by the evidence." *Le v. United States*, Civil Action No. 4:22-cv-00147-O, 2023 U.S. Dist. LEXIS 223476, at *11-12 (N.D. Tex. 2023) (quoting *Keyes v. Lauga*, 635 F.2d 330, 336 (5th Cir. 1981)) (quotations omitted)). "Courts are required to make a downward adjustment to a damages award in accordance with the maximum recovery under the rule." *Id.* (citing *Vogler v. Blackmore*, 352 F.3d 150, 156 (5th Cir. 2003)). "Conversely, the rule dictates that courts must decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction. *Id.* (quoting *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002)) (quotations omitted). "The rule allows some leeway, so it permits a verdict at 150% of the highest inflation-adjusted recovery in an analogous, published decision. *Longoria v. Hunter Express*, 932 F.3d 360, 365 (5th Cir. 2019) (citing *Puga v. RCX Solutions*, 922

F.3d 285, 298 n.12 (5th Cir. 2019); *Thomas v. Tex. Dep't of Crim. Justice*, 297 F.3d 361, 369 n.8 (5th Cir. 2002)).[33] But in order to account for the multitude of factual nuances at play across many different cases, the Fifth Circuit has carved out an exception to the rule. "Because the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited if unique facts are present that are not reflected within the controlling caselaw." *Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 739 (5th Cir. 2011) (quoting *Lebron*, 279 F.3d at 326). Where a "case presents unique facts for which there are no controlling cases in the relevant jurisdiction, the maximum recovery rule is not implicated" and the Fifth Circuit "refuse[s] to substitute [its] judgment for that of the jury." *Id.* (citing *Vogler v. Blackmore*, 352 F.3d 150, 158 (5th Cir. 2003)).

Hutto cites one case, *Johnson v. Sw. Rsch. Inst.*, as an analogous published case. Dkt. 146 ¶24. In that case, the plaintiff was awarded $260,000 in compensatory damages. *Johnson v. Sw. Research Inst.*, 384 F. Supp. 3d 722, 726 (W.D. Tex. 2019).

*Johnson* is not remotely analogous. That case involved a woman who sued a *private* entity for sex discrimination related to tuition reimbursements. *Id.* This case involves racial discrimination by a public entity against a prominent, formerly high-ranking official. Accordingly, the court concludes that Jones's recovery is not bound by Hutto's cited case because it is not "factually similar." *See Lebron*, 279 F.3d at 326.

The court found no controlling cases in a relevant jurisdiction that presented similar facts, and the only case Hutto provided was not factually analogous. Accordingly, the maximum recovery rule is not implicated.

---

[33] The "133% multiplier [applies] only in bench trials." *See Thomas*, 297 F.3d at 369 n.8. The 150% multiplier applies to jury trials. *Id.* (citing *Salinas v. O'Neill*, 286 F.3d 827, 831 n.6 (5th Cir. 2002)).

### 4. *Conclusion: § 1981 damages*

Hutto essentially asserts two challenges to the jury's damages award for Jones's §1981 constitutional tort claim. First, Hutto argues that a provision of Texas law waiving immunity in specific breach of contract actions includes a waiver of liability for constitutional torts. It does not. Tex. Loc. Gov't Code § 271.153. Second, Hutto asserts that Jones's §1981 claim and his breach of contract claim are both breach of contract claims and that Jones's cannot recover for both under Texas law. Hutto cites no authority for any part of its position. *See generally* Dkts. 133 & 146. Federal law is clear that deprivations of constitutional rights claims are not breaches of contract. *Braden*, 636 F.2d at 92. Because such claims "are governed by common law tort principles," *Combs*, 134 F. App'x at 670, Hutto's argument that Jones's claims are one-in-the-same fails. Compensatory damages may include a broad range of damages, *see Oby*, 778 F. App'x at 327 and *Benoit*, 596 F. App'x at 269–70, and the record contains evidence to support the jury's award of various damages. Lastly, this damages award in this case is not bound by the maximum recovery rule. Accordingly, Hutto has not carried its heavy burden to disturb the jury's damages award.

### 5. *Attorney's fees*

Hutto argues the "issue of attorney's fees was not for the jury[] and no instruction in the charge or verdict form [sic]." Dkt. 146 ¶21. Jones counters that attorney's fees were properly before the jury and points out that Hutto's assertion that the Jury Charge did not contain an instruction pertaining to legal fees is incorrect. Dkt. 150 at 8–9.

In the context of an action for attorney's fees under § 1988, the Supreme Court has explained that a plaintiff prevails "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Deutsh v. Becerra*, 668 F. App'x 569, 571 (5th Cir. 2016) (quoting

*Lefemine v. Wideman*, 568 U.S. 1, 4 (per curiam)); *see also* 42 U.S.C. § 1988. "Further, [the Fifth Circuit] has consistently acknowledged in civil rights cases 'that a prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances.'" *Id.* (quoting *Dean v. Riser*, 240 F.3d 505, 508 (5th Cir. 2001)).

Title 42 U.S.C. § 1988 provides that in a federal civil rights action "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." See 42 U.S.C. §1988(b). "Where a decision awarding attorneys' fees is adequately supported by the record and the district court has explained  its reasons for the award, there is no abuse of discretion." *Freiler v. Tangipahoa Parish Bd. Of Educ.*, 185 F.3d 337, 348 (5th Cir. 1999) (citing *Strong v. BellSouth Telecomms.*, 137 F.3d 844, 851 (5th Cir.1998)). In *Jimenez v. Wood County, Tex.*, the Fifth Circuit restated the basic procedure and standard for determining attorney's fees:

> The determination of a fees award is a two-step process. First the court calculates the "lodestar" which is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work. The court should exclude all time that is excessive, duplicative, or inadequately documented. Once the lodestar amount is calculated, the court can adjust it based on the twelve factors set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir. 1974). **The court *must* provide a reasonably specific explanation for all aspects of a fee determination**.

621 F.3d 372, 379–80 (5th Cir. 2010) (emphases added) (internal citations and quotation marks omitted).

In short, "[a]lthough an award of attorney's fees, like an award of costs, is committed to the discretion of the trial court and can only be reversed for an abuse of discretion, *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 748 (5th Cir. 1984), the trial court must give reasons for its decisions regarding attorney's fees" to enable meaningful review. *Schwarz v. Folloder*, 767 F.2d 125, 133 (5th Cir. 1985); *Sanchez v. City of Austin*, 774 F.3d 873, 885 (5th Cir. 2014) ("Because

the district court did not conduct any analysis or make any findings as to the reasonableness of Appellants' fee request, we remand this case to the district court with directions to award attorneys' fees, in the first instance, consistent with this court's criteria.")

Here, the only evidence supporting attorney's fees is Jones's testimony. Fifth Circuit precedent is clear that testimony of the type that Jones's provided is insufficient to support an award of attorney's fees. "Nevertheless, the discretion afforded district courts to deny attorney's fees to prevailing plaintiffs under § 1988 is exceedingly narrow," *Sanchez*, 774 F.3d at 878 (citing *Cruz v. Hauck*, 762 F.2d 1230, 1233 (5th Cir. 1985)), and "absent special circumstances, a prevailing plaintiff should be awarded section 1988 fees *as a matter of course*." *Cruz*, 762 F.2d at 1233 (quoting *Kirchberg v. Feenstra*, 708 F.2d 991, 998 (5th Cir. 1983) (emphasis in original)).

Bearing in mind that "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Hopwood v. Texas*, 236 F.3d 256, 277 (5th Cir. 2000). Accordingly, the court will offer Jones the opportunity to remit $500,000 and submit a Rule 54 motion so that the court may conduct a lodestar and *Johnson* factors analysis.

## V.   MOTION FOR A NEW TRIAL

### A.  Legal Standard

"A district court can grant a motion for new trial if the first trial was unfair or if the jury verdict was against the great weight of the evidence." *Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005) (citing *Scott v. Monsanto Co.*, 868 F.2d 786, 789 (5th Cir. 1989)). "If the new trial is granted on evidentiary grounds, the jury's verdict must be 'against the great not merely the greater weight of the evidence.'" *Monsanto*, 868 F.2d at 789 (quoting *Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980)). "Factors militating against new trials in such cases

are simplicity of the issues, the degree to which the evidence was in dispute, and the absence of any pernicious or undesirable occurrence at trial." *Conway*, 610 F.2d at 363.

### B. Analysis

Hutto asserts several grounds for its Motion for a New Trial: (1) the judgment is contrary to the evidence and the law; (2) the jury failed to follow the Jury Instructions; (3) the final judgment awarded was $12.5 million; and (4) Hutto is entitled to a new trial on liability and damages or remitter under Rule 59(a). Dkt. 134 at 2. Hutto's Motion does not necessarily adhere to these four grounds. Further, the court notes that one of the grounds is simply a fact and another a conclusory statement.

Jones points out that Hutto makes many of the same arguments in its Motion for a New Trial that it made in its Renewed Motion for Judgment as a Matter of Law. Dkt. 144 at 1. Jones also contends that Hutto fails to "make 'the strongest of showings'" required for a new trial based on excessiveness. *Id.* at 2–3 (quoting *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983).

#### 1. *"Nuclear" verdict argument*

Hutto first complains that the jury's damage award was the product of a "rogue jury's nuclear verdict fueled by passion or prejudice . . ." and "asserts that the Record of the trial contains no legally sufficient evidence whatsoever to support damages." Dkt. 134 ¶16. Hutto then goes on to make a number of factually inaccurate claims.

Hutto argues that the damages award cannot be supported based on Jones's counsel's comments at a pre-trial hearing. *Id.* Hutto does not provide a citation for the alleged comments. *Id.* More significantly, Hutto provides no authority that the jury was bound to adhere to comments made by counsel at a hearing two weeks prior to trial. *See id.* Nor does Hutto provide authority for

the proposition that a damages award was limited by comments made at a pre-trial hearing. *See id.* This argument merits no further discussion.

Troublingly, Hutto goes on to make easily disproved assertions about jury notes. Hutto claims "the Court received **a number** of jury questions which **repeatedly** sought direction on how to award relief outside the confines of the Jury Instruction." *Id.* ¶17 (emphasis added). This is simply false. The substance of the jury notes was:

- Jury Note 1: election of a foreperson and setting of a schedule (Dkt. 116)
- Jury Note 2: request for the page number where the jury could find where Mike Snyder discussed his experience with Black people and "the term 'crook'" (Dkt. 117)
- Jury Note 3: inquiry regarding the calculation of legal fees (Dkt. 118)
- Jury Note 4: inquiry regarding whether damages could include non-financial damages, specifically whether the jury could require Hutto to reinstall the plaque containing Jones's name that was removed from Hutto's city hall (Dkt. 119)
- Jury Note 5: verdict reached (Dkt. 120)

*One* of the jury notes pertained to non-financial damages. The court responded: "No. You are limited to answering the questions asked." Dkt. 119.  Hutto assented to the court's response, raising no concern about the court's answer. 4RR60. Hutto provides no argument for why one question regard reinstalling a plaque indicated that the jury was "rogue" and the verdict "nuclear."

Hutto also falsely contends that Jones's "counsel's closing argument sought $913,000 as full compensation for the breach of contract and the Section 1981 claim." Dkt. 134 ¶18. Again, Hutto provides no citation to the Record. The court could not find in the transcript an instance of Jones's counsel seeking $913,000 as full compensation. The transcript does contain statements by Jones's counsel outlining a "minimum" amount the jury should consider awarding for the breach of contract claim. 4RR30. Jones's counsel was not cabining the amount the jury should considered and noted: "it's hard to put a number on that." *Id.* Hutto offers no argument or authority for why the jury's damage award should have been limited to Jones's counsel's reference to a minimum amount of damages.

*2.  Double recovery*

Hutto argues—citing no authority—that Jones's § 1981 constitutional tort claim should be treated as a second breach of contract claim. Dkt. 134 ¶20. Hutto contends such a conversion yields a double recovery. *Id.* Because the court believes Jones's voluntary remittitur of the breach of contract damages is appropriate, this argument is moot.

*3.  Standing*

Hutto also makes an argument in its Motion for a New Trial that Jones lacks standing to sue. Dkt. 134 ¶10. Hutto's argument is grounded in its assertion that "one of the two alleged discriminatory acts is the 'publishing' of two letters by the City Attorney and City Manager . . . ." *Id.* ¶24. Hutto then urges the court to "[a]ssume for a moment that the Resolution and the Letters do not constitute a breach of contract. If there was no breach of contract, the case is subject to Rule 12(b)(6) dismissal for failure to state a claim." *Id.* ¶26. The court need not assume, as Hutto's own argument states, those letters were but one *of two* disparaging acts alleged. *Id.* ¶24. As Jones put it "[t]he breach was of course [Hutto's] action in passing the [Recission] Resolution." Dkt. 150 at 5. Thus, even without the letters, Jones alleged a disparaging act. For these reasons and for the reasons stated above, the court is satisfied that Jones has standing to sue. *Supra* at 10, 16.

## VI.  REQUEST TO STRIKE TO JONES'S RESPONSE TO MOTION FOR JMOL

In a footnote in its Reply in support of its Motion for JMOL, Hutto requests that the court strike Jones's Response for failing to included numbered paragraphs and exceeding page limitations without leave of court. Dkt. 146 ¶2n.4. Hutto contends that Jones's approximate three-page unauthorized overage (which included figures) "significantly impaired" Hutto's ability to prepare its Reply. *Id.*

Given the gravity of the issues involved in this case—racial discrimination by a governmental entity—and its post-jury trial posture, the court declines to strike Jones's Response.

## VII.   NOTE ON HUTTO'S BRIEFING

Hutto's Reply in support of its Motion for JMOL includes a request that the court give no weight to any argument in Jones's Response to Hutto's Motion for JMOL. Dkt. 146 ¶2. Hutto complains that Jones's briefing contains insufficient citations to the record, which placed "an undue and inequitable burden on Hutto and this [c]ourt to sift through the trial transcripts and evidence, and then speculate as to whether a piece of testimony or document admitted at trial may, or may not, be the evidence referred to." *Id.* The court had no problem identifying the portions of the record to which Jones referred.

However, the court experienced **significant frustration** with Hutto's briefing. In addition to numerous typos and incomplete or otherwise nonsensical sentences and statements (*E.g.*, "No Evidence of Recoverable Contract the Evidence of Damages Provided," Dkt. 146 ¶17), there were myriad instances of stating legal propositions without citation and inserting quotes without citation. Hutto attempted to file time-barred motions by masquerading them as properly filed pleadings and at one point misquoted the court's Local Rules. Lastly (and perhaps most troublingly), there was more than one instance of Hutto claiming that the Record contained things it did not and urging the court to rule based on its misrepresentations.

Suffice to say, it's a bit rich that Hutto complained of deficiencies in Jones's briefing— deficiencies the court somehow did not encounter. And this is to say nothing of Hutto's contrived arguments and attempts to shoehorn this case into Fifth Circuit precedents without analysis.

## VIII.   CONCLUSION

The court afforded the jury great deference in resolving Hutto's post-judgment motions. Although the jury's verdict presented damages-related issues that required adjustment, at the end of the day the parties had their day in court. Along this litigation's long road, the court reminded the parties more than once that settlement was an option. The parties opted to proceed to a jury trial—where one party would win, and one would lose.

The court understands the root of Hutto's throw-everything-at-the-wall-to-see-what-sticks strategy: it is downright repugnant that a governmental entity, here a fast-growing city, discriminated against a person on the basis of race. Hutto had its day in court. In fact, it had five. Hutto had an opportunity to present its case; to choose its face;[34] to tell its story. Hutto had its chance to persuade a jury. It did not.

## IX.   ORDER

For the foregoing reasons, the undersigned **ORDERS** that:

- Defendant City of Hutto's Rule 12(h)(3) Challenge to the Court's Subject Matter Jurisdiction and Brief in Support of Granting its Renewed Motion for Judgment as a Matter of Law (Dkt. 156) is **DENIED**;

- Defendant City of Hutto's Rule 50 (b) Renewed Motion for Judgment as a Matter of Law, and in the Alternative Rule 59 Motion for New Trial (Dkt. 133) is **DENIED**;

- Defendant City of Hutto's Rule 59 Motion for New Trial (Dkt. 134) is **GRANTED in part and CONDITIONALLY DENIED in part**;
    - o   Defendant Hutto's request for a new trial on liability is **DENIED**;
    - o   Defendant Hutto's request for remittitur is **GRANTED in part** as follows;

---

[34] Hutto selected Mayor Snyder as its corporate representative.

o   Hutto's request for remittitur is **GRANTED** with respect to the damages awarded for the breach of contract claim; commensurate with Plaintiff Odis Jones's offer to remit the entire breach of contract award, Jones **SHALL REMIT** the $4.5 million breach of contract award;

o   With respect to attorney's fees, Hutto's request for remitter is **CONDITIONALLY GRANTED**; Plaintiff Odis Jones **SHALL REMIT** $500,000 of the damages awarded for the 42 U.S.C. § 1981 claim; and **SHALL FILE** within fourteen days of this Order a motion for award of attorney's fees pursuant to Federal Rule of Civil Procedure 54 and in accordance with Local Rule CV-54(b); the motion for attorney's fees shall comport with the lodestar method and incorporate the *Johnson* factors;[35] along with the motion for attorney's fees, Plaintiff Odis Jones shall include a proposed order incorporating specifically a lodestar analysis and analysis of the *Johnson* factors; and

o   Plaintiff Odis Jones is **ORDERED** to state in writing whether he accepts the court's remittitur within ten days of the date of this Order. If Plaintiff Jones agrees to and accepts the remitted damages and procedure for awarding attorney's fees, the court will deny the Motion for New Trial without condition.

SIGNED January 11, 2024.

_____

MARK LANE
UNITED STATES MAGISTRATE JUDGE

---

[35] In the Fifth Circuit, the "lodestar" method is used to calculate reasonable attorney's fees. The "lodestar" analysis involves a two-step procedure. First, the district court must determine the reasonable number of hours expended on the litigation and the reasonable hourly rates for the participating lawyers. Then, the court must multiply the reasonable hours by the reasonable hourly rates. The product is the "lodestar," which the court either accepts or adjusts upward or downward, depending on the circumstances of the case, assessing the factors set forth in *Johnson v. Georgia Highway Express*.